# Exhibit A

- Case Type:
- Civil II
- Case Status:
- Closed
- File Date:
- 02/02/2022
- Action:
- Complaint for Employment Discrimination (Non-MPA) Filed
- Status Date:
- 02/02/2022
- Next Event:

| All Information | Party | Event | Docket | Receipt | Disposition |

## Party Information

**REINHARDT, KYLE**
- Plaintiff

- Disposition
- Disp Date

| Alias |

| Party Attorney |
- Attorney
- BUFFONE, JR, SAMUEL J

**GUIDEHOUSE, INC.**
- Defendant

- Disposition
- Disp Date

| Alias |

| Party Attorney |
- Attorney
- HARDING, JOHN W

**PRICEWATERHOUSECOOPER LLP**
- Defendant

- Disposition
- Disp Date

| Alias |

| Party Attorney |
- Attorney
- SULLIVAN, CARSON H

**CIRKA, KIM**
- Defendant

- Disposition
- Disp Date

| Alias |

| Party Attorney |

## Events

| Date/Time | Location | Type | Result | Event Judge |
|---|---|---|---|---|
| 05/06/2022 09:30 AM | Courtroom 100 | Initial Scheduling Conference-60 | Scheduling Conference Hearing Vacated | |
| 05/13/2022 09:30 AM | Courtroom 100 | Scheduling Conference Hearing | Scheduling Conference Hearing Vacated | |
| 07/22/2022 09:30 AM | Courtroom 100 | Scheduling Conference Hearing | Event Cancelled | |

## Docket Information

| Date | Docket Text | Image Avail. |
|---|---|---|
| 02/02/2022 | Complaint for Employment Discrimination (Non-MPA) Filed  Receipt: 487443  Date: 02/07/2022 | |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 02/02/2022 | eComplaint Filed. Submitted 02/02/2022 11:49. kc.<br>[NO SUMMONS OR INFORMATION SHEET SUBMITTED WITH THIS FILING]<br>Attorney: BUFFONE JR, SAMUEL J (1721688)<br>KYLE REINHARDT (Plaintiff); | Image |
| 02/07/2022 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 05/06/2022   Time: 9:30 am<br>Judge: ROSS, MAURICE    Location: Courtroom 100 | |
| 02/07/2022 | Complaint Package eServed to Filer | Image |
| 02/07/2022 | Initial Summons Requested as to:<br>GUIDEHOUSE, INC. (Defendant); PRICEWATERHOUSECOOPER LLP (Defendant); KIM CIRKA (Defendant); | Image |
| 02/07/2022 | Additional eFiling Document to Initial Summons Requested as to:<br>GUIDEHOUSE, INC. (Defendant); PRICEWATERHOUSECOOPER LLP (Defendant); KIM CIRKA (Defendant); | Image |
| 02/07/2022 | Initial Summons Requested as to:<br>GUIDEHOUSE, INC. (Defendant); | |
| 02/07/2022 | Initial Summons Requested as to:<br>KIM CIRKA (Defendant); | Image |
| 02/10/2022 | Issue Date:  02/10/2022<br>Service:  Summons Issued<br>Method:  Service Issued<br>Cost Per:  $<br><br>GUIDEHOUSE, INC.<br>1200 19th Street, NW Suite 700<br>WASHINGTON, DC   20036<br>Tracking No: 5000239312<br><br>PRICEWATERHOUSECOOPER LLP<br>655 New York Ave NW<br>WASHINGTON, DC   20001<br>Tracking No: 5000239313<br><br>CIRKA, KIM<br>902 Lincoln Ave.<br>FALLS CHURCH, VA   22046<br>Tracking No: 5000239314 | |
| 03/14/2022 | Order Sua Sponte to/for: Reschedule Initial Scheduling Conference Entered on Docket 3/14/2022.  Signed by Judge Ross; E-filed and E-served on parties from Chambers on 3/14/2022. Copies to be mailed. (KR) | |
| 03/14/2022 | Event Resulted:<br>The following event: Initial Scheduling Conference-60 scheduled for 05/06/2022 at 9:30 am has been resulted as follows:<br><br>Result: Scheduling Conference Hearing Vacated<br>Judge: ROSS, MAURICE    Location: Courtroom 100 | |
| 03/14/2022 | Scheduling Conference Hearing<br>Event: Scheduling Conference Hearing<br>Date: 05/13/2022   Time: 9:30 am<br>Judge: ROSS, MAURICE    Location: Courtroom 100 | |
| 03/14/2022 | Order Sua Sponte; Order to Reschedule Initial Scheduling Conference signed by J/Ross on 03/14/2022. submitted 03/14/2022 09:07. mw | Image |
| 03/22/2022 | Joint Stipulation and [Proposed] Order Regarding Briefing Schedule for Defendants' Motion to Compel Arbitration and to Stay Filed. submitted 03/22/2022 20:40. mw<br>Attorney: SULLIVAN, CARSON H (488139)<br>KYLE REINHARDT (Plaintiff); GUIDEHOUSE, INC. (Defendant); PRICEWATERHOUSECOOPER LLP (Defendant); KIM CIRKA (Defendant);  Receipt: 490321  Date: 03/25/2022 | Image |
| 03/22/2022 | Additional eFiling Document to Joint Stipulation and [Proposed] Order Regarding Briefing Schedule for Defendants' Motion to Compel Arbitration and to Stay  Filed. submitted 03/22/2022 20:40. mw<br>Attorney: SULLIVAN, CARSON H (488139)<br>KYLE REINHARDT (Plaintiff); GUIDEHOUSE, INC. (Defendant); PRICEWATERHOUSECOOPER LLP (Defendant); KIM CIRKA (Defendant); | Image |
| 03/29/2022 | Order Granting Joint Stipulation and Order Regarding Briefing Schedule for Defendants' Motions to Compel Arbitration and to Stay Entered on the Docket 3/292/2022.  Signed by Judge Ross; E-filed and E-served on parties from Chambers on 3/29/2022. Copies to be mailed.  (KR) | |
| 03/29/2022 | Event Resulted:<br>The following event: Scheduling Conference Hearing scheduled for 05/13/2022 at 9:30 am has been resulted as follows:<br><br>Result: Scheduling Conference Hearing Vacated<br>Judge: ROSS, MAURICE    Location: Courtroom 100 | |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 03/29/2022 | Scheduling Conference Hearing<br>Event: Scheduling Conference Hearing<br>Date: 07/22/2022   Time: 9:30 am<br>Judge: ROSS, MAURICE   Location: Courtroom 100 | |
| 03/29/2022 | Order Granting Joint Stipulation and Order Regarding Briefing Schedule for Defendants' Motion to Compel Arbitration and to Stay, Signed by J/Ross on March 29, 2022 Filed. Submitted 03/29/2022 14:52. DM | Image |
| 04/01/2022 | Defendant Price Water House Coopers LLC's Motion to Compel Filed. Submitted 04/01/2022 16:35. ta<br>Attorney: SULLIVAN, CARSON H (488139)<br><br>PRICEWATERHOUSECOOPER LLP (Defendant);  Receipt: 490826  Date: 04/05/2022 | Image |
| 04/01/2022 | Defendant Price Water House Coopers LLC's Motion to Compel Filed. Submitted 04/01/2022 16:35. ta<br>Attorney: SULLIVAN, CARSON H (488139) | Image |
| 04/01/2022 | Defendant Guidehouse INC.'s Motion To Stay And To Compel Arbitration Filed. Submitted 04/01/2022 17:57PM. PD<br>Attorney: HARDING, JOHN W (1028734)<br><br>GUIDEHOUSE, INC. (Defendant);  Receipt: 490843  Date: 04/05/2022 | Image |
| 04/01/2022 | Notice of Appearance Filed. Submitted 04/01/2022 17:25. ta<br>Attorney: HARDING, JOHN W (1028734)<br>GUIDEHOUSE, INC. (Defendant); | Image |
| 04/01/2022 | Notice of Appearance Filed. Submitted 04/01/2022 17:33. ta<br>Attorney: HARDING, JOHN W (1028734)<br>GUIDEHOUSE, INC. (Defendant); | Image |
| 04/01/2022 | Disclosure Statement Filed. Submitted 04/01/2022 17:45. ta<br>Attorney: HARDING, JOHN W (1028734)<br>GUIDEHOUSE, INC. (Defendant); | Image |
| 04/01/2022 | Defendant Kim Cirka's Motion To Stay And To Compel Arbitration Filed. Submitted 04/01/2022 19:25PM. PD<br>Attorney: MOLSTER III, Mr CHARLES B B (386821)<br><br>KIM CIRKA (Defendant);  Receipt: 490862  Date: 04/05/2022 | Image |
| 04/01/2022 | Additional eFiling Document to Defendant Kim Cirka's Motion To Stay And To Compel Arbitration Filed. Submitted 04/01/2022 19:25PM. PD<br>Attorney: MOLSTER III, Mr CHARLES B B (386821) | Image |
| 04/21/2022 | Notice Of Voluntary Dismissal Without Prejudice Filed. Submitted 04/21/2022 16:51PM. PD<br>Attorney: BUFFONE JR, SAMUEL J (1721688)<br>KYLE REINHARDT (Plaintiff); | Image |
| 04/22/2022 | Plaintiff Kyle Reinhardt's Consolidated Statement of Points and Authorities in Opposition to Defendants Guidehouse's and Kim Cirka's Motions to Compel Arbitration and to Stay Filed. Submitted 04/22/2022 15:31. DM<br>Attorney: BUFFONE JR, SAMUEL J (1721688)<br>KYLE REINHARDT (Plaintiff); | Image |
| 04/26/2022 | Event Resulted:<br>The following event: Scheduling Conference Hearing scheduled for 07/22/2022 at 9:30 am has been resulted as follows:<br><br>Result: Event Cancelled<br>Judge: ROSS, MAURICE   Location: Courtroom 100 | |
| 04/26/2022 | Dismissed by Plaintiff per Praecipe Filed | |

## Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|----------------|--------------|---------------|----------------|
| 487443 | 02/07/2022 | BUFFONE JR, SAMUEL J, Attorney | $120.00 |
| 490321 | 03/25/2022 | SULLIVAN, CARSON H, Attorney | $20.00 |
| 490826 | 04/05/2022 | SULLIVAN, CARSON H, Attorney | $20.00 |
| 490843 | 04/05/2022 | HARDING, JOHN W, Attorney | $20.00 |
| 490862 | 04/05/2022 | Charles Molster | $20.00 |
| Total | Total | Total | Total $200.00 |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Dismissed-by Plaintiff per Praecipe Filed | 04/21/2022 | |

**Filed**
**D.C. Superior Court**
**02/02/2022 11:49AM**
**Clerk of the Court**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008,

          Plaintiff,

   v.

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC 20036,

PricewaterhouseCooper LLP
655 New York Ave NW
Washington, DC 20001,

Kim Cirka
902 Lincoln Ave.
Falls Church, VA 22046,

          Defendants.

Civil Action No. 22-cv-XXXX

COMPLAINT
FOR VIOLATIONS OF:

D.C. Code § 2-1401, *et seq.;*
D.C. Code §§ 32-1301, *et seq.;*
And common law

## Table of Contents

I.      Introduction ................................................................................................................ 1

II.     Parties ........................................................................................................................ 4

III.    Jurisdiction and Venue .............................................................................................. 5

IV.     Defendants' Sexual Harrassment and Assault of Reinhardt ...................................... 5

   A.   Cirka Kisses Reinhardt's Girlfriend at Sorriso Bistro ........................................ 8

   B.   Cirka Sexually Harasses Reinhardt at Iron Gate Bar .......................................... 9

   C.   Cirka Sexually Harasses Reinhardt and is Ejected From Columbia Room for Intoxication 10

   D.   Bradley Assaults Reinhardt's Girlfriend ........................................................... 11

   E.   Cirka Fondles a Business Partner's Breasts at the St. Regis Hotel .................... 12

   F.   Cirka Sexually Harasses Reinhardt at Buck's Fishing and Camping ................ 13

   G.   Cirka Sexually Assaults Reinhardt .................................................................... 14

   H.   Cirka Encourages Reinhardt to Provide Male Attention to a Government Official ......... 16

   I.   Cirka Licks Reinhardt's Friend's Face .............................................................. 18

V.      Defendants' Unjustified Retaliation, Failure to Promote, and Baseless Termination ....... 19

VI.     Defendants' Breach of Employment Agreement and Unenforceable Non-Solicitation
Agreement ......................................................................................................................... 23

   A.   Failure to Pay Severance ................................................................................... 23

   B.   Non-Solicitation as to U.S. Department of Veterans Affairs Void for Public Policy ...... 23

VII.    Claims against PWC ................................................................................................ 24

VIII.   Claims For Relief ..................................................................................................... 24

## I.   __INTRODUCTION__

1.      Kyle Reinhardt served 20 years in the United States Air Force, retiring in 2012 with the rank of Lieutenant Colonel. After he retired, Reinhardt hoped to use the skills he learned in the Air Force and his degrees from Yale and Harvard to build a successful career as a consultant on federal contracts. He went to work for PricewaterhouseCoopers LLP (PWC) in their public service sector (PWC PS). PWC's public service sector was spun out into a new company, Guidehouse, Inc., in 2018. For purposes of this Complaint, Guidehouse refers to both Guidehouse, Inc. and its predecessor, PWC PS.

2.      In 2012, Guidehouse also acquired the Ray Group, and along with it, Kim Cirka. Reinhardt did not know at the time, but this would lead to years of harassment, sexual battery, and ultimately retaliation and termination.

3.      In 2015, Reinhardt began reporting to Cirka. Because of Reinhardt's military service, Cirka was more senior at the company but 4-5 years younger than Reinhardt. As Reinhardt would soon learn, Cirka developed an unhealthy infatuation with Reinhardt. She was also a drunk. And whenever she got drunk around Reinhardt, she would seek his attention to try to satisfy her sexual desire.

4.      Over the ensuing years, Cirka regularly subjected Reinhardt to harassment and inappropriate advances, including drinking to excess, rubbing his legs and shoulders, and sitting in his lap without consent. Cirka also regularly acted out in front of Reinhardt to seek his attention, making repeated unwanted sexual advances, harassing Reinhardt's girlfriends, fondling a woman's breasts without her consent, and sexually licking Reinhardt's friend's face.

5.      In June 2017, after pressuring Reinhardt to engage in a sexual relationship for two years without success, Cirka sexually assaulted Reinhardt. While intoxicated, Cirka exposed Reinhardt's penis and attempted to perform oral sex on him. After a moment of shock because

his boss was assaulting him, Reinhardt pulled away from Cirka. Reinhardt has and continues to suffer from this traumatic event.

6.     In the months and years following the assault, Cirka continued to sexually harass Reinhardt and pushed Reinhardt to engage in sexual conduct with others. Specifically, she encouraged Reinhardt to give "male attention" to a female government official in order to help Guidehouse secure more business.

7.     Cirka's sexual harassment was all part of a culture she and Guidehouse colleagues cultivated of excessive drinking and sex. Cirka would brag about her sexual exploits in the office and encourage others to do so as well. She engaged in a sexual relationship with her subordinate, Paul Bradley, then a Director at Guidehouse. Bradley engaged in a separate sexual relationship with one of his subordinates, a female friend of Cirka. This freewheeling sexual culture was epitomized when Bradley sexually assaulted Reinhardt's girlfriend by penetrating her anus with his finger. When Reinhardt reported Bradley for inappropriate behavior, including Bradley's inappropriate relationship with his subordinate, Cirka did nothing.

8.     Cirka was supported and encouraged by Guidehouse's own culture. First, Cirka's harassment only started when she became the leader of the VA healthcare account, the precursor to her becoming an equity partner, solidifying her place in the company's hierarchy. Second, as a consulting firm, Guidehouse's business was primarily built on relationships. Guidehouse built these relationships through dinners and drinks. Therefore, when Cirka suggested Reinhardt drink with her, it was not merely a friendly invitation, it was a job requirement. Reinhardt had to either drink with Cirka and endure the harassment that went along with it or hurt his ability to advance in his career at Guidehouse.

9.      Reinhardt's career was tied to Cirka. As the partner overseeing his work, Reinhardt could not advance at Guidehouse without Cirka's support. Cirka made clear that to have that support, Reinhardt would need to go along to get along and "play the game." Further, he could not end her harassment but would need to keep any inappropriate behavior "in the family." The message to Reinhardt was clear: either get in line or Cirka would end his career.

10.      Reinhardt helped Guidehouse obtain one of its largest contracts, securing a lucrative government contract with the United States Department of Veterans Affairs (VA) to help modernize the VA. As a healthcare planning professional and a Veteran dedicated to improving access and care for fellow Veterans, working on this contract was one of his life goals. The contract had been in development and out to bid throughout Cirka's repeated harassment. The hope of working to help modernize the VA helped Reinhardt preserve.

11.      Guidehouse obtained this contract at the same time Reinhardt stopped playing Cirka's game. Cirka then started to retaliate against Reinhardt. She first did so professionally, using the contract to torpedo Reinhardt's reputation in the industry, casting him as a lower-level employee and limiting his interactions with key high-level government contacts in favor of non-expert "yes-person" staff.

12.      Next, Cirka and Guidehouse manufactured a reason to be rid of Reinhardt for good. This retaliation culminated when, despite Reinhardt's 9-year sterling record and professional successes, they failed to promote Reinhardt to partner, then placed Reinhardt on a pretextual performance improvement plan (PIP). Reinhardt received no guidance or achievable means to improve. Sixty days later, the minimum amount of time after instituting the PIP, Guidehouse fired Reinhardt, as the company planned from the start.

13.     The retaliation did not stop there. Despite clear language in his employment contract requiring Guidehouse to pay three months' salary as severance, Guidehouse refused, and instead tried to leverage that severance to pressure Reinhardt to legally release Guidehouse of any claims against it, including the sexual assault, discrimination, harassment, and retaliation.

14.     Further, Guidehouse continues to punish Reinhardt by hurting his future job prospects. Guidehouse is attempting to enforce the employment contract while not paying the required severance by enforcing the contract's non-solicitation provision. This enforcement is particularly problematic as it restricts the United States' ability to select the most able contractor. Guidehouse has told Reinhardt that he is prohibited from soliciting the Department of Veterans Affairs for two years. This attempted prohibition is clearly improper and void for public policy reasons.

## II.   PARTIES

15.     Kyle Reinhardt is a highly educated military veteran who was subjected to repeated harassment and assault by Cirka and Guidehouse. He is a resident of the District of Columbia.

16.     Guidehouse, Inc. is an international consulting company headquartered in McLean, Virginia. All client services professionals were assigned to Washington, D.C., at 1730 Pennsylvania Ave.

17.     Kim Cirka is a partner at and equity holder of Guidehouse who leads Guidehouse's public sector healthcare practice. Cirka is a resident of Virginia.

18.     PricewaterhouseCoopers LLP is the U.S. arm of a multinational professional service firm. PricewaterhouseCoopers LLP is headquartered in New York, New York.

### III.   JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Defendant Guidehouse because it is subject to the jurisdiction of the courts of the District of Columbia, both because it maintains its principal place of business in the District of Columbia and because Plaintiff's claims arise out of Defendant Guidehouse's conduct of business in the District of Columbia. D.C. Code §§ 13-422, 13-423.

20.     This Court has personal jurisdiction over Defendant PWC because it is subject to the jurisdiction of the courts of the District of Columbia, both because it regularly transacts business in the District of Columbia and because Plaintiff's claims arise out of Defendant PWC's conduct of business in the District of Columbia. D.C. Code §§ 13-422, 13-423.

21.     This Court has personal jurisdiction over Defendant Cirka because she is subject to the jurisdiction of the courts of the District of Columbia, both because she works in the District of Columbia and because Plaintiff's claims arise out of Defendant Cirka's conduct in the District of Columbia. D.C. Code §§ 13-422, 13-423.

22.     Venue is proper in this District because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted business within this District. Moreover, Plaintiff and numerous other witnesses reside in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

23.     Plaintiff filed a timely charge with the District of Columbia Office of Human Rights on October 14, 2021. Reinhardt withdrew his charge on February 2, 2022.

### IV.   DEFENDANTS' SEXUAL HARRASSMENT AND ASSAULT OF REINHARDT

24.     Reinhardt graduated from Yale with a degree in Architecture. After college, Reinhardt joined the U.S. Air Force as a commissioned officer. In the Air Force, he served

twenty years, primarily as a healthcare architect/engineer, healthcare planner, capital infrastructure portfolio expert, and finally as a senior health policy advisor in the Office of the Assistant Under Secretary of Defense for Health Affairs. While in the Air Force, he earned a master's degree in Urban Planning from Harvard University's Graduate School of Design and Kennedy School of Government. Reinhardt was promoted repeatedly, eventually attaining the rank of Lieutenant Colonel. He was deployed to Dhahran, Saudi Arabia in support of Desert Shield and Operation Northern Watch, where he experienced the high stress of supporting active military operations. Reinhardt received numerous medals and commendations, including the Defense Meritorious Service Medal.

25.     While in the Air Force, Reinhardt was taught to respect authority and his superiors. He also learned how to stay calm and focused in any situation, even if the situation was traumatizing.

26.     When Reinhardt retired from the military in 2012, he knew he wanted to go work for a government contractor where he could utilize his specialized knowledge of government healthcare. He joined Guidehouse, then PWC PS, in order to meet this goal.

27.     Reinhardt soon observed that Guidehouse had a work hard, play hard culture. As a government contractor, its business was based on building and developing good relationships with both the government and potential teaming partners – other government contractors who could serve as subcontractors to Guidehouse or vice versa.

28.     These relationships were often greased by food and alcohol. Therefore, dinner and drinks were a regular part of Reinhardt's job at Guidehouse. At least once a month, and often more frequently, Guidehouse would host open tabs at local bars for 30-40 employees and teaming partners.

29.     In 2015, Guidehouse fired the partner to whom Reinhardt then reported. Reinhardt then began reporting to Kim Cirka, who was made a partner soon after.

30.     Cirka joined Guidehouse in 2012 as part of Guidehouse's purchase of the Ray Group International, LLC. Bradley also joined through the Ray Group acquisition.

31.     As a partner, Cirka acted on behalf of Guidehouse. As the partner overseeing Reinhardt, Cirka's requests were requirements of Reinhardt's job. When Cirka suggested drinks or dinner, Reinhardt knew he had to attend in order to have a successful career at Guidehouse.

32.     Cirka embodied the work hard, play hard culture of Guidehouse. She developed relationships for Guidehouse through drinking and socializing. She encouraged her team to engage in similar activities.

33.     For example, Cirka kept alcohol in her desk, including wine and hard liquor, and would sometimes encourage others to drink in the office with her. At least weekly, she would suggest drinks after work. Reinhardt always felt obligated to attend, as Cirka made clear that drinking with her was necessary to become part of her trusted inner circle and advance at Guidehouse.

34.     Her mottos were "it's all in the family" and "just play the game," implying that her team was expected to follow her alcohol-fueled sexual conduct and that, as long as her team played along, she would protect them, and herself, from any repercussions.

35.     Cirka almost immediately latched onto Reinhardt, a good-looking, social man around her age. She began using Reinhardt for his social rolodex, asking for his recommendations on where to entertain her team and teaming partners and always encouraging him to join.

36.     It quickly became clear that her interest was more than a boss getting to know her new team member. Instead, she was infatuated with Reinhardt, tried to indoctrinate him into her freewheeling drinking and sexual culture, and jealously harassed his girlfriends, giving them unsolicited relationship and sex advice. She would also repeatedly act out to gain Reinhardt's attention, probe Reinhardt about his sex life, and share intimate details about her sex life.

### A.  Cirka Kisses Reinhardt's Girlfriend at Sorriso Bistro

37.     Sometime in 2015, not long after Cirka became Reinhardt's boss, Reinhardt and Cirka came from a work event to a dinner with Reinhardt's then girlfriend, Paige Boddie, at Sorriso Bistro in Washington, D.C.

38.     Cirka had previously had lunch with Boddie. At the time, Boddie had recently finished business school and was considering her job opportunities. At the lunch, Cirka made numerous overly familiar comments to Boddie about Reinhardt, including that "you can't control Kyle." Boddie felt Cirka viewed Reinhardt more as a potential boyfriend than an employee. She and Reinhardt later discussed how Cirka acted in a way that was creepy, and in particular, creepy toward Reinhardt.

39.     As the evening went on, Cirka consumed an excessive amount of alcohol and was visibly very drunk by the end of the night. In her intoxicated state, Cirka's inhibitions disappeared, and she began acting aggressively to gain Reinhardt's attention.

40.     Cirka spent the night flirting with Reinhardt, making sexual comments and inappropriately touching him. Cirka repeated and expanded on her comments to Boddie, noting that Reinhardt was hard to control, implying that she viewed Reinhardt as a potential sexual partner.

41.     Cirka also acted inappropriately with Boddie. At one point, Boddie and Cirka both needed to use the bathroom. The restrooms were single toilet rooms meant for one person.

When the restroom opened up, Cirka pressured Boddie to use the restroom together, despite the fact that Cirka was Boddie's boyfriend's boss and had only met Boddie once before.

42.     Later in the night, Cirka began dancing and encouraged Boddie to dance with her. Sorriso is a low-key sit-down Italian restaurant where patrons do not normally dance. While dancing, Cirka kissed Boddie on the lips in a sexual manner. Boddie neither consented nor encouraged the sexual touching by Cirka. This was the start of Cirka's practice of acting out in front of Reinhardt's girlfriends in order to seek his attention, making inappropriate sexual comments, and trying to intimidate his girlfriends with overly familiar comments and suggestions.

43.     Despite her excessive drinking, Cirka drove herself home, later stating that she had to sit and wait in her car for hours to sober up.

**B.  Cirka Sexually Harasses Reinhardt at Iron Gate Bar**

44.     Reinhardt started dating a new woman, Jenn Larsen. By this point, Reinhardt knew that Cirka required a close personal relationship with her employees in order for them to advance at Guidehouse. Additionally, Cirka had begun to express a keen interest in Reinhardt's dating life.

45.     On or about December 17, 2015, Reinhardt invited Larsen to join a dinner with Cirka at the Iron Gate Bar in Washington, D.C. Cirka again consumed an excessive amount of alcohol, became visibly intoxicated, and once again began harassing and propositioning Reinhardt.

46.     Cirka made continuous sexual advances toward Reinhardt throughout the dinner. She repeatedly touched his shoulders and legs and made sexually suggestive comments. Cirka attempted to imply to Larsen that Cirka was in a sexual relationship with Reinhardt. Cirka's actions were so inappropriate for a boss that Larsen thought Reinhardt must have been joking

when he stated Cirka was his boss. Reinhardt remained stoic throughout the night, attempting to endure the harassment without harming his potential to advance at Guidehouse.

### C. Cirka Sexually Harasses Reinhardt and is Ejected From Columbia Room for Intoxication

47.     On or about April 9, 2016, Reinhardt attended a business dinner with Cirka and Summer Worden, a senior executive at a government contractor with whom Guidehouse hoped to do more business. After dinner, Cirka insisted they continue the night at a nearby bar and so Reinhardt, Cirka, and Worden went to Bar a Vin located in Washington, D.C. Reinhardt felt obligated to join.

48.     Cirka was already intoxicated from dinner and became more intoxicated at Bar a Vin. In her intoxicated state, Cirka once again began harassing and making sexual advances towards Reinhardt. In her intoxicated state, she turned her harassment onto an unknown woman who was alone at the bar, once again acting out to gain his attention. This harassment continued to escalate, and Reinhardt became increasingly uncomfortable.

49.     Reinhardt felt trapped. He did not want to be around an intoxicated Cirka, but he knew he had to develop a relationship with Worden to advance his career. He also knew that leaving the bar while Cirka was enjoying herself would negatively impact his working relationship with Cirka and jeopardize his future at Guidehouse.

50.     Reinhardt once again tried to stoically endure Cirka's harassment without jeopardizing his career. But, because Cirka was harassing others and not just him, Reinhardt needed help and called Larsen. Not knowing what to do, Larsen suggested a change of venue could defuse the situation and salvage the relationship with Worden. Reinhardt and Larsen therefore suggested the group go to the Columbia Room, a subdued and exclusive Washington, D.C. speakeasy where Larsen knew the owner and staff.

51.     At the Columbia Room, Cirka became even more intoxicated and began making sexual advances toward Reinhardt. She eventually sat on Reinhardt's lap without Reinhardt's consent. Reinhardt quickly removed her from his lap.

52.     Reinhardt felt even more trapped. He could not aggressively confront Cirka about her inappropriate behavior for fear she would retaliate and his future at Guidehouse would be ruined. But he would not relent to her sexual desires.

53.     Cirka's alcohol consumption was so excessive, and her behavior became so inappropriate, that she was cut off by the bar's management and kicked out of the establishment.

54.     The next day, Reinhardt raised with Cirka that her behavior had been inappropriate. But Reinhardt's fears were confirmed. Cirka brushed off Reinhardt's comment, making clear that if he wanted to advance at Guidehouse, he had to "play the game."

### D. Bradley Assaults Reinhardt's Girlfriend

55.     On or about July 13, 2016, Reinhardt met Cirka and Bradley for a Guidehouse business team meeting over dinner at Martin's Tavern in Washington, D.C. Larsen, Reinhardt's girlfriend, joined after the dinner ended. After dinner, Cirka suggested they continue the night. In order to try to contain Cirka's drinking and behavior and provide an easy end to the night, Reinhardt suggested a drink at his apartment. Larsen had been socializing with Bradley throughout the evening in a non-sexual way.

56.     After the drink, they all went to leave the apartment. Bradley approached Larsen to give her a hug. During the hug, he lifted up her dress, pulled aside her underwear, and inserted his finger into her anus. He then walked away without saying anything. Larsen was shocked and got the impression that Bradley had done this before.

57.     At the time, Bradley was more senior than Reinhardt and acted as Cirka's second in command—a member of her trusted inner circle.

58.     On or about the next day, Reinhardt approached Cirka and reported that Bradley had acted extremely inappropriately and was a high risk to Guidehouse given his actions. At this time, Reinhardt also reported that Bradley was engaged in an inappropriate sexual relationship with his subordinate. Cirka brushed off Reinhardt's concerns.

59.     Reinhardt's fear that misbehavior was not only tolerated but encouraged at Guidehouse was reinforced by Cirka's response. Her response made clear that Reinhardt had to keep issues "all in the family" and "play the game" to advance at Guidehouse.

60.     Upon information and belief, Cirka took no actions at the time to address Bradley's behavior or discipline Bradley.

61.     Later in 2016, Reinhardt was riding in a car share SUV taxi with Bradley and Cirka. Reinhardt was riding in front of Bradley and Cirka, who were in the back of the SUV. Reinhardt saw Bradley and Cirka kissing aggressively and heard noises that indicated they were engaged in additional sexual activity. The next day, Cirka told Reinhardt that Bradley had slept at her home, implying they had engaged in sexual intercourse.

### E.   Cirka Fondles a Business Partner's Breasts at the St. Regis Hotel

62.     On or about March 24, 2017, Reinhardt, Cirka, Andrew Kane, a manager at Guidehouse, and Kim Burke, a principal at the Craddock Group, had a meeting at the St. Regis Hotel Lounge in Washington, D.C. about a contract the Craddock Group and Guidehouse were pursuing together.

63.     Once again, Cirka became overly intoxicated. Once again, Cirka began her harassment. Cirka first directed her behavior towards Burke and made numerous unsolicited sexual comments directed at Burke. Then, after consuming alcohol to excess, Cirka walked behind Burke, rubbed Burke's shoulders, and moved both hands down to Burke's breasts, fondling them in front of Reinhardt and Kane.

64.     Unsure of what to do, Reinhardt and Kane discussed the situation and decided to try to separate Cirka from Burke. Reinhardt felt trapped. He once again called on Larsen and asked her to join to help control Cirka.

65.     After Larsen arrived, Cirka switched her attention from Burke to Larsen. Cirka steered the conversation to Larsen's relationship with Reinhardt, including unsolicited advice and comments about Larsen and Reinhardt's sex life. The topic made Larsen uncomfortable, and the comments were inappropriate for her boyfriend's boss to make. But Larsen knew the relationship with Cirka was important to Reinhardt and his career at Guidehouse. Like Reinhardt, she was trapped.

**F. Cirka Sexually Harasses Reinhardt at Buck's Fishing and Camping**

66.     On or about June 6, 2017, Reinhardt, Larsen, Cirka, and Scott Guermonprez, a high-level government official at the VA Medical Center with whom Reinhardt was friends from his time in the Air Force, had dinner at Buck's Fishing and Camping restaurant in Washington, D.C. The purpose of the meeting was for Reinhardt to introduce Cirka to Guermonprez to help develop relationships that could assist Guidehouse secure additional government contracts.

67.     Cirka once again consumed an excessive amount of alcohol. With her alcohol consumption, she once again started harassing and sexualizing Reinhardt.

68.     She made numerous sexual comments directed at Reinhardt. She also inappropriately touched Reinhardt's legs and shoulders in a sexual way.

69.     Reinhardt was once again trapped. His relationships from his time in the military were important to his career development. He needed to introduce his contacts to Cirka, as Cirka was ultimately responsible for originating business as the partner in charge of his practice group. But to advance his career, he was forced to endure the ongoing harassment. So he once again became stoic, enduring Cirka's harassment in order to not jeopardize his career.

70.     Guermonprez also noted to Reinhardt the inappropriate way Cirka was interacting with Reinhardt, given she was his boss.

### G. Cirka Sexually Assaults Reinhardt

71.     On or about June 10, 2017, the weekend after the dinner with Guermonprez, Cirka invited Reinhardt to dinner with her twin-sister, Kari Cirka, who was visiting, at a local restaurant, Acacia. Reinhardt and Kim Cirka talked about Guidehouse business at the dinner. Kari was visibly annoyed at the business conversation topics, going so far as to roll herself up in an outdoor patio umbrella to distract them. Both sisters drank heavily.

72.     The Cirka sisters invited themselves back to Reinhardt's apartment, which was nearby. Reinhardt felt he could not reject Cirka's request and so agreed to a night cap in the hope the visit would be short. It was not.

73.     By this point, the Cirka sisters were excessively drunk. Kim Cirka spilled red wine all over Reinhardt's carpet. Reinhardt cleaned up the mess but was once again trapped. He felt he could not kick his boss and her twin sister out of his apartment for fear of retaliation at work.

74.     Reinhardt therefore called Larsen to join to try to help cope with the situation. When Larsen arrived, Reinhardt was once again stoic and shut down, trying to endure Cirka's harassment without jeopardizing his career. Larsen and Reinhardt attempted to give Cirka and her sister the impression that the night was over, and it was time for them to leave.

75.     The Cirka sisters did not receive the message. Kim said to Larsen, "you're the woman for Kyle. I am rooting for you. We're soul sisters." While Kari Cirka drunkenly said, "please Kimmy, let's have some fun." Kim Cirka then laid down on Reinhardt's couch and proceeded to pass out drunk. Kari Cirka was trying to continue to drink, but neither Reinhardt nor Larsen joined or encouraged her.

76.    With the sisters overly intoxicated and making it clear they had no intention of leaving the apartment, Reinhardt instead attempted to remove himself from the situation before anything else occurred. Rather than make a scene to try to force his intoxicated boss to leave, Reinhardt and Larsen decided to go to bed in the bedroom of Reinhardt's apartment in the hopes that the Cirka sisters would leave on their own.

77.    Reinhardt and Larsen shut the door, got undressed, and went to bed. After a few minutes, they engaged in sexual conduct with each other. About fifteen minutes later, they looked up to see that Kari Cirka had surreptitiously entered their bedroom and was watching Reinhardt and Larsen. Startled, they immediately told Kari to leave the bedroom. They then put on bathrobes and went out to Reinhardt's living room, where Kim Cirka was now awake. Kari Cirka sat down on the couch next to Kim Cirka.

78.    Reinhardt approached Kim Cirka and told her directly that it was time to leave. Ignoring Reinhardt's command to leave, Kari Cirka instead told her sister Kim that she had just seen Reinhardt's penis, telling her that "you should see what I saw."

79.    Kim Cirka replied that she had heard about Reinhardt's "cock" and wanted to know if it is really large.

80.    Kim Cirka then leaned forward, forcibly opened Reinhardt's bathrobe, put her hands on his hips, and pulled him toward her so she could perform oral sex.

81.    Reinhardt was in a state of shock. He could not believe his boss was sexually assaulting him. After a moment, he jumped back and told both Cirka sisters they had to leave the apartment immediately. Reinhardt remained in a state of complete shock from the trauma of his boss and a Guidehouse partner opening his bathrobe to expose his penis, touching his naked body, and starting to perform an unwanted sex act on him without his consent.

### H. Cirka Encourages Reinhardt to Provide Male Attention to a Government Official

82.     Having been directly rebuffed by Reinhardt during her assault, Cirka did not end her sexual harassment of Reinhardt but changed her tact to encourage Reinhardt to engage in sexual relationships with others, usually for the benefit of Guidehouse's business.

83.     Sometime in the summer of 2017, Cirka invited Reinhardt to the St. Regis to meet Melissa Glynn, who was nominated for a Senate-confirmed position at the VA. Cirka only invited Reinhardt, telling him Glynn was a former "party partner" at PWC who appreciated male attention, and that it would be beneficial for Reinhardt to join and pay her compliments in order to further their work. Reinhardt was not comfortable with the situation but went along as he knew he needed Cirka to continue his career at Guidehouse.

84.     On or about August 9, 2017, Reinhardt was again invited by Cirka to socialize with Glynn. Reinhardt understood this social invitation was really a requirement of his job. Both Cirka and Glynn had been drinking when Reinhardt met them. They went to dinner at Sfoligna, where Larsen was having dinner with a colleague. Cirka again harassed Reinhardt throughout the night, making inappropriate, sexually-tinged comments.

85.     On or about January 31, 2018, Reinhardt attended a business development meeting with Cirka and Glynn at the St. Regis Hotel in Washington, D.C. Once again, the message to Reinhardt was that it would be beneficial for Reinhardt to join and pay her compliments in order to further Guidehouse's work.

86.     Once again, Cirka drank excessively. Once again, her drinking led to her harassing Reinhardt.

87.     Once they were all together, Cirka made numerous sexual comments directed at and about Reinhardt. Cirka's comments indicated that Glynn should see Reinhardt as a potential

sexual partner. Cirka's comments also came with the implicit indication to Reinhardt that she controlled him and he was subject to her sexual desires.

88.     After dinner, at Cirka's suggestion, Reinhardt, Cirka, and Glynn went to Bistro Lepic Wine Bar in Washington, D.C. Reinhardt knew he had to continue to go along, despite the ongoing harassment. Glynn was an important contact for Guidehouse, and Reinhardt needed to continue to "play the game" to try to stay in Cirka's good graces and help secure business for Guidehouse. Cirka continued her inappropriate sexual harassment, including additional sexual comments, touching Reinhardt in a sexual manner, and using her body language to encourage Glynn to do the same.

89.     Reinhardt once again called in Larsen to help. She arrived at Bistro Lepic and found Cirka and Glynn visibly intoxicated, Reinhardt stoic and reserved, and Cirka repeatedly sexually harassing Reinhardt.

90.     In the following days, Cirka instructed Reinhardt to accept any advances by Glynn, with the implied message that accepting Glynn's sexual advances would assist Guidehouse obtain additional business.

91.     On February 8, 2018, Cirka, Reinhardt, Kane, Larsen, Glynn, and John Bulick, an official with the Department of Veterans Affairs, had a business dinner at The Rake's Progress at the Line Hotel in Washington, D.C. Cirka again made numerous comments to both Reinhardt and Larsen that Reinhardt should engage in a sexual relationship with Glynn instead of Larsen. It was clear that Cirka was jealous of Reinhardt's relationship with Larsen and that she viewed a sexual relationship with Glynn as helpful to Guidehouse's future business prospects.

92.     Under pressure from Cirka, Reinhardt did engage in a relationship with Glynn, though he kept it non-sexual. At her invitation, he went with her to several art exhibits to venues

including Kreeger, Phillips, and Hillwood Museum on weekends in 2019. Reinhardt would endeavor to make sure he was accompanied by another friend as a chaperone or had a following engagement in order to create an easy end to the event. On one occasion, he invited Boddie to join as well, telling her that Cirka wanted Reinhardt to take Glynn out and provide her with male attention, in part as Glynn was not married. Boddie got the impression that Cirka wanted Reinhardt to have some form of a sexual relationship with Glynn and conveyed to Reinhardt that she thought it was weird and inappropriate. Boddie refused to join, given the awkward nature of the relationship between Reinhardt and Glynn.

### I.  Cirka Licks Reinhardt's Friend's Face

93.     Later in 2018, Cirka suggested a drink after work, and Reinhardt accompanied her to the St. Regis along with other Guidehouse employees. Some of Reinhardt's friends joined the group, including Mark Weinberger.

94.     Weinberger had met Cirka multiple times since 2015. Weinberger had previously witnessed Cirka's inappropriate behavior directed at Reinhardt. He had seen Cirka harass Reinhardt multiple times, including hugging Reinhardt, putting her arms around him in a sexual manner, and kissing Reinhardt on the cheek. Throughout these evenings, Reinhardt acted stoically, trying to avoid Cirka's advances while not causing a scene that would embarrass her. Reinhardt always made it clear to Weinberger that Cirka's harassment was unwanted, but that Reinhardt had to put up with it because Cirka was his boss.

95.     That night, Cirka was again engaging in inappropriate behavior, hugging and grabbing Reinhardt and making various advances on him. Reinhardt did not reciprocate, but instead felt trapped by the situation caused by his boss.

96.     At the end of the night, when Weinberger went to the bar to close his bill, Cirka came up behind him, hugged him in a sexual way, and licked his cheek up and down.

V.   **DEFENDANTS' UNJUSTIFIED RETALIATION, FAILURE TO PROMOTE, AND BASELESS TERMINATION**

97.     Reinhardt's job at Guidehouse began to change in 2017. Reinhardt had been working for years to help Guidehouse secure the VA Market Area Health System Optimization (MAHSO) contract. The contract was to help the VA modernize its hospital systems. This was the contract that Reinhardt had hoped would come to fruition and that he would be able to work on. It represented a professional milestone that he had been enduring Cirka's harassment to achieve.

98.     MAHSO was originally awarded to Guidehouse in 2017 but was rebid after a bid protest. Guidehouse was again awarded the contract in November 2018. The contract was a $110 million contract over 3 years. At Guidehouse's standard profit margin, Guidehouse received at least $15 million in profit, and most likely more.

99.     Reinhardt held the most important and foundational relationships with key individuals in the VA, including with an integral financial client and the external teaming partners. He was included in Guidehouse's bid as one of the five key subject matter experts essential to the contract's success–and had identified and introduced Guidehouse to the other four experts. Cirka, as the partner responsible for obtaining the MAHSO contract, knew she needed Reinhardt to successfully perform under the contract. The contract required Guidehouse to send teams to visit VA hospitals throughout the country while keeping senior members in D.C. to interact with VA management.

100.     Guidehouse obtained the contract at the same time it became clear to Cirka that Reinhardt was not going to "play the game" the way Cirka wanted. Cirka therefore used the contract to punish Reinhardt for refusing her sexual advances and for being a lone holdout against the culture of sex that Guidehouse and Cirka fostered. Cirka began retaliating directly

against Reinhardt. However, given his importance to the MAHSO contract, Guidehouse could

not simply fire Reinhardt because it needed him to continue to perform its duties for the firm.

101.     While he was the most senior federal practice staff member under Cirka on the

contract, Guidehouse almost immediately began to marginalize Reinhardt in order to diminish

his ongoing importance to its success. Most notably, Reinhardt was the only Guidehouse

employee among the five key personnel bid in the contract. He was also a U.S. military Veteran

and based locally in Washington, D.C. It would have been logical to keep him in D.C. for the

duration of the contract to continue engaging directly with the client and top-level management

at the VA, and only rotate him into the field for the most complex matters. This in turn would

have allowed Reinhardt to effectively cultivate the relationships with senior VA officials.

102.     Instead, Guidehouse marginalized Reinhardt by sending him out on the road

continually with one of the teams conducting field interviews. This team already included senior

subject matter experts capable of performing the work on their own. A more junior manager,

Andrew Kane, stayed in D.C. with Cirka. Reinhardt was kept out of major decisions by virtue of

being continually on the road, unable to maximize the spontaneity of "water cooler moments,"

intentionally kept out of meetings with senior VA executives and had to force his way into

meetings with VA management. This enforced distance had a negative impact on his ability to

advance his career.

103.     Going on the road for the field reviews was a grueling job. Reinhardt would fly to

a VA region with a team of 8-10 people. He would be responsible for renting a car and

shepherding the team to the various VA hospitals, sometimes driving 5-6 people and their

luggage. They stayed in low rent hotels to stay within the government per diem, one of which

had blood stains on the furniture. The day would start at 6 in the morning with a team meeting

over breakfast, go straight into interviews until 4:30 that evening, then a tour of the facility until 6 at night. Reinhardt would then have to load up the rental car with the team and drive to the next location, sometimes 4 hours away. He regularly arrived at his next hotel late at night, sometimes as late as 11:30, and had to strategize with the team for the next day's work. He would then need to be up in time to be ready to meet the team by 6 am to do it all again.

104.    Reinhardt was put on this grueling schedule in two stretches of every other week for three months, continually leaving his home and his friends to shepherd a team across a remote part of the country. Reinhardt asked to be on the road less and have a role more appropriate for his level of seniority and expertise but was ignored. It was clear to Reinhardt that Guidehouse was not treating him as his seniority on the team should dictate and was instead retaliating against him for pushing back on the harassment he had endured.

105.    Guidehouse performed annual reviews. In each review, employees are rated on various topics. In every review of Reinhardt until 2021, Reinhardt received the highest ratings possible. For example, in Reinhardt's 2020 review, Reinhardt received a "conquered" rating, the highest, and an evaluation that he "has developed and is leading a tremendous, sustainable business and is logically looking to advance to the partner[.]"

106.    Cirka also recognized that, given Reinhardt's key role in securing the MAHSO contract, as well as his experience and time at Guidehouse, he had to be considered for partner. But she began working against his prospects.

107.    Guidehouse considers new partners every year. In October 2020, Reinhardt was first considered for promotion to partner. On October 15, 2020, Cirka informed Reinhardt that he had not been selected for partner. The stated reason for not selecting Reinhardt was that during the COVID pandemic, the account had not hit its $84 million revenue target. However, the

account surpassed that target by several million dollars a few short months later, a fact Guidehouse knew would occur at the time it considered Reinhardt's promotion. Cirka was promoted even higher among the partner hierarchy for this achievement. But it was Reinhardt who had worked closely with his VA contacts to develop a $37 million dollar series of 6-8 month bridging task orders to keep the team of over 100 contractors on the job.

108.     Reinhardt was not promoted to Guidehouse partner because he repeatedly refused to accede to Cirka's sexual advances and refused to participate in the improper sexual culture encouraged by Cirka and fostered by Guidehouse. In short, Reinhardt had not agreed to "play the game" and keep her inappropriate behavior "all in the family," and so Cirka, along with the other Guidehouse partners, retaliated against Reinhardt by refusing to promote him to partner.

109.     Instead, Cirka told Reinhardt that if he kept working, he would be considered again next year. Cirka was sending Reinhardt a message that he had to come back to the family in order to become a Guidehouse partner. If he was willing to submit to her control, she and Guidehouse would promote him.

110.     Reinhardt did not accede to Guidehouse and Cirka's culture of harassment and deceit. Guidehouse then put Reinhardt on a pretextual performance improvement plan (PIP) on July 20, 2021, for the purpose of creating a false record to justify firing him.

111.     With its tracks safely covered, Guidehouse fired Reinhardt. He was kept on the PIP for the minimum amount of time and was terminated on September 23, 2021. Reinhardt's termination was not for professional, legal, or ethical violations of Guidehouse policy.

112.     On October 14, 2021, Reinhardt submitted a complaint with the District of Columbia Office of Human Rights (DCOHR) for discrimination based on sex, retaliation, and status as a victim of sexual offense.

113.     On February 2, 2022, Reinhardt withdrew his DCOHR complaint.

## VI.     DEFENDANTS' BREACH OF EMPLOYMENT AGREEMENT AND UNENFORCEABLE NON-SOLICITATION AGREEMENT

### A.     Failure to Pay Severance.

114.     Reinhardt's contract with Guidehouse requires Guidehouse to provide Reinhardt three months' notice or pay three months' salary. Guidehouse failed to provide Reinhardt three months' notice and was therefore required to pay three months' salary at the time of termination.

115.     When Reinhardt requested his severance, Guidehouse refused to pay unless he released Guidehouse for Cirka's assaults and harassment and other potential claims Reinhardt might have against Guidehouse.

116.     In doing so, Guidehouse improperly attempted to leverage Reinhardt's need for financial support while he looked for a new job which it has hindered by attempting to enforce an improper non-solicitation agreement in Reinhardt's contract, continuing the retaliation against him.

### B.     Non-Solicitation as to U.S. Department of Veterans Affairs Void for Public Policy

117.     Additionally, Guidehouse has attempted to improperly limit Reinhardt's future employment. His contract also contains a non-solicitation provision that limits Reinhardt's ability to solicit a client on which he worked for two years after his termination.

118.     Based on this language, Guidehouse has stated that Reinhardt is prohibited from soliciting the VA. Guidehouse has breached its contract with Reinhardt and therefore cannot enforce this provision.

119.     Additionally, by trying to enforce the provision as to the federal government, Guidehouse is trying to improperly limit the federal government's ability to pick the most

qualified contractor by limiting Reinhardt's and other former Guidehouse employees' ability to compete against Guidehouse on federal contracts.

120.     Guidehouse is also enforcing this non-solicitation as further retaliation against Reinhardt. Guidehouse is refusing to pay the severance required under the contract while at the same time enforcing the non-solicitation. Guidehouse's actions make clear that it seeks to make Reinhardt's life as difficult as possible and punish him for not "playing the game" and "keeping things in the family."

**VII.   CLAIMS AGAINST PWC**

121.     Upon information and belief, Guidehouse assumed certain liabilities of PWC when Guidehouse was spun out of PWC, including those contemplated by this Complaint, and so is liable for all actions that occurred at PWC PS.

122.     In the alternative, Guidehouse did not assume the liabilities and PWC is liable for the acts that occurred prior to May 1, 2018.

**VIII.  CLAIMS FOR RELIEF**

**Claim for Relief I**
**DISCRIMINATION ON THE BASIS OF SEX**
**IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401, *et seq.***
**(All Defendants)**

123.     Plaintiff re-alleges and incorporates every allegation in this Complaint.

124.     Defendants were and are employers within the meaning of the DCHRA, D.C. Code § 2-1401 *et seq.*

125.     Reinhardt was employed by Defendants, as that term is defined by the DCHRA, D.C. Code § 2-1401.

126.     Defendants subjected Reinhardt to sexual harassment based on his sex, and Reinhardt is a member of the group protected by the DCHRA and federal statutes.

127.    Defendants subjected Reinhardt to discrimination based on his sex when Cirka subjected Reinhardt to unwelcome sexual advances, touching, and groping.

128.    Defendant Guidehouse discriminated against Reinhardt through the actions of its partner Cirka's sexual harassment and assault, and in doing so, created an illegal and hostile work environment.

129.    Reinhardt attempted to stop this discrimination and harassment by rebuffing Cirka's advances.

130.    The harassment, assault, and discrimination unreasonably interfered with Reinhardt's work performance and created an intimidating, hostile, and offensive working environment. Reinhardt suffered and continues to suffer harm, including but not limited to financial loss, impairment to his name and reputation, humiliation, psychological harm, emotional distress, pain, and suffering.

**Claim for Relief II**
**DISCRIMINATION ON THE BASIS OF STATUS AS A VICTIM OF SEXUAL ABUSE**
**IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401,** *et seq.*
**(All Defendants)**

131.    Plaintiff re-alleges and incorporates every allegation in this Complaint.

132.    Defendants were and are employers within the meaning of the DCHRA, D.C. Code § 2-1401 *et seq.*

133.    Reinhardt was employed by Defendants, as that term is defined by the DCHRA, D.C. Code § 2-1401.

134.    Defendants subjected Reinhardt to discrimination based on his status as a victim of sexual abuse, and Reinhardt is a member of the group protected by the DCHRA and federal statutes.

135.   Defendants subjected Reinhardt to discrimination based on his status as a victim of sexual abuse when they (a) failed to promote him to partner; (b) placed him on a pretextual performance improvement place; (c) created an intimidating and hostile work environment; and (d) fired him.

136.   The harassment, assault, and discrimination unreasonably interfered with Reinhardt's work performance and created an intimidating, hostile, and offensive working environment. Reinhardt suffered and continues to suffer harm, including but not limited to financial loss, impairment to his name and reputation, humiliation, psychological harm, emotional distress, pain, and suffering.

**Claim for Relief III**
**RETALIATION IN VIOLATION OF**
**THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401,** *et seq.*
**(All Defendants)**

137.   Plaintiff re-alleges and incorporates every allegation in this Complaint.

138.   Defendants were and are employers within the meaning of the DCHRA, D.C. Code § 2-1401 *et seq.*

139.   Reinhardt was employed by Defendants, as that term is defined by the DCHRA, D.C. Code § 2-1401.

140.   Defendants subjected Reinhardt to sexual harassment based on his sex, and Reinhardt is a member of the group protected by the DCHRA and federal statutes.

141.   Defendants subjected Reinhardt to discrimination based on his sex when Cirka subjected Reinhardt to unwelcome sexual advances, touching, and groping.

142.   Defendant Guidehouse discriminated against Reinhardt through the actions of its partner Cirka's sexual harassment and assault, and in doing so, created an illegal and hostile work environment.

143.    Defendants subjected Reinhardt to discrimination based on his status as a victim of sexual abuse when they (a) failed to promote him to partner; (b) placed him on a pretextual performance improvement plan; (c) created an intimidating and hostile work environment; and (d) fired him.

144.    Reinhardt engaged in protected activity within the meaning of the DCHRA, D.C. Code § 2-1401 *et seq.* when he rejected Cirka's advances and complained to her that she should stop.

145.    Defendants took adverse actions against Reinhardt by (a) terminating his employment; (b) placing Reinhardt on a pretextual performance improvement plan; and (c) failing to promote Reinhardt to partner.

146.    Defendants took adverse actions against Reinhardt because of his protected opposition to employment practices made unlawful by the DCHRA.

147.    Defendants explicitly and implicitly discouraged Reinhardt from reporting the harassment, assault, and discrimination, then punished Reinhardt for engaging in protected conduct.

148.    Defendants engaged in unlawful employment practices in violation of the DCHRA by subjecting Reinhardt to retaliation for engaging in protected opposition to employment practices made unlawful by the DCHRA.

149.    As a result of Defendants actions, Reinhardt has suffered and continues to suffer harm, including but not limited to financial loss, impairment to his name and reputation, humiliation, psychological harm, emotional distress, pain, and suffering.

**Claim for Relief IV**
**BATTERY**
**(Cirka)**

150.    Plaintiff re-alleges and incorporates every allegation in this Complaint.

151.    Cirka battered Reinhardt by subjecting him to unwanted sexual acts, including but not limited to groping of his penis and body and forcibly attempting to perform oral sex on Reinhardt.

152.    Cirka did so intentionally.

153.    Reinhardt has suffered and continues to suffer harm as a result of Cirka's battery, including but not limited to humiliation, psychological harm, emotional distress, pain, and suffering.

**Claim for Relief V**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(All Defendants)**

154.    Plaintiff re-alleges and incorporates every allegation in this Complaint.

155.    Defendants' extreme and outrageous conduct includes but is not limited to Cirka's sexual battery of Reinhardt, Defendants' discrimination against Reinhardt on the basis of his sex, Defendants' discrimination against Reinhardt on the basis of his status as a victim of sexual assault, and Defendants' retaliation against Reinhardt.

156.    Defendants' conduct was intentional or done recklessly.

157.    As a result of Defendants conduct, Reinhardt has suffered and continues to suffer harm, including but not limited to financial loss, impairment to his name and reputation, humiliation, psychological harm, emotional distress, pain, and suffering.

**Claim for Relief VI**
**BREACH OF CONTRACT**
**(Guidehouse and PWC)**

158.    Plaintiff re-alleges and incorporates every allegation in this Complaint.

159.    Reinhardt and Guidehouse are parties to Reinhardt's employment contract.

160.    Defendants have breached the employment contract by failing and refusing to pay Reinhardt the severance due under the contract.

161.    Reinhardt has suffered damages as a result of this breach of contract.

**Claim for Relief VII**
**VIOLATION OF THE DISTRICT OF COLUMBIA**
**WAGE PAYMENT AND COLLECTION LAW**
**D.C. Code §§ 32-1301, *et seq.***
**(Guidehouse and PWC)**

162.    Plaintiff re-alleges and incorporates every allegation in this Complaint.

163.    At all times relevant to this Complaint, Defendants Guidehouse and PWC were

Plaintiff's employers, and Plaintiff was their employee, as defined by D.C. Code §§ 32-1301(1B)

and 32-1301(2), respectively.

164.    Defendants Guidehouse and PWC were and are aware that the DCWPCL, D.C.

Code § 32-1303, requires employers to pay an employee who it has discharged all wages earned

not later than the working day following such discharge.

165.    Defendants Guidehouse and PWC have thus far refused to pay Reinhardt the

severance due under his contract.

166.    This severance payment qualifies as "wages" as defined in the DCWPCL, D.C.

Code § 32-1301(3).

167.    Reinhardt is entitled to receive reasonable attorneys' fees and costs, back wages,

liquidated damages equal to treble unpaid wages, statutory penalties, and such legal and

equitable relief as may be appropriate pursuant to D.C. Code § 32-1308(a)(1)(A).

**Demand for Jury Trial**

168.    Pursuant to Rule 38 of the District of Columbia Superior Court Rules of Civil

Procedure, Reinhardt hereby demands a trial by jury.

**Prayer for Relief**

WHEREFORE, Plaintiff Kyle Reinhardt, demands and prays that judgment be entered in

his favor against the specified Defendants on Counts I through VII of the Complaint as follows:

A.      The maximum economic damages permissible by applicable law, including but not limited to lost wages and benefits, back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal;

B.      Compensatory (non-economic) damages, including but not limited to damages for emotional distress, pain and suffering, and loss of reputation;

C.      For pre- and post-judgment interest and for such other and further relief as the Court deems just and equitable.

D.      Punitive damages to punish Defendants for malicious acts of assault and retaliation and to deter it from similar retaliatory conduct toward other employees, in an amount to be determined at trial;

E.      Declaratory judgment stating that Reinhardt's employment contract does not prevent him from soliciting the US Department of Veterans Affair or other governmental agencies;

F.      Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by Defendants' retaliation;

G.      Reasonable litigation costs, expert fees, and reasonable attorneys' fees; and

H.      Such other and further relief that this Court may deem just and equitable.

Dated: February 2, 2022                    **BLACK & BUFFONE PLLC**


By: _ s/ Samule J. Buffone, Jr. _____
          Samuel J. Buffone, Jr.

Samuel J. Buffone, Jr.
D.C. Bar 1721688
John W. Black
D.C. Bar 989303
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
Sam@blackandbuffone.com
John@blackandbuffone.com


*Attorneys for Plaintiff Kyle Reinhardt*

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Kyle Reinhardt
_____
Plaintiff

vs.

Kim Cirka
_____
Defendant

Case Number    2022 CA 000530 B

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Black & Buffone PLLC
_____
Name of Plaintiff's Attorney

1400 Eye St. NW, Suite 200
_____
Address
Washington, D.C. 20005

(202) - 997 - 8562
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

h     o
_____
                                              Demandante
        contra
                                          Número de Caso: _____ RP
  h
_____
                                              Demandado

### CITATORIO

Al susodicho Demandado:

    Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

    A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

          C        mii                                    *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

  N        K kt                                    Por: _____
Dirección
  t        aK K      R                                          Subsecretario

  E        RS                                      Fecha _____
Teléfono

如需翻译, 请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828로 전화주십시오       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

    Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Kyle Reinhardt
_____
Plaintiff

vs.

PricewaterhouseCooper LLP          Case Number    2022 CA 000530 B
_____
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Black & Buffone PLLC
_____          _Clerk of the Court_
Name of Plaintiff's Attorney

1400 Eye St. NW, Suite 200                  By _____
Address                                         Deputy Clerk
Washington, D.C. 20005

(202) - 997 - 8562                          Date _____
Telephone

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

h          o
_____
                                    Demandante

        contra

                                                    Número de Caso: _____ RP

                ii
_____
                                    Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

            C            ii                                  *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

 N        p K kt   p                                 Por: _____
Dirección
    t          aK K      R                                          Subsecretario

 E          RS                                       Fecha _____
Teléfono
如需翻译, 请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828로 연락주십시오.       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Kyle Reinhardt
_____
                              Plaintiff
                   vs.
                                              Case Number   2022 CA 000530 B
Kim Cirka
_____
                              Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Black & Buffone PLLC
_____
Name of Plaintiff's Attorney
1400 Eye St. NW, Suite 200
_____
Address
Washington, D.C. 20005
_____
(202) - 997 - 8562
_____
Telephone
如需翻译，请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주세요         \[Amharic\] (202) 879-4828

Clerk of the Court

By _____
                              Deputy Clerk

Date _____

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME*.

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                 Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

h    o
_____
                                    Demandante
            contra

                                            Número de Caso: _____ RP
h
_____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes y entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

C____ ___ mil                                    *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante:

N____ ___ki                                    Por_____
Dirección                                               Subsecretario
T____ ___RE____ R

E____ ___RS                                    Fecha_____
Teléfono
_____ (202) 879-____    Veuillez appeler au (202)____-____ pour une traduction    Dế có một bài dịch hãy gọi (202)879-____
_____(202)879-____ _____    ____ ____ ____ (202) 879-____ ____

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés.
See reverse side for English original

CV-3110 [Rev. June 2017]                                    Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
CIVIL DIVISION
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Kyle Reinhardt

_____
Plaintiff

vs.

Case Number    2022 CA 000530 B

PricewaterhouseCooper LLP

_____
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Black & Buffone PLLC
_____
Name of Plaintiff's Attorney

1400 Eye St. NW, Suite 200
_____
Address
Washington, D.C. 20005

(202) - 997 - 8562
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME_.

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]    Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

h    o
_____
                    Demandante

        contra

        ii
_____                    Número de Caso: _____  RP
                    Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandado. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

C              ii                                    *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

N       p K kt    p                                  Por: _____
Dirección                                                        Subsecretario
t        aK K      R

E            RS                                      Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 번역을 원하시면 (202) 879-4828 으로 전화주십시오      የአማርኛ ትርጉም አማካኝ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                    Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

**Filed**
**D.C. Superior Court**
**02/07/2022 15:38PM**
**Clerk of the Court**

Kyle Reinhardt
_____
Plaintiff

vs.

Guidehouse, Inc.
_____
Defendant

Case Number   2022 CA 000530 B

**SUMMONS**

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Black & Buffone PLLC
_____
Name of Plaintiff's Attorney

1400 Eye St. NW, Suite 200
_____
Address
Washington, D.C. 20005

(202) - 997 - 8562
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요.    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ።

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

h       o
_____
                                          Demandante

contra

                                          Número de Caso: _____ RP

d       l   f   K
_____
                                          Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

              C            ii                              *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

  N          K ktl                          Por: _____
Dirección                                                  Subsecretario
  t      l  aK K      R

  E          RS                             Fecha _____
Teléfono

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오.          የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

Filed
D.C. Superior Court
03/14/2022 09:07AM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

KYLE REINHARDT,                      )
                                     )
              Plaintiff(s),          )     Civil Action No. 2022 CA 000530 B
                                     )     Judge Maurice A. Ross
       v.                            )     Civil II – Calendar 6
                                     )
GUIDEHOUSE, INC. et al.,             )     Next Event:  Initial Scheduling Conference
                                     )              May 13, 2022 @ 9:30 a.m.
              Defendant(s).          )

**ORDER TO RESCHEDULE INITIAL SCHEDULING CONFERENCE**

This matter comes before the Court *sua sponte* for the purpose of rescheduling the Initial

Scheduling Conference to a later date due to the Court's Judicial Training to be held on May 5

and 6, 2022.  **Accordingly**, it is this **14th** day of March 2022, hereby

**ORDERED** that the **remote** Initial Scheduling Conference currently set on May 6, 2022,

at 9:30 a.m. is hereby **vacated** and rescheduled for **May 13, 2022 at 9:30 a.m**. before Judge

Ross in Courtroom 100, located at 500 Indiana Avenue, NW, Washington, DC 20001.  A copy of

the Remote Hearing Instructions is attached for your convenience.

So Ordered.

Maurice A. Ross
Judge Maurice A. Ross

Copies to:

Samuel J. Buffone, Jr., Esquire (E-Service)
*Counsel for Plaintiff*

**Via U.S. Mail**

Kim Cirka
902 Lincoln Avenue
Fall Church, VA  22046

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC  20036

PRICEWATERHOUSECOOPER LLP
655 New York Avenue, NW
Washington, DC  20001

*Defendants*

<u>**ATTACHMENT**</u>

<u>**Remote Hearing Instruction for Participants**</u>

The following instructions are for participants who are scheduled to hear cases remotely before Judge M. Ross in Remote Courtroom 100.

All parties should be checked in at least 15 minutes prior to the scheduled hearing time. After you log on, please mute your audio until you are addressed.
Once the judge logs on, the hearing will begin. At that time, the judge may provide a brief opening statement and the courtroom clerk will begin to call the cases as scheduled. Please state your name (s) for the record.

When connecting to the WebEx System, you have several options that allows you to join into the session. Please review the following options and follow the directions as instructed.

**Method 1**:

1. Open Web Browser in Google Chrome and copy and paste following URL or click: https://dccourts.webex.com/meet/ctb100. You will be connected directly into the waiting room or the live WebEx session. If this is the first time you are connecting to a WebEx session an applet will download to your computer first then connect you to the session.

2. When prompted, click "Join Meeting" to enter the session. Please place your microphone on mute and unmute your video as directed by clerk.

**Method 2**:

1. Open Web Browser in Google Chrome and copy and paste following URL or click: https://dccourts.webex.com.

2. Select **Join**, enter Access Code/Meeting ID: 129 846 4145
**AUDIO ALTERNATIVE:** Instead of automatically using **USE COMPUTER FOR AUDIO**, you may select **CALL-IN** and follow the **CALL-IN** prompt window. It is very important that you enter the **Access ID #** so that your audio is matched with your video. You will be heard clearer if you **do not** place your phone on SPEAKER.

**Smartphone/Tablets or iPads:**

**Method 3**:

1. Go to App Store, Download WebEx App (Cisco WebEx Meetings)
2.  Sign into the App with your Name and Email Address
3. Select Join Meeting
4. Enter URL: https://dccourts.webex.com/meet/ctb100.
5. Click Join and make sure your microphone is muted and your video is unmuted (if you need to be seen). If you only need to speak and do not need to be seen use the audio only option.
6. When you are ready click "Join Meeting". If the host has not yet started the meeting you will be placed in the lobby until the meeting begins.

▓▓▓▓ With Sound
If you are using your computer for sound and can't hear, or can't be heard, or the sound quality is bad then you should let the Clerk or Judge know that you are going to dial in by phone.  Then disconnect from the WebEx hearing and use the dial in by phone Method 4 below.

**AUDIO ONLY/Dial-in by Phone:**

**Method 4**:

1. Dial the Webex Toll (202) 860-2110 or 844-992-4726
2. Enter Access Code/ Meeting ID: 129 846 4145, press # to enter session.

**Once you have joined the session, please place your phone on mute until directed.**

Filed
D.C. Superior Court
03/22/2022 20:40PM
Clerk of the Court

### SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

KYLE REINHARDT,

        *Plaintiffs,*

    v.

GUIDEHOUSE INC.
and
PRICEWATERHOUSECOOPERS LLP
and
KIM CIRKA,

        *Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event: Initial Scheduling Conference,
May 13, 2022

### JOINT STIPULATION AND [PROPOSED] ORDER REGARDING BRIEFING SCHEDULE FOR DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND TO STAY

Defendants Guidehouse Inc., PricewaterhouseCoopers LLP, and Kim Cirka (collectively, "Defendants"), by and through counsel, together with Plaintiff Kyle Reinhardt ("Reinhardt"), by and through counsel, respectfully file this joint stipulation and request to set a briefing schedule related to Defendants' forthcoming motions to compel the arbitration of Reinhardt's claims and to stay this judicial proceeding. In support of such request, Reinhardt and Defendants (collectively, the "Parties") stipulate as follows:

1. Defendants each assert that Reinhardt is contractually bound to arbitrate the claims in the Complaint, pursuant to the terms of a predispute arbitration agreement.

2. Defendants intend to move this Court for an order compelling arbitration and staying this judicial proceeding.

3. In the interest of judicial economy, Reinhardt would like to file a consolidated opposition to Defendants' motions.

4.   The Parties have met and conferred regarding a briefing schedule for the proposed motions to compel arbitration and to stay.

5.   The initial hearing regarding this matter is currently scheduled for May 13, 2022.

6.   The Parties have not previously requested an extension of time from this Court.

WHEREFORE, the Parties, in the interest of efficiency and cost as well as to conserve this Court's time, jointly and respectfully request that this Court set the following Schedule:

1.   Defendants' Motions to Compel Arbitration and to Stay:  **Due by April 1, 2022.**

2.   Reinhardt's Consolidated Opposition to Defendants' Motions to Compel Arbitration and to Stay:  **Due by April 22, 2022.**

**3.**   Defendants' Reply briefs, if any, in further support of the motions to compel arbitration and to stay:  **Due by May 5, 2022.**

**4.**   Defendants' time to respond otherwise to the Complaint: **Due 21 days following the Court's ruling on the motions to compel arbitration.**

A proposed order is attached.

Dated: March 17, 2022                    Respectfully submitted,

*/s/ Sam Buffone*                        */s/ Carson H. Sullivan*
Sam Buffone (D.C. Bar No. 1721688)       Carson H. Sullivan (D.C. Bar No. 488139)
BLACK & BUFFONE                          Christine L. Cedar (D.C. Bar No. 242003)
1400 Eye St. NW, Suite 200               PAUL HASTINGS LLP
Washington, D.C. 20005                   2050 M Street, NW
Tel: (202) 997-8562                      Washington, D.C. 20036
sam@blackandbuffone.com                  Tel: 202-551-1700
                                         Fax: 202-551-1704
*Counsel for Plaintiff Kyle Reinhardt*   carsonsullivan@paulhastings.com
                                         christinecedar@paulhastings.com

                                         *Counsel for Defendant PricewaterhouseCoopers LLC*

/s/ *Stephen Sheinfeld*
Stephen Sheinfeld
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY  10166
Tel: 212-294-2650
ssheinfe@winston.com

*Counsel for Defendant Guidehouse Inc.*

/s/ *Charles Molster*
Charles Molster
THE LAW OFFICES OF CHARLES B. MOLSTER, III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, D.C. 20007
Tel: 202.787.1312
cmolster@molsterlaw.com

*Counsel for Defendant Kim Cirka*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 17, 2022, a copy of the foregoing was served via CaseFileXpress on all parties of record.

_/s/ Carson H. Sullivan_
Carson H. Sullivan

Filed
D.C. Superior Court
03/29/2022 14:52PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| KYLE REINHARDT, | ) | |
| | ) | |
| Plaintiff(s), | ) | Civil Action No. 2022 CA 000530 B |
| | ) | Judge Maurice A. Ross |
| v. | ) | Civil II – Calendar 6 |
| | ) | |
| GUIDEHOUSE, INC. et al., | ) | Next Event:  Initial Scheduling Conference |
| | ) | **July 22, 2022** @ 9:30 a.m. |
| Defendant(s). | ) | |

## ORDER GRANTING JOINT STIPULATION AND ORDER REGARDING BRIEFING SCHEDULE FOR DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND TO STAY

Upon consideration of Plaintiff Kyle Reinhardt ('Plaintiff') and Defendants Guidehouse, Inc. PricewaterhouseCooper LLP, and Kim Cirka (collectively, "Defendants") Joint Stipulation and Order Regarding Briefing Schedule for Defendants' Motions to Compel Arbitration and to Stay.  **Accordingly**, it is thereupon this **29th** day of March 2022, hereby

**ORDERED** that Defendants shall file their responsive Motions to Compel Arbitration and to Stay on or before April 1, 2022, and it is further

**ORDERED** that Plaintiff shall file his Consolidated Opposition to Defendants' Motions to Compel Arbitration and to Stay on or before April 22, 2022; and it is further

**ORDERED** that Defendants shall file their Reply briefs, if any, in further support of the Motions to Compel Arbitration and to Stay on or before May 5, 2022; and it is further

**ORDERED** that Defendants shall answer or otherwise respond to Plaintiff's Complaint on or before 21 days following the Court's ruling on the Motions to Compel Arbitration and to Stay; and it is further

**ORDERED** that the **remote** Initial Scheduling Conference currently set on May 13, 2022, at 9:30 a.m. is hereby **vacated** and rescheduled for **July 22, 2022 at 9:30 a.m.** before

Judge Ross in Courtroom 100, located at 500 Indiana Avenue, NW, Washington, DC 20001.  A

copy of the Remote Hearing Instructions is attached for your convenience; and it is

**So Ordered**.

*Maurice A. Ross*

_____
Judge Maurice A. Ross

Copies to:

Samuel J. Buffone, Jr., Esquire (E-Service)
*Counsel for Plaintiff*

**Via U.S. Mail**

Kim Cirka
902 Lincoln Avenue
Fall Church, VA  22046

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC  20036

PRICEWATERHOUSECOOPER LLP
655 New York Avenue, NW
Washington, DC  20001

*Defendants*

<u>**ATTACHMENT**</u>

<u>**Remote Hearing Instruction for Participants**</u>

The following instructions are for participants who are scheduled to hear cases remotely before Judge M. Ross in Remote Courtroom 100.

All parties should be checked in at least 15 minutes prior to the scheduled hearing time. After you log on, please mute your audio until you are addressed.
Once the judge logs on, the hearing will begin. At that time, the judge may provide a brief opening statement and the courtroom clerk will begin to call the cases as scheduled. Please state your name (s) for the record.

When connecting to the WebEx System, you have several options that allows you to join into the session. Please review the following options and follow the directions as instructed.

**Method 1**:

1. Open Web Browser in Google Chrome and copy and paste following URL or click: https://dccourts.webex.com/meet/ctb100. You will be connected directly into the waiting room or the live WebEx session. If this is the first time you are connecting to a WebEx session an applet will download to your computer first then connect you to the session.

2. When prompted, click "Join Meeting" to enter the session. Please place your microphone on mute and unmute your video as directed by clerk.

**Method 2**:

1. Open Web Browser in Google Chrome and copy and paste following URL or click: https://dccourts.webex.com.

2. Select **Join**, enter Access Code/Meeting ID: 129 846 4145
**AUDIO ALTERNATIVE:** Instead of automatically using **USE COMPUTER FOR AUDIO**, you may select **CALL-IN** and follow the **CALL-IN** prompt window. It is very important that you enter the **Access ID #** so that your audio is matched with your video. You will be heard clearer if you **do not** place your phone on SPEAKER.

**Smartphone/Tablets or iPads:**

**Method 3**:

1. Go to App Store, Download WebEx App (Cisco WebEx Meetings)
2.  Sign into the App with your Name and Email Address
3. Select Join Meeting
4. Enter URL: https://dccourts.webex.com/meet/ctb100.
5. Click Join and make sure your microphone is muted and your video is unmuted (if you need to be seen). If you only need to speak and do not need to be seen use the audio only option.
6. When you are ready click "Join Meeting". If the host has not yet started the meeting you will be placed in the lobby until the meeting begins.

▓▓▓▓ With Sound
If you are using your computer for sound and can't hear, or can't be heard, or the sound quality is bad then you should let the Clerk or Judge know that you are going to dial in by phone.  Then disconnect from the WebEx hearing and use the dial in by phone Method 4 below.

**AUDIO ONLY/Dial-in by Phone:**

**Method 4**:

1. Dial the Webex Toll (202) 860-2110 or 844-992-4726
2. Enter Access Code/ Meeting ID: 129 846 4145, press # to enter session.

**Once you have joined the session, please place your phone on mute until directed.**

Filed
D.C. Superior Court
04/01/2022 16:35PM
Clerk of the Court

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KYLE REINHARDT,

*Plaintiff,*

v.

GUIDEHOUSE INC.
and
PRICEWATERHOUSECOOPERS LLC
and
KIM CIRKA,

*Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event: Initial Scheduling Conference,
July 22, 2022

## DEFENDANT PRICEWATERHOUSECOOPERS LLC'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

Pursuant to section 16-4407 of the District of Columbia Code, Defendant PricewaterhouseCoopers LLC ("Defendant" or "PwC"), by and through its undersigned counsel, hereby moves the Court for an Order staying all proceedings and compelling Plaintiff Kyle Reinhardt ("Plaintiff" or "Reinhardt") to arbitrate his claims as set forth in his binding, valid and enforceable arbitration agreement.

For these reasons, set forth more fully in the accompanying Memorandum of Law and exhibits, Defendant respectfully requests that this Court stay these proceedings and compel arbitration before JAMS. A proposed Order is attached.

Dated: April 1, 2022

Respectfully submitted,

Carson H. Sullivan (D.C. Bar No. 488139)
Christine L. Cedar (D.C. Bar No. 242003)
PAUL HASTINGS LLP
2050 M Street, NW

1

Washington, D.C. 20036
Tel: 202-551-1700
Fax: 202-551-1704
carsonsullivan@paulhastings.com
christinecedar@paulhastings.com


*Counsel for Defendant PricewaterhouseCoopers LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 1, 2022, a copy of the foregoing was served via CaseFileXpress on all parties of record.

_/s/ Carson H. Sullivan___
Carson H. Sullivan

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

KYLE REINHARDT,

        *Plaintiff,*

    v.

GUIDEHOUSE INC.
and
PRICEWATERHOUSECOOPERS LLP
and
KIM CIRKA,

        *Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event:  Initial Scheduling Conference
              July 22, 2022 @ 9:30 a.m.

**[PROPOSED] ORDER GRANTING DEFENDANT**
**PRICEWATERHOUSECOOPERS LLP'S**
**MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

Upon Defendant PricewaterhouseCoopers LLP's Motion to Compel Arbitration and Stay

Litigation, dated April 1, 2022 (the "Motion"), and Plaintiff having opposed the Motion, the Court,

having considered the papers submitted by counsel, oral arguments of counsel, evidence presented

by the parties, and all other matters properly presented to and received by the Court, and for the

reasons set forth in the Motion and for good cause shown, the Motion to Compel Arbitration of

Plaintiff's claims is GRANTED and this case is STAYED pending completion of arbitration.

IT IS SO ORDERED.

Dated: _____, 2022

                    _____
                    Judge Maurice A. Ross

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KYLE REINHARDT,

        *Plaintiff,*

     v.

GUIDEHOUSE INC.
and
PRICEWATERHOUSECOOPERS LLP
and
KIM CIRKA,

        *Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event: Initial Scheduling Conference,
July 22, 2022

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  RELEVANT FACTS ........................................................................................... 1

III.  THE COURT SHOULD COMPEL ARBITRATION OF REINHARDT'S
CLAIMS AGAINST PWC ................................................................................. 3

    A.  The FAA Governs the Arbitration Agreement ....................................... 3

    B.  The Arbitration Agreement is Valid and Enforceable ........................... 4

    C.  Reinhardt Must Arbitrate His Dispute .................................................. 5

        1.  A Valid Agreement to Arbitrate Exists.................................... 6

        2.  Reinhardt's Claims Plainly Fall Within the Scope of the
Arbitration Agreement ................................................................ 8

IV.  CONCLUSION.................................................................................................... 9

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Allied-Bruce Terminex Cos. Inc. v. Dobson,*
   513 U.S. 265, 115 S. Ct. 834 (1995)................................................................................3

*American Fed'n of Gov't Emps., Local 3721 v. District of Columbia,*
   563 A.2d 361 (D.C. 1989) .......................................................................................6

*AT&T Mobility LLC v. Concepcion,*
   563 U.S. 333, 131 S. Ct. 1740 (2011)...............................................................4, 6

*Booker v. Robert Half Int'l, Inc.,*
   315 F. Supp. 2d 94 (D.D.C. 2004), *aff'd,* 413 F.3d 77 (D.C. Cir. 2005).............5, 8

*Carter v. Cathedral Ave. Coop., Inc.,*
   566 A.2d 716 (D.C. 1989) .......................................................................................5

*Circuit City Store, Inc. v. Adams,*
   532 U.S. 105, 121 S. Ct. 1302 (2001).....................................................................4

*CompuCredit Corp v. Greenwood,*
   565 U.S. 95, 132 S. Ct. 665 (2012)..........................................................................4

*Doctor's Assocs., Inc. v. Casarotto,*
   517 U.S. 681, 116 S. Ct. 1652 (1996).....................................................................6

*Fox v. Computer World Servs. Corp.,*
   920 F. Supp. 2d 90 (D.D.C. 2013) ..................................................................5, 6, 7

*Friend v. Friend,*
   609 A.2d 1137 (D.C. 1992) .....................................................................................4

*Hill v. Wackenhut Servs. Int'l,*
   865 F. Supp. 2d 84 (D.D.C. 2012) ..........................................................................8

*Johns v. Newsmax Media, Inc.,*
   887 F. Supp. 2d 90 (D.D.C. 2012) ..........................................................................9

*Maldonado v. Loglogic, Inc.,*
   No. 1:07-CV-00066 (RCL), 2007 WL 9752789 (D.D.C. Dec. 5, 2007) ..................7

*Masurovsky v. Green,*
   687 A.2d 198 (D.C. 1997) .......................................................................................9

*U.S. ex rel. McBride v. Halliburton Co.,*
   Civil Action No. 05-00828 (HHK), 2007 WL 1954441 (D.D.C. July 5, 2007) ...................5, 9

*Meshel v. Ohev Sholom Talmud Torah,*
   869 A.2d 343 (D.C. 2005) ................................................................5

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983) ...........................................................................9

*Nelson v. Insignia/Esg, Inc.,*
   215 F. Supp. 2d 143 (D.D.C. 2002) ..................................................5

*Shatteen v. Omni Hotels Mgmt. Corp.,*
   113 F. Supp. 3d 176 (D.D.C. 2015) ..................................................8

*Song Fi, Inc. v. Google Inc.,*
   72 F. Supp. 3d 53 (D.D.C. 2014) ......................................................7

*Southland Corp. v. Keating,*
   465 U.S. 1 (1984) ...........................................................................4

*Urban Invs., Inc. v. Branham,*
   464 A.2d 93 (D.C. 1983) ..............................................................6, 7

*Volt Info. Sciences, Inc. v. Bd. Of Trustees of the Leland Stanford Junior Univ.,*
   489 U.S. 468, 109 S. Ct. 1248 (1989) ..............................................4

*White v. Four Seasons Hotels & Resorts,*
   999 F. Supp. 2d 250 (D.D.C. 2013) ...............................................7, 8

*Williams v. Walker-Thomas Furniture Co.,*
   350 F.2d 445 (D.C. Cir. 1965) ........................................................7

**Statutes**

9 U.S.C. § 2 ................................................................................3, 4, 6

D.C. Code § 16-4407 ....................................................................5, 9

Pub. L. No. 117-90, 9 U.S.C. § 401 NOTE, 136 Stat. 26 (Mar. 3, 2022) ......................4

## I.     __INTRODUCTION__

On July 5, 2017, Plaintiff Kyle Reinhardt ("Reinhardt") accepted a promotion to Director at PricewaterhouseCoopers Public Sector LLP, then-a subsidiary of defendant PricewaterhouseCoopers LLP ("PwC"). In so doing, he accepted the terms of an arbitration agreement that covers claims "that [he] may have against the Firm …, including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ('Covered Claims')." Reinhardt now pursues Covered Claims in this Court in breach of his agreement. Undersigned counsel for PwC notified Reinhardt's counsel of the arbitration agreement, and requested that Reinhardt withdraw this action and pursue his claims in arbitration instead. He refused.

Therefore, defendant PwC now brings this motion to compel arbitration and stay litigation pursuant to section 16-4407 of the District of Columbia Code.

## II.    __RELEVANT FACTS__

On July 5, 2017, Reinhardt electronically accepted the terms and conditions of a new employment agreement ("Employment Agreement") with PricewaterhouseCoopers Public Sector LLP ("Public Sector LLP"). (Declaration of Ivan P. Stolze ("Stolze Decl.") Ex. 1 at pp. 1, 10, 16.) As a condition of his promotion to Director, and as part of the Employment Agreement, Reinhardt also entered into an arbitration agreement with PwC (Public Sector LLP's parent). (Stolze Decl. Ex. 1 at pp. 1, 9, Exhibit A.) That agreement became "effective on the date [Reinhardt] sign[ed] the employment agreement to which this [arbitration] Agreement is attached… and survives and continues to apply following termination of employment." (Stolze Decl. Ex. 1 at Exhibit A § 1.a.) ("By signing the employment agreement, you have accepted this [arbitration] Agreement, and you and the Firm are bound by its terms.").)

Reinhardt's arbitration agreement broadly defines "Covered Claims" as:

[A]ll disputes, controversies and claims relating to or arising out of [Reinhardt's] employment agreement or termination of that agreement, or [Reinhardt's] … employment with the Firm, or [Reinhardt's] separation from such employment…, … that [Reinhardt] may have against the Firm (and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents), including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency.

(Stolze Decl. Ex. 1 at Exhibit A § 1.c.)[1] Covered Claims specifically include, without limitation, "state and local laws concerning discrimination and retaliation, and any other federal, state and local laws regarding employment, and all amendments thereto, claims for breach of contract…, and any other claims arising under any federal, state or local statute ordinance, regulation, public policy or common law." (Stolze Decl. Ex. 1 at Exhibit A § 1.c.)[2] Reinhardt therefore "waive[d] [his] right to a trial before a judge or jury … in favor of arbitration under this Agreement" and agreed that all Covered Claims must be resolved "exclusively through final and binding arbitration" before JAMS. (Stolze Decl. Ex. 1 at Exhibit A §§ 1.b., 1.a., 3.a.)

PwC sold its interest in Reinhardt's employer Public Sector LLP in February 2018. (Compl. ¶ 1.) Thereafter, Public Sector LLP became Guidehouse, Inc. (Compl. ¶ 1.) According to his complaint, Reinhardt remained an employee of Guidehouse, Inc., not PwC, until September 23, 2021. (*See* Compl. ¶ 111.)

Reinhardt commenced this action on February 2, 2022. As against PwC, he alleges claims for: (a) hostile work environment and discrimination against him because of sex and his alleged status as a victim of sexual abuse in violation of the District of Columbia Human Rights Act ("DC

---

[1] The "Firm" is defined in the agreement as "PricewaterhouseCoopers LLP, and/or any of its subsidiaries or affiliates based in the United States." (Stolze Decl. Ex. 1 at p. 11.)

[2] Section 1.d.viii. of the arbitration agreement does not apply here. (*See* Stolze Decl. Ex. 1 at Exhibit A § 1.d.viii. (excluding from the definition of Covered Claims, *inter alia*, "[a]ny claims that, at the time they are asserted, are…governed by Section 8116 of the Department of Defense Appropriations Act of 2010.")) PwC currently has no Department of Defense contracts and thus is not subject to Section 8116 of the Defense Appropriations Act of 2010. (Declaration of Don McCrory ¶ 3.)

HRA") (Compl. ¶¶ 123–149); (b) unlawful retaliation in violation of the DC HRA (Compl. ¶¶ 137–149); (c) intentional infliction of emotional distress (Compl. ¶¶ 154–157); (d) breach of his contract (Compl. ¶¶ 158–161); and (e) violation of the D.C. Wage Payment and Collection Law ("DC WPCL") (Compl. ¶¶ 162–167).

Defendant PwC advised Reinhardt's counsel of Reinhardt's agreement to arbitrate, and requested that he withdraw his claims and proceed instead in arbitration. Reinhardt refused. (Declaration of Kenneth W. Gage ¶¶ 3–4.)

## III.   THE COURT SHOULD COMPEL ARBITRATION OF REINHARDT'S CLAIMS AGAINST PWC

### A.   The FAA Governs the Arbitration Agreement

According to its terms, the Federal Arbitration Act governs the arbitration agreement. (Stolze Decl. Ex. 1 at Exhibit A § 5 ("Choice of Law. This Agreement shall be governed by the FAA…")). Even without the choice of law provision, however, the FAA would apply in any event because Reinhardt's employment agreement undisputedly involved interstate commerce.

The FAA applies to all written contracts "evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2; *see also Allied-Bruce Terminex Cos. Inc. v. Dobson*, 513 U.S. 265, 273–74, 115 S. Ct. 834, 839 (1995). The "involving [interstate] commerce" standard stretches to the limits of congressional power created by the Commerce Clause of the United States Constitution. *See id.* at 274. This standard only requires "that the 'transaction' in fact 'involv[e]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Id.* at 281 (alteration in original).

Reinhardt alleges that PwC is a national firm, with offices in multiple states and its main office in New York, New York. (Compl. ¶¶ 1, 18.) Reinhardt alleges that his work involved large federal contracts. (Compl. ¶¶ 1, 10, 27). Consequently, because Reinhardt's employment

3

"involv[ed] interstate commerce," his arbitration agreement is covered by the FAA. *See Circuit City Store, Inc. v. Adams*, 532 U.S. 105, 113, 121 S. Ct. 1302, 1308 (2001).

### B.   The Arbitration Agreement is Valid and Enforceable

Arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. *See also Southland Corp. v. Keating*, 465 U.S. 1, 11–16 (1984) (substantive provisions of the FAA, such as 9 U.S.C. § 2, apply in both federal and state courts).[3] The FAA codifies the "liberal federal policy favoring arbitration agreements." *CompuCredit Corp v. Greenwood*, 565 U.S. 95, 98, 132 S. Ct. 665, 669 (2012) (citations omitted). The policy of the District of Columbia is in accord with federal policy favoring arbitration. *See Friend v. Friend*, 609 A.2d 1137, 1139 (D.C. 1992) ("Federal and District of Columbia statutes 'are in agreement on the issue of favoring arbitration when the parties have entered into a contract containing an arbitration clause.'") (citing cases).

Courts therefore are required to enforce arbitration agreements according to their terms. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 344, 131 S. Ct. 1740, 1745, 1748 (2011) ("The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'") (quoting *Volt Info. Sciences, Inc. v. Bd. Of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S. Ct. 1248, 1255 (1989)). This policy favoring arbitration applies with full force in the employment context. *See Circuit City Stores, Inc.*, 532 U.S. at 123 ("We have been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context. Arbitration

---

[3] The March 3, 2022 amendments to the FAA that make pre-dispute arbitration agreements voidable in certain circumstances do not apply here.  These amendments apply only prospectively "to any dispute or claim that arises or accrues on or after the date of enactment."  Pub. L. No. 117-90, 9 U.S.C. § 401 NOTE, 136 Stat. 26 (Mar. 3, 2022).

agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation…") (citation omitted).

Courts have repeatedly found that the precise statutory claims asserted by Reinhardt can be subject to arbitration. *See, e.g., Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 100 (D.D.C. 2004), *aff'd*, 413 F.3d 77 (D.C. Cir. 2005) (ordering arbitration of discrimination claims arising under the DC HRA); *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 93 (D.D.C. 2013) (compelling, *inter alia*, arbitration of discrimination and retaliation claims arising under the DC HRA). Courts have likewise compelled the arbitration of common law claims like those at issue here. *See, e.g., U.S. ex rel. McBride v. Halliburton Co.*, Civil Action No. 05-00828 (HHK), 2007 WL 1954441, at *5 (D.D.C. July 5, 2007) (ordering arbitration of employee's intentional tort claim against her employer); *Nelson v. Insignia/Esg, Inc.*, 215 F. Supp. 2d 143, 158 (D.D.C. 2002) (compelling, *inter alia*, arbitration of employee's breach of contract claim); *Fox*, 920 F. Supp. 2d at 93 (compelling, *inter alia*, arbitration of employee's contract claim against his employer).

### C.    Reinhardt Must Arbitrate His Dispute

The Court must consider two issues in determining whether to compel arbitration: (1) whether a valid agreement to arbitrate exists; and (2) whether the claims at issue fall within the scope of the arbitration agreement. *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 354 (D.C. 2005) ("[T]he court will have to do no more than make the two findings that are required any time a court considers an action to compel arbitration pursuant to the District of Columbia Uniform Arbitration Act—namely, whether the parties have an enforceable agreement to arbitrate and, if so, whether the underlying dispute between the parties falls within the scope of the agreement.") (citing *Carter v. Cathedral Ave. Coop., Inc.*, 566 A.2d 716, 717–19 (D.C. 1989)); D.C. Code § 16-4407(a)(2). Traditional principles of contract law govern these determinations.

*American Fed'n of Gov't Emps., Local 3721 v. District of Columbia*, 563 A.2d 361, 362 (D.C. 1989). Here, the answer to each threshold question is yes.

1.      **A Valid Agreement to Arbitrate Exists.**

First, it is beyond dispute that the parties have agreed to arbitrate. By his own allegations, Reinhardt had an employment contract with Public Sector LLP. (*See generally* Compl. ¶ 114–116 (alleging breach of employment agreement).) As already discussed herein, Reinhardt entered into the arbitration agreement as part of that contract, effective July 5, 2017. (Stolze Decl. Ex. 1 at pp. 1, 9, 10, 16, Exhibit A.)

The only question, then, is whether any defenses to contract formation apply. The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration agreements may "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656 (1996)). In Reinhardt's case, no such defenses apply.

To prevail on an unconscionability claim, a plaintiff must show that an agreement is both substantively and procedurally unconscionable at the time of contract formation. *Fox*, 920 F. Supp. 2d at 97 ("Under D.C. law, a court can void a contract on the grounds that it is unconscionable if the party seeking to avoid the contract proves that the contract was both procedurally and substantively unconscionable."); *see also Urban Invs., Inc. v. Branham*, 464 A.2d 93, 98–100 (D.C. 1983). Reinhardt can show neither.

Substantive unconscionability may be found when the terms of an agreement "'are unreasonably favorable to one party' such that they are 'so outrageously unfair as to shock the

judicial conscience.'" *Song Fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53, 62 (D.D.C. 2014) (quoting *Fox*, 920 F. Supp. 2d at 99). Here, the arbitration agreement does not deprive Reinhardt of any benefit while preserving such benefit for PwC (or its subsidiaries or affiliates); the same procedures apply to both parties. (Stolze Decl. Ex. 1 § 16 ("[Y]ou and the Firm agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement.").) Thus, substantive unconscionability is absent because both contracting parties have identical obligations under the Agreement. *See, e.g.*, *Maldonado v. Loglogic, Inc.*, No. 1:07-CV-00066 (RCL), 2007 WL 9752789, at *4 (D.D.C. Dec. 5, 2007) (substantively unconscionable contracts lack "mutuality of recourse between the parties").

A contract may be procedurally unconscionable where, under all the circumstances, "a party lacked meaningful choice as to whether to enter the agreement." *Fox*, 920 F. Supp. 2d at 97 (citing *Urban Invs.*, 464 A.2d at 99). To assess whether the parties had a meaningful choice, "the Court must ask whether each party to the contract, 'considering his obvious education or lack of it, ha[d] a reasonable opportunity to understand the terms of the contract, or [whether] the important terms [were] hidden in a maze of fine print and minimized by deceptive [ ] practices.'" *White v. Four Seasons Hotels & Resorts*, 999 F. Supp. 2d 250, 257 (D.D.C. 2013) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)) (alterations in original). Offering an arbitration agreement on a "take-it-or-leave-it" basis is insufficient under D.C. law to render the provision procedurally unconscionable. *Fox*, 920 F. Supp. 2d at 98 ("[T]he fact that the Agreement was presented to Fox as a condition of employment without further negotiation does not render it unenforceable."). And although "unequal bargaining power between employers and employees may be common, 'mere inequality in bargaining power . . . is not a

sufficient reason to hold that arbitration agreements are never enforceable in the employment context.'" *Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84, 94 (D.D.C. 2012) (citation omitted).

Here, the terms of the arbitration agreement were clear and plainly incorporated into Reinhardt's Employment Agreement. As expressly stated in both the Employment Agreement and the arbitration agreement, acceptance of the arbitration agreement was a precondition to Reinhardt's promotion with Public Sector LLP. (Stolze Decl. Ex. 1 at pp. 1, 11.) Reinhardt cannot claim that he, a sophisticated, well-educated professional with more than twenty years of engineering, capital infrastructure, and government contracting experience (*see* Compl. ¶¶ 15, 24, 26), lacked a meaningful choice, particularly since he could have rejected the offer of promotion. *See Shatteen v. Omni Hotels Mgmt. Corp.*, 113 F. Supp. 3d 176, 180 (D.D.C. 2015) (rejecting claim that arbitration agreement was procedurally unconscionable where "[plaintiff] was forced to sign [the agreement] in front of her employer rather than at a later date"); *Four Seasons Hotels & Resorts*, 999 F. Supp. 2d at 258 (rejecting claim that arbitration provision was procedurally unconscionable where plaintiff held only a high school education because she was a native English speaker and could plainly read the agreement; "While [plaintiff] may not be a lawyer, her education level gives her an understanding of the plain English language used in the [arbitration] agreement, which notably includes a section titled 'what is mediation/arbitration'"). Accordingly, the arbitration agreement is not procedurally unconscionable.

    2.    **Reinhardt's Claims Plainly Fall Within the Scope of the Arbitration Agreement**

Given the express reference in the agreement to the claims in this lawsuit there can be no dispute that the arbitration agreement encompasses Reinhardt's statutory employment discrimination claims under the DC HRA, his wage and hour claims under the DC WPCL, and his tort and breach of contract claims under common law. *See, e.g., Booker*, 315 F. Supp. 2d at 100

(plaintiff's employment discrimination claims fell within the scope of the arbitration agreement where agreement stated that it applied to "[a]ny dispute or claim arising out of or relating to Employee's employment or any provision of this Agreement, whether based on contract or tort or otherwise"); *Halliburton Co.*, 2007 WL 1954441, at *5 (plaintiff's intentional tort claim fell within the scope of the arbitration agreement where agreement stated that it covered "any matters with respect to [plaintiff's] employment" as well as "any other matter related to or concerning the relationship between the Employee and the Company.").

Furthermore, any "[d]oubts regarding an arbitration provision must be resolved in favor of coverage." *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 97 (D.D.C. 2012) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration")); *see also Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1997) (the court is to "construe any ambiguity in favor of arbitration"). Accordingly, this Court must enforce the arbitration agreement according to its terms, as required by the FAA.

## IV.   CONCLUSION

For the foregoing reasons, defendant PricewaterhouseCoopers LLP respectfully requests that the Court enter an order directing Reinhardt to arbitrate his claims before JAMS in the District of Columbia, and staying the present litigation pending arbitration. *See* D.C. Code § 16-4407 ("If the court orders arbitration, the court, on just terms, shall stay any judicial proceeding that involves a claim subject to the arbitration.").

Dated: April 1, 2022                     Respectfully submitted,

Carson H. Sullivan (D.C. Bar No. 488139)
Christine L. Cedar (D.C. Bar No. 242003)
PAUL HASTINGS LLP
2050 M Street, NW
Washington, D.C. 20036
Tel: 202-551-1700
Fax: 202-551-1704
carsonsullivan@paulhastings.com
christinecedar@paulhastings.com

*Counsel for Defendant PricewaterhouseCoopers LLC*

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| KYLE REINHARDT, | Civil Action No. 2022 CA 000530 B |
| *Plaintiff,* | Hon. Judge Maurice A. Ross |
| v. | |
| GUIDEHOUSE INC. and PRICEWATERHOUSECOOPERS LLP and KIM CIRKA, | |
| *Defendants.* | |

## DECLARATION OF KENNETH W. GAGE IN SUPPORT OF DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

I, Kenneth W. Gage, declare and state as follows:

1.      I am a member of Paul Hastings LLP, attorneys for defendant PricewaterhouseCoopers LLP (the "Defendant" or "PwC").  I respectfully submit this declaration in support of Defendant's Motion to Compel Arbitration and Stay Litigation pursuant to section 16-4407 of the Code of the District of Columbia.

2.      On information and belief, on February 2, 2022, Plaintiff Kyle Reinhardt ("Reinhardt") filed a summons and notice in this Court.

3.      On March 8, 2022, I and my colleague, Paul Hastings LLP attorney Carson H. Sullivan, spoke to Reinhardt's counsel, advising them that Reinhardt's claims are covered by a valid and enforceable arbitration agreement ("Arbitration Agreement").  In a follow-up email sent March 10, 2022, Ms. Sullivan and I provided Reinhardt's counsel with the Arbitration Agreement.

Attached hereto as **Exhibit A** is a true and correct copy of our email correspondence with Reinhardt's counsel.

4.      Between March 8, 2022, and March 17, 2022, I conferred with Reinhardt's counsel on multiple occasions regarding Defendant's demand for arbitration pursuant to the Arbitration Agreement.  As of the date of this affirmation, Reinhardt has refused to submit the claims in this case to arbitration.

I declare under penalty of perjury pursuant to the laws of the United States and the District of Columbia that the foregoing is true and correct.

DATED:          April 1, 2022

Palm Beach, Florida

Kenneth W. Gage

# EXHIBIT A

| | |
|---|---|
| **From:** | Gage, Kenneth W. <kennethgage@paulhastings.com> |
| **Sent:** | Thursday, March 10, 2022 10:34 AM |
| **To:** | John Black; Sam Buffone |
| **Cc:** | Sullivan, Carson H. |
| **Subject:** | RE: Reinhardt v. Guidehouse et al |
| **Attachments:** | Reinhardt - Employment Agreement.pdf |

John and Sam:

I am following up on our prior two conversations. As discussed, your client agreed to arbitrate his dispute with my client, PricewaterhouseCoopers LLP. You indicated that you had seen his agreement, but we are attaching a copy for avoidance of doubt. Note that prior to him signing the attached, dated July 5, 2017, Mr. Reinhardt previously signed another agreement with the same arbitration provision. On behalf of PwC LLP, we ask that Mr. Reinhardt withdraw all claims against my client and, if he wishes to pursue them, proceed instead in arbitration pursuant to his agreement.

We understand that you need time to discuss this and other issues with Mr. Reinhardt before responding. We have discussed a reasonable extension of time for my client to respond to Mr. Reinhardt's complaint. In our discussion yesterday, you agreed that my client could have at least until Friday March 18th, and depending upon our further discussions, maybe longer. Unless your client is prepared today to withdraw his claims against PwC, please confirm that my client need not file a response to the complaint any earlier than March 18th.

If you would like other information concerning the arbitration agreement, I am happy to find time to discuss it further.

Ken


-----Original Appointment-----
**From:** John Black <john@blackandbuffone.com>
**Sent:** Wednesday, March 9, 2022 11:49 AM
**To:** John Black; Gage, Kenneth W.; Sam Buffone; Sullivan, Carson H.
**Subject:** [EXT] Reinhardt v. Guidehouse et al
**When:** Wednesday, March 9, 2022 4:30 PM-5:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Zoom Link Below

John Black is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://us06web.zoom.us/j/85485460835?pwd=NkFFYkkya2RqQWJidWRrSmQxeGlVQT09&from=addon

Meeting ID: 854 8546 0835
Passcode: 037004
One tap mobile
+13126266799,,85485460835#,,,,*037004# US (Chicago)
+19292056099,,85485460835#,,,,*037004# US (New York)

Dial by your location
+1 312 626 6799 US (Chicago)
+1 929 205 6099 US (New York)

+1 301 715 8592 US (Washington DC)
+1 346 248 7799 US (Houston)
+1 669 900 6833 US (San Jose)
+1 253 215 8782 US (Tacoma)
Meeting ID: 854 8546 0835
Passcode: 037004
Find your local number: https://us06web.zoom.us/u/keCeU86ZH9

Reinhardt,Kyle                          Employee                  EmplID: 00300254756

## PricewaterhouseCoopers Public Sector LLP Employment Agreement

In consideration of your promotion to the position of Director at PricewaterhouseCoopers Public Sector LLP (the "Firm"), and for other good and valuable consideration, the adequacy, sufficiency and receipt of which are hereby acknowledged, you, Kyle Reinhardt, hereby acknowledge and agree that:

1. **Compensation**.

   a. **Salary**. As a Director in the Firm's Washington, DC office, you will be compensated at a rate of $15,250.00 per month, payable semi-monthly, which represents $183,000.00 when computed on an annual basis. Your compensation generally will be reviewed once each fiscal year for the purpose of determining whether any adjustment is appropriate; however, the Firm may make changes to or adjust compensation, up or down, during the year for business or other reasons. Salary increases, if any, generally are made effective July 1.

   b. **Incentive Compensation**. Under the Firm's current incentive programs, you may be eligible for an annual performance bonus equal to a percentage of your base salary. The amount of such bonus, if any, will be based on your staff level, Firm performance, and your individual performance. The annual performance bonus currently is expected to be paid once each fiscal year to employees; the amount and timing of, and eligibility for, any bonuses are at the sole discretion of the Firm. In addition to an annual performance bonus, you may be eligible to participate in other Firm rewards and recognition programs. The Firm provides rewards and bonuses as an incentive for your continued employment. You must therefore be actively employed by the Firm on the date any bonus or reward is to be paid in order to earn and be eligible to receive it.

2. **Benefits**.

   You will remain eligible to participate in the comprehensive benefits program offered by the Firm to its employees, subject to the terms and conditions of the respective plans. The Firm reserves the right to change or eliminate these benefits in its sole discretion at any time. Also, the Firm will continue to reimburse you for appropriately documented, reasonable expenses you incur while working on Firm business, in accordance with its business expense reimbursement policies.

3. **Duties and Responsibilities**.

   You agree that you will continue to devote substantially all of your working time and attention to the performance of your assigned duties as required, and will not, without the written consent of the Firm, engage, directly or indirectly, in any other employment, business or professional activity for compensation, profit or financial gain. You also agree that you will not assume any paid or unpaid directorships; however, this

restriction does not apply to directorships in non-client charitable, civic, educational, social or other similar nonprofit organizations, to the extent such activities do not conflict with the Firm's policies, including, without limitation, its independence policy.

4. **Employment-at-Will**.

This Employment Agreement does not constitute, and may not be construed as, a commitment to employment for any specific duration. The duration and terms and conditions of your employment relationship with the Firm will continue to be at-will, which means that the Firm may change the terms and conditions of the employment relationship, and that you may leave the Firm, or the Firm may require you to leave its employ, for any reason or no reason, at any time.

5. **Termination of Employment**

a. **Termination by the Firm**. If your employment is terminated by the Firm for reasons other than professional, legal, ethical or Firm policy violations by you, subject to the severance plan in effect for the Firm's employees (the "Severance Plan"), you will be provided with: (i) one month's notice, if you have been employed for more than six months but less than two years; (ii) two months' notice, if you have been employed for two years but less than five years; or (iii) three months' notice, if you have been employed for five or more years. The Firm reserves the right under the Severance Plan to pay your base salary in lieu of continued employment for any or all of the applicable notice period. For purposes of this section 5(a), your years of service shall include the period during which you were continuously employed by PricewaterhouseCoopers LLP ("PwC US") or any of its subsidiaries immediately prior to your employment by the Firm.

b. **Termination by You**. If you resign, you agree to provide the Firm with at least two weeks' notice to allow an orderly transition of your responsibilities. If the Firm chooses to end your employment before the end of the two weeks, it will pay your base salary for the rest of that two week period. If you do not provide at least two weeks' notice, you will be paid only through your last day of employment, even if the Firm chooses not to continue your employment for the full notice period that you provided. You agree that, prior to your departure, you will provide the Firm with the name of your subsequent employer or other professional affiliation and the position you intend to assume.

6. **Ethics, Independence and Other Compliance Responsibilities**.

a. **General**. You agree that it is your personal responsibility to comply with the Firm's policies, including all Firm specific ethics related policies and compliance programs, as well as the PwC Global Ethics Code of Conduct and Global Risk Management Standards, the PwC US supplement to the Global Code of Conduct (known as "Our Standards"), and the laws and regulations applicable to the Firm's business, including, without limitation:

- Maintaining your independence in accordance with the independence policy of

PwC US and the rules of applicable regulatory bodies;
- Consistently demonstrating ethical conduct in accordance with Firm policies;
- Maintaining your CPA license(s) as required by Firm policies and relevant jurisdictions;
- Cooperating and complying with the regulatory requirements of the Public Company Accounting Oversight Board (PCAOB), including, without limitation, complying with and cooperating as requested with internal investigations and inquiries, providing testimony, producing documents, and, for managerial staff members working on an audit engagement, contacting the PwC US Ethics HelpLine immediately to report certain criminal or regulatory proceedings.

If you are ever uncertain about your obligations, you agree to contact the PwC US Ethics & Compliance Office for clarification and guidance.

b. **Independence**. The U.S. accounting profession is subject to many regulations designed to maintain public trust, including independence rules established by the SEC, PCAOB, AICPA and other regulatory bodies that govern the profession. "Independence" refers to the ability of individuals who provide professional services at public accounting firms to act with integrity, objectivity and impartiality in their work, and encompasses a number of rules, including, without limitation, those relating to personal and business relationships and permissible personal financial holdings. Employees of the Firm are subject to the independence rules applicable to PwC US because of the Firm's relationship to PwC US. Independence obligations prohibit, among other things, you, your spouse/spouse equivalent and your dependents from holding certain positions with or investing in certain audit/attest clients of firms in the PricewaterhouseCoopers global network of firms (the "Network Firms"), and such clients' affiliates. Similarly, a nondependent close relative's position with, or material investment in, an audit/attest client of a Network Firm may impair your compliance with PwC US's independence rules.

Because it is important that you comply with PwC US's independence policy, you acknowledge that you are familiar with PwC US's independence policy. You agree, throughout your career with the Firm, to remain alert to changes in your clients, role, location or financial interests and relationships that may affect your independence status. Periodically, you will be required to confirm your compliance with PwC US's independence policy.

In connection with your independence obligations, the Firm, PwC US or its regulators may request, and you agree to provide, relevant and up-to-date financial and tax information relating to you, your spouse/spouse equivalent, and your dependents. If you are a managerial staff member or employed in the Global Assurance Delivery Center, you also may be required to maintain a current record of your financial interests and other financial relationships (but not their value) in a PricewaterhouseCoopers global network database. If an impairment of PwC US's independence or a conflict of interest exists or is likely to occur, you may be required to dispose of securities or resolve other independence issues on short notice and on terms that are disadvantageous to you. The Firm also may require that you relocate to another Firm office or even separate from its employ.

c. **Work Authorization**. If you are or will be on a Firm-sponsored work visa, you must remain in compliance with, and agree to, the Visa and Work Authorization requirements attached hereto as Exhibit B, which is incorporated herein by reference.

7. **Confidential and Proprietary Information**.

Information, documents and materials relating to any Network Firm and their respective parents, affiliates, subsidiaries, subcontractors, agents, clients, vendors, licensors or suppliers ("Confidential Information") must be treated as confidential and proprietary and may only be used, distributed, disclosed or accessed by you for business purposes related to your employment duties with the Firm. You have an obligation to maintain Confidential Information in strict confidence and to protect and safeguard Confidential Information from unauthorized use, distribution and disclosure. By way of example, Confidential Information may include trade secrets; inventions (whether or not patentable); professional and technical manuals; business forms and processes; computer systems (including hardware, software, databases and information technology systems); client service or other methodologies; sales and related forecasts; marketing and business development plans and strategies; client and prospective client files, lists and materials; research materials; work product and deliverables; and project notes and plans. Information shall not be deemed Confidential Information if it is or becomes available in the public domain other than as a result of an unauthorized use, disclosure or action by you, at your direction or on your behalf, or by any other person who directly or indirectly receives such information from you.

Because Confidential Information is extremely valuable and may be subject to laws restricting disclosure or other obligations of confidentiality, the Network Firms take measures to maintain its confidentiality and guard its secrecy. Confidential Information may not be copied, disclosed, distributed, accessed or used by you (or at your direction or on your behalf) during your employment with the Firm except to the extent necessary to carry out Firm business and, where applicable, only as required or authorized under the terms of any agreements between or among the Network Firms and their respective parents, affiliates, subsidiaries, clients, subcontractors, agents, licensors, vendors or suppliers. When you leave the Firm, you agree not to use, distribute, disclose or access Confidential Information or to take or keep, or provide to any third party, any Confidential Information, irrespective of format, and you agree to return all Confidential Information to the Firm before your departure. The restrictions and obligations in this section apply regardless of whether you created, participated in creating, were in possession of, or had access to information, documents or materials constituting, summarizing, utilizing, containing or otherwise referencing Confidential Information. If you are ever asked to disclose any Confidential Information, whether pursuant to law, statute, rule or regulation (including any subpoena or similar form of process), by professional standards or guidelines, or otherwise, the Firm requests that you contact PwC US's Office of the General Counsel. These confidentiality restrictions are permanent and do not terminate, lapse, expire or otherwise cease upon your departure from the Firm.

Notwithstanding anything to the contrary contained in this Employment Agreement, you may, without informing or obtaining prior authorization of the Firm: (i) disclose trade

secrets in confidence to a federal, state or local government official, either directly or indirectly, or to your attorney, solely for the purpose of reporting or investigating a suspected violation of law that directly pertains to the trade secrets; (ii) disclose trade secrets in a complaint or other document filed in an arbitral, judicial or administrative proceeding that directly pertains to the trade secrets, if such filing is made under seal; and, (iii) disclose trade secrets to your attorney and use the trade secrets in an arbitral, judicial or administrative proceeding brought by you against the Firm alleging retaliation for your having reported a violation of law, provided that you file any document containing the trade secrets under seal and do not otherwise disclose the trade secrets, except as required by court order.

8. **Insider Information**.

You are prohibited from using or sharing information not publicly disclosed, which you obtain during the course of your work for the Firm, for your personal gain or advantage in securities transactions, or for the personal gain or advantage of anyone with whom you improperly share this information. This restriction applies to such information related to any company, not just the Firm's clients and their affiliates. The foregoing obligation is in addition to any obligation that you have not to purchase or hold securities of entities with respect to which the Firm must maintain independence.

9. **Intellectual Property**.

You agree that, upon request by the Firm, you will inform the Firm whether or not you are the owner, in whole or in part, of any patents, design rights (registered and unregistered), trademarks, service marks, copyrights, database rights, trade secrets, or any applications for any such rights (collectively, "Intellectual Property"). If you are the owner of any such Intellectual Property, you further agree that you will furnish all detail regarding such Intellectual Property as requested by the Firm. You agree that you will not incorporate, or permit to be incorporated, any such Intellectual Property, or any Intellectual Property owned by any third party, into a Firm product, process or service without the Firm's prior written consent. Nevertheless, if, in the course of your employment with the Firm, you incorporate into a Firm product, process or service any Intellectual Property owned by you, you hereby grant to the Firm a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, sublicensable, worldwide license to reproduce, make derivative works of, distribute, perform, display, import, make, have made, modify, use, sell, offer to sell, and exploit in any other way such Intellectual Property as part of or in connection with such product, process or service, and to practice any method related thereto.

You agree to disclose promptly to the Firm any and all inventions, discoveries, techniques, technologies, methodologies, writings, software, improvements, and any other works developed, conceived or created by you, either alone or in conjunction with others, at any time during your employment and related to the actual or expected business or activities of the Firm ("Works"), including, without limitation, Works created in connection with services provided to clients. You hereby assign all of your rights, titles and interests in Works (including, without limitation, all intellectual property contained therein) to the Firm. Whenever requested to do so by the

Firm, you agree to cooperate and do all things necessary, including executing all applications, assignments or other instruments that the Firm shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country, or otherwise protect the Firm's interests therein. If you do not execute such instruments within five days of their being presented to you, you hereby appoint the Firm with limited power of attorney to execute all such instruments. This power of attorney is a right coupled with an interest and is irrevocable. These obligations shall continue beyond the conclusion of your employment, and shall be binding upon your assigns, executors, administrators and other legal representatives. All Works shall be considered Confidential Information.

Notwithstanding the foregoing, any provision in this Employment Agreement requiring you to assign or license, or to offer to assign or license, your rights in any Work to the Firm does not apply to an invention or work of authorship that you developed entirely on your own time without using or referring to the Firm's resources, equipment, supplies, facilities, Confidential Information or trade secrets; provided, however, that such provisions shall remain applicable to those inventions or works of authorship that either (i) at the time of creation, conception or reduction to practice of the work or invention relate to the Firm's business, or to actual or demonstrably anticipated research or development of the Firm, or (ii) result from any work performed by you for the Firm. You acknowledge that you bear the burden of proving that an invention or work of authorship is exempt from the assignment provisions of this Employment Agreement. You agree to disclose to the Firm, in confidence, all inventions or works of authorship made solely by you or jointly with others at any time during the term of your employment with the Firm, for a review process under which the Firm may determine such issues as may arise, including the Firm's rights and your rights in such inventions or works of authorship.

10. **Continuing Obligations**.

You represent that you have not taken, and agree that you will not take, in connection with your employment with the Firm, any action that would violate any contractual or other restriction or obligation that is binding on you or any continuing duty you may owe to others. Without limiting the generality of the foregoing, if you have signed a confidentiality, non-disclosure or other similar type of agreement with any former employer or other party, you represent that you have complied, and agree you will continue to comply, with the terms of any such agreement to the extent that its terms are valid pursuant to applicable law. You further represent that you have not improperly used, shared, disclosed, distributed or accessed, and agree that you will not improperly use, share, disclose, distribute or access, the confidential or proprietary information of a third party in connection with your employment with the Firm. You represent and warrant that, after undertaking a careful search (including, without limitation, searches of any computers, cell phones, other electronic devices and hard copy documents), you have returned all property (including, without limitation, property containing confidential information) belonging to all former employers or other parties. Moreover, you agree to indemnify and hold harmless the Firm, its past and present direct and indirect parents, subsidiaries, affiliates, divisions, predecessors, successors and assigns, and their past and present partners, principals, employees, officers,

managers, directors, administrators, attorneys, representatives and agents, from and against any and all claims, awards, judgments, settlements, attorneys' fees and costs (except costs unique to arbitration, which the Firm shall pay if and as required by any applicable arbitration agreement) and other losses resulting from your breach of this provision.

If you are a former federal government or military employee and are subject to an opinion letter issued by a federal government agency ethics officer, you represent that you have provided a copy of such opinion letter to the Firm. You also represent that you have fully complied, and agree that you will continue to fully comply, with the guidance set forth in such letter, and that you have not engaged, and will not engage, in any activity that reasonably could be perceived as a personal conflict of interest under such letter. You agree to inform the PwC US Ethics & Compliance Office or the PwC US's Office of the General Counsel immediately if anyone requests that you take any action that would cause you to violate the guidance set forth in such opinion letter.

11. **Solicitation of Clients**.

a. **Prohibition on Solicitation**. You acknowledge that, because of the nature of your work for the Firm, you will develop, learn of, have access to, or be provided with Confidential Information. You further acknowledge that your solicitation or serving of certain Firm clients or potential clients after the termination of your employment inevitably would involve the unauthorized use or disclosure of Confidential Information, and impair the protectable relationships and goodwill of the Firm. Accordingly, you agree that, for two years following your departure from the Firm for any reason, you will not directly or indirectly solicit, accept as a client, or perform services of any type that the Firm can render ("Services") for, any person or entity: (i) for which you provided Services as an employee of the Firm or that received the benefit of such Services at any time during the two years prior to your departure; or (ii) for which you participated in a proposal to provide Services at any time during the one year prior to your departure. You further agree that you will not assist others in such solicitation, client acceptance, or performance of Services. It shall not be relevant that a person or entity desires or prefers that someone other than the Firm render Services or that the person or entity is already served by you or any third party with which you become associated.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm resulting from any breach by you of section 11(a) is uncertain and will be difficult to ascertain or calculate with precision. If you breach section 11(a), in addition to any other legal and equitable remedies the Firm may have, you agree to pay to the Firm liquidated damages in an amount equal to 25% of the gross fees paid for Services rendered in, or as a result of a, violation of section 11(a). Such percentage shall be paid with respect to all such Services rendered by you or a third party at any time during a period of three years from the first date of such violation. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm will incur as a result of your breach of section 11(a). You agree to make the payment to the Firm within 30 days after each such payment of fees has been made by the client.

12. **Solicitation of Personnel**.

a. **Prohibition on Solicitation**. You agree that, during your employment and for two years following your departure from the Firm for any reason, you will not directly or indirectly solicit, induce or retain, or assist others in soliciting, inducing or retaining, current or "Former" Personnel to become associated with, or perform services of the type the Firm or a parent, subsidiary or affiliate of the Firm (each a "Firm Affiliate") can render on behalf of, you or any employer or third party, or to otherwise disrupt, impair, damage or interfere with the Firm's or a Firm Affiliate's relationship with Personnel. "Personnel" means (i) Firm partners, principals, officers, managers, directors, and employees; and (ii) Firm Affiliate partners, principals, officers, managers, directors, and employees with whom you had material personal contact while providing services as an employee of the Firm at any time within 12 months before your departure from the Firm. "Former" Personnel are Personnel who leave the Firm or a Firm Affiliate within six months before or after you leave the Firm.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm or a Firm Affiliate resulting from any breach by you of section 12(a) will be difficult to ascertain or calculate with precision. If you breach section 12(a), in addition to any other legal and equitable remedies the Firm or such Firm Affiliate may have, you agree to pay to the Firm or Firm Affiliate liquidated damages in an amount equal to 30% of the solicited, induced or retained individual's gross annual compensation at the time of departure (including, without limitation, base salary, commission, bonus and the like) to cover replacement costs, and an additional 10% of such annual compensation to cover costs associated with training such individual's replacement. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm or Firm Affiliate will incur as a result of your breach of section 12(a). You agree to make the payment of such damages to the Firm or Firm Affiliate within 30 days from the mailing of a written notice to you advising you of the amount due.

13. **Injunctive Relief**.

In the event of a breach or threatened breach by you of any provision of sections 7, 9, 11 or 12 of this Employment Agreement, you agree that the Firm or Firm Affiliate, as applicable, in addition to any other legal and equitable remedies available to it, shall be entitled to provisional and injunctive relief from an appropriate forum, subject to the arbitration agreement attached hereto as Exhibit A. You further agree that no bond shall be required to be posted by the Firm or Firm Affiliate, as applicable, in connection with any such application for provisional or injunctive relief. The Firm or Firm Affiliate, as applicable, may pursue any remedy available to it (including, without limitation, those remedies set forth in sections 11(b) and 12(b) above), concurrently or consecutively in any order, and the pursuit of one such remedy will not be deemed to be an election of remedies or waiver of the right to pursue any other remedy.

14. **Assignability**.

You may not assign any of your rights or obligations under this Employment Agreement. This Employment Agreement shall be binding upon and inure to the benefit

of the Firm's successors and assigns. Without limiting the foregoing, the Firm may assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Firm or to any transferee of all or a portion of the assets or business to which this Employment Agreement relates.

15. **Severability**.

Except with respect to the terms set forth in the arbitration agreement attached hereto as Exhibit A, which contains its own severability provision, if any term or condition set forth in this Employment Agreement is found by a court, arbitral tribunal or other tribunal to be unenforceable, then the remaining terms and conditions will remain in full force and effect. Terms and conditions found to be unenforceable, if any, will be modified by the court or tribunal to conform to a provision that most closely expresses the intent of the unenforceable term or condition.

16. **Dispute Resolution**.

Unless you are an Excluded Employee (as defined below), you and the Firm agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement. You are an "Excluded Employee" if, at the time you enter into this Employment Agreement, you fall within any of the following exceptions: 1) you are currently a named plaintiff or member of a certified class in litigation pending against the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; 2) you have pending administrative charges against the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; 3) you are otherwise represented by counsel in a current legal dispute with and known to the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; or 4) the most recent time the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States previously presented you with an arbitration agreement, you were given an option to decline and you declined that agreement. If you are an Excluded Employee, the arbitration agreement attached as Exhibit A will not apply to you, and any existing arbitration agreements you have with the Firm, PwC US or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States shall remain in full force and effect in accordance with their terms.

17. **Government Access**.

Nothing in this Employment Agreement is intended to or shall (x) prevent, impede or interfere with your ability to file a charge or complaint with any federal, state or local government agency or commission, or any self-regulatory authority (each, a "Government Agency"), or (y) limit your ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding conducted by any Government Agency, including providing documents or other information, without notice to or prior authorization from the Firm.

18. **Applicable Law**.

This Employment Agreement is governed by the laws of the State of New York, without regard to its conflict of laws principles and provisions, and irrespective of your practice location, unless otherwise required by the law of the state in which you primarily reside and work.

19. **Representations**.

You acknowledge that you have not relied on any representations or statements, whether oral or written, regarding the subject matter of this Employment Agreement, other than as contained in this Employment Agreement.

20. **Entire Agreement; Modifications**.

You acknowledge that this Employment Agreement, including Exhibit A (unless you are an Excluded Employee) and Exhibit B (if you are or will be on a Firm-sponsored work visa), supersedes all prior oral or written agreements or understandings with the Firm, except for any existing agreements with the Firm regarding repayment obligations, which shall remain in full force and effect in accordance with their terms, and except that, if you are an Excluded Employee, any existing arbitration agreements you have with the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States shall remain in full force and effect in accordance with their terms. This Employment Agreement may be modified only by a writing signed by the leader of your practice unit, or his or her designee; provided, however, that any modification of section 4 of this Employment Agreement must be signed by the Firm's President.

21. **Headings**.

Section headings are used herein for convenience of reference and shall not affect the meaning of any provision of this Employment Agreement.

22. **Electronic Signature**.

To evidence your acceptance of the terms and conditions of this Employment Agreement, you have electronically signed this Employment Agreement. You acknowledge and agree that your electronic signature is the legal equivalent of signing this Employment Agreement by hand.

## Exhibit A

## Arbitration Agreement

We value our employees and recognize the importance of maintaining strong employee relations. We recognize, however, the possibility that legal disputes may arise between you and PricewaterhouseCoopers LLP, and/or any of its subsidiaries or affiliates based in the United States (collectively the "Firm"). This agreement (the "Agreement") requires that legal disputes be resolved through arbitration in accordance with the terms of this Agreement. For good and valuable consideration, the adequacy, sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.    Scope.

a.    Agreement to Arbitrate.

This Agreement requires both you and the Firm to resolve all Covered Claims (as described below) exclusively through final and binding arbitration. This Agreement becomes effective on the date you sign the employment agreement to which this Agreement is attached (the "Effective Date"), and survives and continues to apply following termination of employment. This Agreement is a mandatory condition of your employment with the Firm. **By signing the employment agreement, you have accepted this Agreement, and you and the Firm are bound by its terms.**

b.    Waiver of Trial; Waiver of Class, Collective, Consolidated or Representative Action.

**The parties mutually waive their right to a trial before a judge or jury in federal, state or local court in favor of arbitration under this Agreement.**

**This Agreement applies to Covered Claims that could have proceeded on an individual, class, collective, consolidated or representative basis, had they been pursued in another forum, such as a court of law. This Agreement requires that such claims be submitted to arbitration and that they be arbitrated on an individual basis only. Neither you nor the Firm is permitted to bring Covered Claims on a class, collective, consolidated or representative basis.**

c.    Covered Claims.

Except as expressly set forth below, this Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment (collectively, "Employment-Related Claims"), that the Firm may have against you, or that you may have against the Firm (and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents), including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered

Claims"). Covered Claims include, without limitation, claims under the Fair Labor Standards Act, the Family and Medical Leave Act, the Equal Pay Act, the Americans with Disabilities Act, the Rehabilitation Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, the Employee Retirement Income Security Act, state and local wage and hour laws, state and local laws concerning discrimination and retaliation, and any other federal, state and local laws regarding employment, and all amendments thereto, claims for breach of contract, claims for breach of post-employment restrictive covenants, claims for breach of fiduciary duty, claims for fraud or misappropriation, claims for misappropriation of trade secrets, and any other claims arising under any federal, state or local statute ordinance, regulation, public policy or common law.

    d.    <u>Claims Not Subject to Arbitration.</u>

The following types of claims are expressly excluded from the definition of Covered Claims:

(i) Employment-Related Claims arising before the Effective Date, to the extent such claims both (a) are not covered by any prior arbitration agreement between you and the Firm, and (b) are the subject of an action filed before the Effective Date in a court or agency of competent jurisdiction

(ii) Claims for unemployment insurance or workers' compensation benefits, except that claims for retaliation pursuant to these laws shall constitute Covered Claims;

(iii) Sarbanes-Oxley Act, Consumer Financial Protection Bureau and Commodity Futures Trading Commission whistleblower complaints;

(iv) Claims for benefits under the Employee Retirement Income Security Act ("ERISA"), which must be resolved in accordance with the terms and procedures set forth in the applicable plan documents;

(v) Claims that are by contract, regulation or rule explicitly subject to a different arbitration procedure (e.g., FINRA);

(vi) Disputes arising under the National Labor Relations Act;

(vii) Claims arising under patent, copyright or trademark law;

(viii) Any claims that, at the time they are asserted, are not permitted to be subject to a pre-dispute arbitration agreement under a contract between the Firm entity by which you are employed and an agency of the U.S. federal government (or applicable subcontract) that is governed by Section 8116 of the Department of Defense Appropriations Act of 2010; Subpart 222.74 of the Defense Federal Acquisition Regulation Supplement; Section 6 of Executive Order No. 17673 ("Fair Pay and Safe Workplaces"); and/or any other similar provision of law; and

(ix) Any other claims that are not permitted to be subject to a pre-dispute arbitration agreement under applicable law.

This Agreement does not affect your right to file a charge with, make a complaint to, or otherwise participate in an investigation by the U.S. Equal Employment Opportunity Commission, U.S. Department of Labor, the National Labor Relations Board, the Public Company Accounting Oversight Board, state boards of accountancy, or other federal, state, or local government agency, nor does it affect the enforcement authority of such agencies. However, you may seek monetary relief with respect to a Covered Claim only through an arbitration conducted pursuant to this Agreement.

2.    Injunctive Relief.

You or the Firm may seek emergency, temporary or preliminary injunctive relief from a court of competent jurisdiction in aid of arbitration or pending final adjudication of a claim in arbitration where the arbitration award may be rendered ineffectual without such relief.

3.    Arbitration Procedure and Applicable Rules.

a.    Rules and Procedures.

The arbitration shall be held under the auspices of JAMS, in accordance with JAMS Employment Arbitration Rules and Procedures (effective July 15, 2009), except to the extent such rules are inconsistent with this Agreement, and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Copies of the applicable rules and procedures may be found at www.jamsadr.com.

b.    Initiating Arbitration.

To initiate arbitration proceedings, you must follow the instructions for the submittal of arbitration to JAMS based on a pre-dispute provision, which are set forth in the demand for arbitration form, available at www.jamsadr.com, except that you need not submit the case management fee as the Firm will submit this fee on your behalf.

To be timely, the demand for arbitration form must be received by JAMS within the statute of limitations period applicable to the legal claims described in the demand for arbitration form.

c.    Costs and Fees.

The Firm shall pay all costs that are unique to arbitration, including the costs of JAMS and the Arbitrator. Each party shall pay its own attorneys' fees and other costs that are not unique to the arbitration (i.e., costs that each party would incur if the claim were litigated in a court), except that the Arbitrator may award attorneys' fees and other costs that are not unique to the arbitration to a party in accordance with the law governing the claim to the same extent a court could do so.

Postponement and cancellation fees shall be payable, at the discretion of the Arbitrator, by the party causing the postponement or cancellation

    d.    <u>Location of Arbitration.</u>

The arbitration will take place in the county in which your assigned work office is located, unless the parties mutually agree to an alternative location.

    e.    <u>Confidentiality.</u>

To the maximum extent permitted by law, all aspects of the arbitration proceedings, including any award made, shall be kept confidential, except as necessary to comply with a subpoena, court order or other legal requirement, to prosecute or defend a Covered Claim, to enforce an arbitration award or to meet a reasonable business need of the Firm.

    f.    <u>Arbitrator Powers and Authority; Limitations.</u>

The Arbitrator shall have the authority to resolve all Covered Claims with finality, in accordance with the rules of JAMS, **except that the Arbitrator shall not have the authority to hear a Covered Claim on a class, collective, consolidated or representative basis, nor shall the Arbitrator have the authority to grant class-wide relief, relief on a consolidated basis, or other relief extending beyond the individual claimant.**

The Arbitrator shall have the authority to award all remedies available to the Firm, and to you, individually, under applicable law.

The Arbitrator shall not have the authority to decide jurisdictional or arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the Arbitration; such questions shall be reserved for a court of competent jurisdiction.

    g.    <u>Awards.</u>

All awards shall be provided in the manner required by law, and shall be final and binding on both parties to the maximum extent permitted by law.

The award shall be enforceable by either party in a court of competent jurisdiction pursuant to the terms of the Federal Arbitration Act ("FAA").

    4.    <u>At-Will Employment.</u>

Nothing in this Agreement shall be deemed to constitute a contract of employment for any definite term, or to alter the at-will nature of your employment with the Firm.

5.    Choice of Law.

        This Agreement shall be governed by the FAA and, to the extent, if any, that the FAA is held not to apply, by the law of the State of New York, without regard to its conflict of laws principles (including for purposes of determining contract formation), unless otherwise required by the law of the state in which you primarily reside and work.

6.    Integration.

        Except as stated herein, this is the parties' entire agreement on the subject matter hereof, superseding all prior representations, negotiations or agreements.

7.    Severability.

        In the event that any provision of this Agreement is determined to be invalid or unenforceable, it shall be severed from the Agreement, and the rest of the Agreement shall be enforced to the maximum extent permitted by law; **provided, however, that should any provision of this Agreement requiring that Covered Claims be arbitrated on an individual basis, or that Covered Claims may not be brought on a class, collective, consolidated or representative basis, be determined invalid or unenforceable with respect to a Covered Claim, then that Covered Claim shall not proceed in arbitration, but rather shall be required to be filed in a court of competent jurisdiction.** Any other Covered Claims, whether related or unrelated, that can validly be required to proceed on an individual basis shall remain subject to arbitration under the terms of this Agreement. Any Covered Claim that is filed in a court of competent jurisdiction pursuant to the terms of this paragraph shall be required to return to arbitration in the event the lawsuit does not proceed on a class, collective, consolidated or representative basis. In no event shall any class, collective, consolidated or representative proceeding be permitted to proceed in arbitration.

Agreed to on behalf of the Firm by:

/s/ Margaret E. Burke

Margaret E. Burke
PricewaterhouseCoopers LLP

## Exhibit B - Visa and Work Authorization

As an employee of the Firm, you must have valid employment authorization from the United States Citizenship and Immigration Services at all times. The Firm will petition for appropriate visa status on your behalf and your dependent family members, if any. You agree that all matters relating to the Firm's visa applications on behalf of yourself and your dependent family members, and any other immigration-related filings made in connection with your employment with the Firm, must be handled by immigration counsel for the Firm and coordinated by Firm personnel. The Firm will pay the related attorneys' fees and filing costs. You agree to cooperate fully with the Firm's counsel and personnel.

If your visa or any dependent family member's visa is scheduled to expire while you are employed by the Firm, the Firm, in its sole discretion, may apply for any necessary visa extensions for you and your dependent family members, again utilizing immigration counsel for the Firm and paying the related attorneys' fees and filing costs. You acknowledge and agree that it is your responsibility to monitor your and your dependents' visa status in the United States and to notify the Firm sufficiently in advance of any expiration dates or a change in circumstances that can be expected to affect your visa status or the visa status of your dependents.

The Firm reserves the right to change or eliminate its petition for, sponsorship of, or assistance with, any visa status application, in its sole discretion, at any time. If you leave the Firm's employ for any reason, the Firm has no obligation to continue to petition for visa status or sponsor or otherwise assist you or your dependent family members in the visa process.

PwC GUID:   kreinhardt004            Contract Signature Date Time:   07/05/2017 10:29AM

Return to Personal Information Summary

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KYLE REINHARDT,

    *Plaintiff,*

  v.

GUIDEHOUSE INC.
and
PRICEWATERHOUSECOOPERS LLP
and
KIM CIRKA,

    *Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

---

## <u>DECLARATION OF IVAN P. STOLZE</u>

I, Ivan P. Stolze, declare and state as follows:

1.  I submit this affidavit in support of Defendant's Motion to Compel Arbitration and Stay Litigation.  The facts set forth in this affidavit are based upon my personal knowledge and upon information from business records in my custody and control that are maintained by PricewaterhouseCoopers LLP ("PwC") and its affiliates and subsidiaries.  If called upon to do so, I would be competent to testify to the matters set forth in this declaration.

2.  PricewaterhouseCoopers LLP is a national firm, with offices in nearly all states and its main office in New York, New York.

3.  I am currently employed by PwC as a Paralegal in its Office of the General Counsel.  I have been employed at PwC and in this role since July 2000.  In that role, I am responsible for collecting and reviewing business records, maintaining litigation files, and providing various other support on behalf of the PwC Office of the General Counsel.

4.      As a Paralegal for PwC, I have access to employees' personnel records, including but not limited to employment and arbitration agreements, which I can obtain by submitting a request to the records management team.

5.      On February 22, 2022, at the request of PwC in-house attorney Jason Aschenbrand, I requested a copy of the personnel file for Kyle Reinhardt from PwC's records management team. Attached hereto, collectively as **Exhibit 1,** are true and correct copies of the Employment Agreement and its incorporated Arbitration Agreement that I received from PwC's records management team in response to my February 22, 2022 request.

I, Ivan P. Stolze, swear under penalty of perjury pursuant to the laws of the United States and the District of Columbia that the foregoing is true and correct to the best of my personal knowledge, information and belief.

DATED:          March 31, 2022

Berkeley, CA

DocuSigned by:

_Ivan Stolze_

71C981A4AA5146F...

Ivan P. Stolze

# EXHIBIT 1

Reinhardt,Kyle                              Employee                    **EmplID:** 00300254756

## PricewaterhouseCoopers Public Sector LLP Employment Agreement

In consideration of your promotion to the position of Director at PricewaterhouseCoopers Public Sector LLP (the "Firm"), and for other good and valuable consideration, the adequacy, sufficiency and receipt of which are hereby acknowledged, you, Kyle Reinhardt, hereby acknowledge and agree that:

1. **Compensation**.

a. **Salary**. As a Director in the Firm's Washington, DC office, you will be compensated at a rate of $15,250.00 per month, payable semi-monthly, which represents $183,000.00 when computed on an annual basis. Your compensation generally will be reviewed once each fiscal year for the purpose of determining whether any adjustment is appropriate; however, the Firm may make changes to or adjust compensation, up or down, during the year for business or other reasons. Salary increases, if any, generally are made effective July 1.

b. **Incentive Compensation**. Under the Firm's current incentive programs, you may be eligible for an annual performance bonus equal to a percentage of your base salary. The amount of such bonus, if any, will be based on your staff level, Firm performance, and your individual performance. The annual performance bonus currently is expected to be paid once each fiscal year to employees; the amount and timing of, and eligibility for, any bonuses are at the sole discretion of the Firm. In addition to an annual performance bonus, you may be eligible to participate in other Firm rewards and recognition programs. The Firm provides rewards and bonuses as an incentive for your continued employment. You must therefore be actively employed by the Firm on the date any bonus or reward is to be paid in order to earn and be eligible to receive it.

2. **Benefits**.

You will remain eligible to participate in the comprehensive benefits program offered by the Firm to its employees, subject to the terms and conditions of the respective plans. The Firm reserves the right to change or eliminate these benefits in its sole discretion at any time. Also, the Firm will continue to reimburse you for appropriately documented, reasonable expenses you incur while working on Firm business, in accordance with its business expense reimbursement policies.

3. **Duties and Responsibilities**.

You agree that you will continue to devote substantially all of your working time and attention to the performance of your assigned duties as required, and will not, without the written consent of the Firm, engage, directly or indirectly, in any other employment, business or professional activity for compensation, profit or financial gain. You also agree that you will not assume any paid or unpaid directorships; however, this

restriction does not apply to directorships in non-client charitable, civic, educational, social or other similar nonprofit organizations, to the extent such activities do not conflict with the Firm's policies, including, without limitation, its independence policy.

## 4. **Employment-at-Will**.

This Employment Agreement does not constitute, and may not be construed as, a commitment to employment for any specific duration. The duration and terms and conditions of your employment relationship with the Firm will continue to be at-will, which means that the Firm may change the terms and conditions of the employment relationship, and that you may leave the Firm, or the Firm may require you to leave its employ, for any reason or no reason, at any time.

## 5. **Termination of Employment**.

a. **Termination by the Firm**. If your employment is terminated by the Firm for reasons other than professional, legal, ethical or Firm policy violations by you, subject to the severance plan in effect for the Firm's employees (the "Severance Plan"), you will be provided with: (i) one month's notice, if you have been employed for more than six months but less than two years; (ii) two months' notice, if you have been employed for two years but less than five years; or (iii) three months' notice, if you have been employed for five or more years. The Firm reserves the right under the Severance Plan to pay your base salary in lieu of continued employment for any or all of the applicable notice period. For purposes of this section 5(a), your years of service shall include the period during which you were continuously employed by PricewaterhouseCoopers LLP ("PwC US") or any of its subsidiaries immediately prior to your employment by the Firm.

b. **Termination by You**. If you resign, you agree to provide the Firm with at least two weeks' notice to allow an orderly transition of your responsibilities. If the Firm chooses to end your employment before the end of the two weeks, it will pay your base salary for the rest of that two week period. If you do not provide at least two weeks' notice, you will be paid only through your last day of employment, even if the Firm chooses not to continue your employment for the full notice period that you provided. You agree that, prior to your departure, you will provide the Firm with the name of your subsequent employer or other professional affiliation and the position you intend to assume.

## 6. **Ethics, Independence and Other Compliance Responsibilities**.

a. **General**. You agree that it is your personal responsibility to comply with the Firm's policies, including all Firm specific ethics related policies and compliance programs, as well as the PwC Global Ethics Code of Conduct and Global Risk Management Standards, the PwC US supplement to the Global Code of Conduct (known as "Our Standards"), and the laws and regulations applicable to the Firm's business, including, without limitation:

- Maintaining your independence in accordance with the independence policy of

PwC US and the rules of applicable regulatory bodies;
- Consistently demonstrating ethical conduct in accordance with Firm policies;
- Maintaining your CPA license(s) as required by Firm policies and relevant jurisdictions;
- Cooperating and complying with the regulatory requirements of the Public Company Accounting Oversight Board (PCAOB), including, without limitation, complying with and cooperating as requested with internal investigations and inquiries, providing testimony, producing documents, and, for managerial staff members working on an audit engagement, contacting the PwC US Ethics HelpLine immediately to report certain criminal or regulatory proceedings.

If you are ever uncertain about your obligations, you agree to contact the PwC US Ethics & Compliance Office for clarification and guidance.

b. **Independence**. The U.S. accounting profession is subject to many regulations designed to maintain public trust, including independence rules established by the SEC, PCAOB, AICPA and other regulatory bodies that govern the profession. "Independence" refers to the ability of individuals who provide professional services at public accounting firms to act with integrity, objectivity and impartiality in their work, and encompasses a number of rules, including, without limitation, those relating to personal and business relationships and permissible personal financial holdings. Employees of the Firm are subject to the independence rules applicable to PwC US because of the Firm's relationship to PwC US. Independence obligations prohibit, among other things, you, your spouse/spouse equivalent and your dependents from holding certain positions with or investing in certain audit/attest clients of firms in the PricewaterhouseCoopers global network of firms (the "Network Firms"), and such clients' affiliates. Similarly, a nondependent close relative's position with, or material investment in, an audit/attest client of a Network Firm may impair your compliance with PwC US's independence rules.

Because it is important that you comply with PwC US's independence policy, you acknowledge that you are familiar with PwC US's independence policy. You agree, throughout your career with the Firm, to remain alert to changes in your clients, role, location or financial interests and relationships that may affect your independence status. Periodically, you will be required to confirm your compliance with PwC US's independence policy.

In connection with your independence obligations, the Firm, PwC US or its regulators may request, and you agree to provide, relevant and up-to-date financial and tax information relating to you, your spouse/spouse equivalent, and your dependents. If you are a managerial staff member or employed in the Global Assurance Delivery Center, you also may be required to maintain a current record of your financial interests and other financial relationships (but not their value) in a PricewaterhouseCoopers global network database. If an impairment of PwC US's independence or a conflict of interest exists or is likely to occur, you may be required to dispose of securities or resolve other independence issues on short notice and on terms that are disadvantageous to you. The Firm also may require that you relocate to another Firm office or even separate from its employ.

c. **Work Authorization**. If you are or will be on a Firm-sponsored work visa, you must remain in compliance with, and agree to, the Visa and Work Authorization requirements attached hereto as Exhibit B, which is incorporated herein by reference.

7. **Confidential and Proprietary Information**.

Information, documents and materials relating to any Network Firm and their respective parents, affiliates, subsidiaries, subcontractors, agents, clients, vendors, licensors or suppliers ("Confidential Information") must be treated as confidential and proprietary and may only be used, distributed, disclosed or accessed by you for business purposes related to your employment duties with the Firm. You have an obligation to maintain Confidential Information in strict confidence and to protect and safeguard Confidential Information from unauthorized use, distribution and disclosure. By way of example, Confidential Information may include trade secrets; inventions (whether or not patentable); professional and technical manuals; business forms and processes; computer systems (including hardware, software, databases and information technology systems); client service or other methodologies; sales and related forecasts; marketing and business development plans and strategies; client and prospective client files, lists and materials; research materials; work product and deliverables; and project notes and plans. Information shall not be deemed Confidential Information if it is or becomes available in the public domain other than as a result of an unauthorized use, disclosure or action by you, at your direction or on your behalf, or by any other person who directly or indirectly receives such information from you.

Because Confidential Information is extremely valuable and may be subject to laws restricting disclosure or other obligations of confidentiality, the Network Firms take measures to maintain its confidentiality and guard its secrecy. Confidential Information may not be copied, disclosed, distributed, accessed or used by you (or at your direction or on your behalf) during your employment with the Firm except to the extent necessary to carry out Firm business and, where applicable, only as required or authorized under the terms of any agreements between or among the Network Firms and their respective parents, affiliates, subsidiaries, clients, subcontractors, agents, licensors, vendors or suppliers. When you leave the Firm, you agree not to use, distribute, disclose or access Confidential Information or to take or keep, or provide to any third party, any Confidential Information, irrespective of format, and you agree to return all Confidential Information to the Firm before your departure. The restrictions and obligations in this section apply regardless of whether you created, participated in creating, were in possession of, or had access to information, documents or materials constituting, summarizing, utilizing, containing or otherwise referencing Confidential Information. If you are ever asked to disclose any Confidential Information, whether pursuant to law, statute, rule or regulation (including any subpoena or similar form of process), by professional standards or guidelines, or otherwise, the Firm requests that you contact PwC US's Office of the General Counsel. These confidentiality restrictions are permanent and do not terminate, lapse, expire or otherwise cease upon your departure from the Firm.

Notwithstanding anything to the contrary contained in this Employment Agreement, you may, without informing or obtaining prior authorization of the Firm: (i) disclose trade

secrets in confidence to a federal, state or local government official, either directly or indirectly, or to your attorney, solely for the purpose of reporting or investigating a suspected violation of law that directly pertains to the trade secrets; (ii) disclose trade secrets in a complaint or other document filed in an arbitral, judicial or administrative proceeding that directly pertains to the trade secrets, if such filing is made under seal; and, (iii) disclose trade secrets to your attorney and use the trade secrets in an arbitral, judicial or administrative proceeding brought by you against the Firm alleging retaliation for your having reported a violation of law, provided that you file any document containing the trade secrets under seal and do not otherwise disclose the trade secrets, except as required by court order.

8. **Insider Information**.

You are prohibited from using or sharing information not publicly disclosed, which you obtain during the course of your work for the Firm, for your personal gain or advantage in securities transactions, or for the personal gain or advantage of anyone with whom you improperly share this information. This restriction applies to such information related to any company, not just the Firm's clients and their affiliates. The foregoing obligation is in addition to any obligation that you have not to purchase or hold securities of entities with respect to which the Firm must maintain independence.

9. **Intellectual Property**.

You agree that, upon request by the Firm, you will inform the Firm whether or not you are the owner, in whole or in part, of any patents, design rights (registered and unregistered), trademarks, service marks, copyrights, database rights, trade secrets, or any applications for any such rights (collectively, "Intellectual Property"). If you are the owner of any such Intellectual Property, you further agree that you will furnish all detail regarding such Intellectual Property as requested by the Firm. You agree that you will not incorporate, or permit to be incorporated, any such Intellectual Property, or any Intellectual Property owned by any third party, into a Firm product, process or service without the Firm's prior written consent. Nevertheless, if, in the course of your employment with the Firm, you incorporate into a Firm product, process or service any Intellectual Property owned by you, you hereby grant to the Firm a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, sublicensable, worldwide license to reproduce, make derivative works of, distribute, perform, display, import, make, have made, modify, use, sell, offer to sell, and exploit in any other way such Intellectual Property as part of or in connection with such product, process or service, and to practice any method related thereto.

You agree to disclose promptly to the Firm any and all inventions, discoveries, techniques, technologies, methodologies, writings, software, improvements, and any other works developed, conceived or created by you, either alone or in conjunction with others, at any time during your employment and related to the actual or expected business or activities of the Firm ("Works"), including, without limitation, Works created in connection with services provided to clients. You hereby assign all of your rights, titles and interests in Works (including, without limitation, all intellectual property contained therein) to the Firm. Whenever requested to do so by the

Firm, you agree to cooperate and do all things necessary, including executing all applications, assignments or other instruments that the Firm shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country, or otherwise protect the Firm's interests therein. If you do not execute such instruments within five days of their being presented to you, you hereby appoint the Firm with limited power of attorney to execute all such instruments. This power of attorney is a right coupled with an interest and is irrevocable. These obligations shall continue beyond the conclusion of your employment, and shall be binding upon your assigns, executors, administrators and other legal representatives. All Works shall be considered Confidential Information.

Notwithstanding the foregoing, any provision in this Employment Agreement requiring you to assign or license, or to offer to assign or license, your rights in any Work to the Firm does not apply to an invention or work of authorship that you developed entirely on your own time without using or referring to the Firm's resources, equipment, supplies, facilities, Confidential Information or trade secrets; provided, however, that such provisions shall remain applicable to those inventions or works of authorship that either (i) at the time of creation, conception or reduction to practice of the work or invention relate to the Firm's business, or to actual or demonstrably anticipated research or development of the Firm, or (ii) result from any work performed by you for the Firm. You acknowledge that you bear the burden of proving that an invention or work of authorship is exempt from the assignment provisions of this Employment Agreement. You agree to disclose to the Firm, in confidence, all inventions or works of authorship made solely by you or jointly with others at any time during the term of your employment with the Firm, for a review process under which the Firm may determine such issues as may arise, including the Firm's rights and your rights in such inventions or works of authorship.

10. **Continuing Obligations**.

You represent that you have not taken, and agree that you will not take, in connection with your employment with the Firm, any action that would violate any contractual or other restriction or obligation that is binding on you or any continuing duty you may owe to others. Without limiting the generality of the foregoing, if you have signed a confidentiality, non-disclosure or other similar type of agreement with any former employer or other party, you represent that you have complied, and agree you will continue to comply, with the terms of any such agreement to the extent that its terms are valid pursuant to applicable law. You further represent that you have not improperly used, shared, disclosed, distributed or accessed, and agree that you will not improperly use, share, disclose, distribute or access, the confidential or proprietary information of a third party in connection with your employment with the Firm. You represent and warrant that, after undertaking a careful search (including, without limitation, searches of any computers, cell phones, other electronic devices and hard copy documents), you have returned all property (including, without limitation, property containing confidential information) belonging to all former employers or other parties. Moreover, you agree to indemnify and hold harmless the Firm, its past and present direct and indirect parents, subsidiaries, affiliates, divisions, predecessors, successors and assigns, and their past and present partners, principals, employees, officers,

managers, directors, administrators, attorneys, representatives and agents, from and against any and all claims, awards, judgments, settlements, attorneys' fees and costs (except costs unique to arbitration, which the Firm shall pay if and as required by any applicable arbitration agreement) and other losses resulting from your breach of this provision.

If you are a former federal government or military employee and are subject to an opinion letter issued by a federal government agency ethics officer, you represent that you have provided a copy of such opinion letter to the Firm. You also represent that you have fully complied, and agree that you will continue to fully comply, with the guidance set forth in such letter, and that you have not engaged, and will not engage, in any activity that reasonably could be perceived as a personal conflict of interest under such letter. You agree to inform the PwC US Ethics & Compliance Office or the PwC US's Office of the General Counsel immediately if anyone requests that you take any action that would cause you to violate the guidance set forth in such opinion letter.

11. **Solicitation of Clients**.

a. **Prohibition on Solicitation**. You acknowledge that, because of the nature of your work for the Firm, you will develop, learn of, have access to, or be provided with Confidential Information. You further acknowledge that your solicitation or serving of certain Firm clients or potential clients after the termination of your employment inevitably would involve the unauthorized use or disclosure of Confidential Information, and impair the protectable relationships and goodwill of the Firm. Accordingly, you agree that, for two years following your departure from the Firm for any reason, you will not directly or indirectly solicit, accept as a client, or perform services of any type that the Firm can render ("Services") for, any person or entity: (i) for which you provided Services as an employee of the Firm or that received the benefit of such Services at any time during the two years prior to your departure; or (ii) for which you participated in a proposal to provide Services at any time during the one year prior to your departure. You further agree that you will not assist others in such solicitation, client acceptance, or performance of Services. It shall not be relevant that a person or entity desires or prefers that someone other than the Firm render Services or that the person or entity is already served by you or any third party with which you become associated.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm resulting from any breach by you of section 11(a) is uncertain and will be difficult to ascertain or calculate with precision. If you breach section 11(a), in addition to any other legal and equitable remedies the Firm may have, you agree to pay to the Firm liquidated damages in an amount equal to 25% of the gross fees paid for Services rendered in, or as a result of a, violation of section 11(a). Such percentage shall be paid with respect to all such Services rendered by you or a third party at any time during a period of three years from the first date of such violation. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm will incur as a result of your breach of section 11(a). You agree to make the payment to the Firm within 30 days after each such payment of fees has been made by the client.

12. **Solicitation of Personnel**.

a. **Prohibition on Solicitation**. You agree that, during your employment and for two years following your departure from the Firm for any reason, you will not directly or indirectly solicit, induce or retain, or assist others in soliciting, inducing or retaining, current or "Former" Personnel to become associated with, or perform services of the type the Firm or a parent, subsidiary or affiliate of the Firm (each a "Firm Affiliate") can render on behalf of, you or any employer or third party, or to otherwise disrupt, impair, damage or interfere with the Firm's or a Firm Affiliate's relationship with Personnel. "Personnel" means (i) Firm partners, principals, officers, managers, directors, and employees; and (ii) Firm Affiliate partners, principals, officers, managers, directors, and employees with whom you had material personal contact while providing services as an employee of the Firm at any time within 12 months before your departure from the Firm. "Former" Personnel are Personnel who leave the Firm or a Firm Affiliate within six months before or after you leave the Firm.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm or a Firm Affiliate resulting from any breach by you of section 12(a) will be difficult to ascertain or calculate with precision. If you breach section 12(a), in addition to any other legal and equitable remedies the Firm or such Firm Affiliate may have, you agree to pay to the Firm or Firm Affiliate liquidated damages in an amount equal to 30% of the solicited, induced or retained individual's gross annual compensation at the time of departure (including, without limitation, base salary, commission, bonus and the like) to cover replacement costs, and an additional 10% of such annual compensation to cover costs associated with training such individual's replacement. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm or Firm Affiliate will incur as a result of your breach of section 12(a). You agree to make the payment of such damages to the Firm or Firm Affiliate within 30 days from the mailing of a written notice to you advising you of the amount due.

13. **Injunctive Relief**.

In the event of a breach or threatened breach by you of any provision of sections 7, 9, 11 or 12 of this Employment Agreement, you agree that the Firm or Firm Affiliate, as applicable, in addition to any other legal and equitable remedies available to it, shall be entitled to provisional and injunctive relief from an appropriate forum, subject to the arbitration agreement attached hereto as Exhibit A. You further agree that no bond shall be required to be posted by the Firm or Firm Affiliate, as applicable, in connection with any such application for provisional or injunctive relief. The Firm or Firm Affiliate, as applicable, may pursue any remedy available to it (including, without limitation, those remedies set forth in sections 11(b) and 12(b) above), concurrently or consecutively in any order, and the pursuit of one such remedy will not be deemed to be an election of remedies or waiver of the right to pursue any other remedy.

14. **Assignability**.

You may not assign any of your rights or obligations under this Employment Agreement. This Employment Agreement shall be binding upon and inure to the benefit

of the Firm's successors and assigns. Without limiting the foregoing, the Firm may assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Firm or to any transferee of all or a portion of the assets or business to which this Employment Agreement relates.

15. **Severability**.

      Except with respect to the terms set forth in the arbitration agreement attached hereto as Exhibit A, which contains its own severability provision, if any term or condition set forth in this Employment Agreement is found by a court, arbitral tribunal or other tribunal to be unenforceable, then the remaining terms and conditions will remain in full force and effect. Terms and conditions found to be unenforceable, if any, will be modified by the court or tribunal to conform to a provision that most closely expresses the intent of the unenforceable term or condition.

16. **Dispute Resolution**.

      Unless you are an Excluded Employee (as defined below), you and the Firm agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement. You are an "Excluded Employee" if, at the time you enter into this Employment Agreement, you fall within any of the following exceptions: 1) you are currently a named plaintiff or member of a certified class in litigation pending against the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; 2) you have pending administrative charges against the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; 3) you are otherwise represented by counsel in a current legal dispute with and known to the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; or 4) the most recent time the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States previously presented you with an arbitration agreement, you were given an option to decline and you declined that agreement. If you are an Excluded Employee, the arbitration agreement attached as Exhibit A will not apply to you, and any existing arbitration agreements you have with the Firm, PwC US or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States shall remain in full force and effect in accordance with their terms.

17. **Government Access**.

      Nothing in this Employment Agreement is intended to or shall (x) prevent, impede or interfere with your ability to file a charge or complaint with any federal, state or local government agency or commission, or any self-regulatory authority (each, a "Government Agency"), or (y) limit your ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding conducted by any Government Agency, including providing documents or other information, without notice to or prior authorization from the Firm.

18. **Applicable Law**.

This Employment Agreement is governed by the laws of the State of New York, without regard to its conflict of laws principles and provisions, and irrespective of your practice location, unless otherwise required by the law of the state in which you primarily reside and work.

19. **Representations**.

You acknowledge that you have not relied on any representations or statements, whether oral or written, regarding the subject matter of this Employment Agreement, other than as contained in this Employment Agreement.

20. **Entire Agreement; Modifications**.

You acknowledge that this Employment Agreement, including Exhibit A (unless you are an Excluded Employee) and Exhibit B (if you are or will be on a Firm-sponsored work visa), supersedes all prior oral or written agreements or understandings with the Firm, except for any existing agreements with the Firm regarding repayment obligations, which shall remain in full force and effect in accordance with their terms, and except that, if you are an Excluded Employee, any existing arbitration agreements you have with the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States shall remain in full force and effect in accordance with their terms. This Employment Agreement may be modified only by a writing signed by the leader of your practice unit, or his or her designee; provided, however, that any modification of section 4 of this Employment Agreement must be signed by the Firm's President.

21. **Headings**.

Section headings are used herein for convenience of reference and shall not affect the meaning of any provision of this Employment Agreement.

22. **Electronic Signature**.

To evidence your acceptance of the terms and conditions of this Employment Agreement, you have electronically signed this Employment Agreement. You acknowledge and agree that your electronic signature is the legal equivalent of signing this Employment Agreement by hand.

## **Exhibit A**

## **Arbitration Agreement**

We value our employees and recognize the importance of maintaining strong employee relations. We recognize, however, the possibility that legal disputes may arise between you and PricewaterhouseCoopers LLP, and/or any of its subsidiaries or affiliates based in the United States (collectively the "Firm"). This agreement (the "Agreement") requires that legal disputes be resolved through arbitration in accordance with the terms of this Agreement. For good and valuable consideration, the adequacy, sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.    Scope.

   a.    Agreement to Arbitrate.

This Agreement requires both you and the Firm to resolve all Covered Claims (as described below) exclusively through final and binding arbitration. This Agreement becomes effective on the date you sign the employment agreement to which this Agreement is attached (the "Effective Date"), and survives and continues to apply following termination of employment. This Agreement is a mandatory condition of your employment with the Firm. **By signing the employment agreement, you have accepted this Agreement, and you and the Firm are bound by its terms.**

   b.    Waiver of Trial; Waiver of Class, Collective, Consolidated or Representative Action.

**The parties mutually waive their right to a trial before a judge or jury in federal, state or local court in favor of arbitration under this Agreement.**

**This Agreement applies to Covered Claims that could have proceeded on an individual, class, collective, consolidated or representative basis, had they been pursued in another forum, such as a court of law. This Agreement requires that such claims be submitted to arbitration and that they be arbitrated on an individual basis only. Neither you nor the Firm is permitted to bring Covered Claims on a class, collective, consolidated or representative basis.**

   c.    Covered Claims.

Except as expressly set forth below, this Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment (collectively, "Employment-Related Claims"), that the Firm may have against you, or that you may have against the Firm (and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents), including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered

Claims"). Covered Claims include, without limitation, claims under the Fair Labor Standards Act, the Family and Medical Leave Act, the Equal Pay Act, the Americans with Disabilities Act, the Rehabilitation Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, the Employee Retirement Income Security Act, state and local wage and hour laws, state and local laws concerning discrimination and retaliation, and any other federal, state and local laws regarding employment, and all amendments thereto, claims for breach of contract, claims for breach of post-employment restrictive covenants, claims for breach of fiduciary duty, claims for fraud or misappropriation, claims for misappropriation of trade secrets, and any other claims arising under any federal, state or local statute ordinance, regulation, public policy or common law.

     d.    <u>Claims Not Subject to Arbitration.</u>

The following types of claims are expressly excluded from the definition of Covered Claims:

(i) Employment-Related Claims arising before the Effective Date, to the extent such claims both (a) are not covered by any prior arbitration agreement between you and the Firm, and (b) are the subject of an action filed before the Effective Date in a court or agency of competent jurisdiction

(ii) Claims for unemployment insurance or workers' compensation benefits, except that claims for retaliation pursuant to these laws shall constitute Covered Claims;

(iii) Sarbanes-Oxley Act, Consumer Financial Protection Bureau and Commodity Futures Trading Commission whistleblower complaints;

(iv) Claims for benefits under the Employee Retirement Income Security Act ("ERISA"), which must be resolved in accordance with the terms and procedures set forth in the applicable plan documents;

(v) Claims that are by contract, regulation or rule explicitly subject to a different arbitration procedure (e.g., FINRA);

(vi) Disputes arising under the National Labor Relations Act;

(vii) Claims arising under patent, copyright or trademark law;

(viii) Any claims that, at the time they are asserted, are not permitted to be subject to a pre-dispute arbitration agreement under a contract between the Firm entity by which you are employed and an agency of the U.S. federal government (or applicable subcontract) that is governed by Section 8116 of the Department of Defense Appropriations Act of 2010; Subpart 222.74 of the Defense Federal Acquisition Regulation Supplement; Section 6 of Executive Order No. 17673 ("Fair Pay and Safe Workplaces"); and/or any other similar provision of law; and

(ix) Any other claims that are not permitted to be subject to a pre-dispute arbitration agreement under applicable law.

This Agreement does not affect your right to file a charge with, make a complaint to, or otherwise participate in an investigation by the U.S. Equal Employment Opportunity Commission, U.S. Department of Labor, the National Labor Relations Board, the Public Company Accounting Oversight Board, state boards of accountancy, or other federal, state, or local government agency, nor does it affect the enforcement authority of such agencies. However, you may seek monetary relief with respect to a Covered Claim only through an arbitration conducted pursuant to this Agreement.

2.      Injunctive Relief.

You or the Firm may seek emergency, temporary or preliminary injunctive relief from a court of competent jurisdiction in aid of arbitration or pending final adjudication of a claim in arbitration where the arbitration award may be rendered ineffectual without such relief.

3.      Arbitration Procedure and Applicable Rules.

a.      Rules and Procedures.

The arbitration shall be held under the auspices of JAMS, in accordance with JAMS Employment Arbitration Rules and Procedures (effective July 15, 2009), except to the extent such rules are inconsistent with this Agreement, and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Copies of the applicable rules and procedures may be found at www.jamsadr.com.

b.      Initiating Arbitration.

To initiate arbitration proceedings, you must follow the instructions for the submittal of arbitration to JAMS based on a pre-dispute provision, which are set forth in the demand for arbitration form, available at www.jamsadr.com, except that you need not submit the case management fee as the Firm will submit this fee on your behalf.

To be timely, the demand for arbitration form must be received by JAMS within the statute of limitations period applicable to the legal claims described in the demand for arbitration form.

c.      Costs and Fees.

The Firm shall pay all costs that are unique to arbitration, including the costs of JAMS and the Arbitrator. Each party shall pay its own attorneys' fees and other costs that are not unique to the arbitration (i.e., costs that each party would incur if the claim were litigated in a court), except that the Arbitrator may award attorneys' fees and other costs that are not unique to the arbitration to a party in accordance with the law governing the claim to the same extent a court could do so.

Postponement and cancellation fees shall be payable, at the discretion of the Arbitrator, by the party causing the postponement or cancellation

d.    Location of Arbitration.

The arbitration will take place in the county in which your assigned work office is located, unless the parties mutually agree to an alternative location.

e.    Confidentiality.

To the maximum extent permitted by law, all aspects of the arbitration proceedings, including any award made, shall be kept confidential, except as necessary to comply with a subpoena, court order or other legal requirement, to prosecute or defend a Covered Claim, to enforce an arbitration award or to meet a reasonable business need of the Firm.

f.    Arbitrator Powers and Authority; Limitations.

The Arbitrator shall have the authority to resolve all Covered Claims with finality, in accordance with the rules of JAMS, **except that the Arbitrator shall not have the authority to hear a Covered Claim on a class, collective, consolidated or representative basis, nor shall the Arbitrator have the authority to grant class-wide relief, relief on a consolidated basis, or other relief extending beyond the individual claimant.**

The Arbitrator shall have the authority to award all remedies available to the Firm, and to you, individually, under applicable law.

The Arbitrator shall not have the authority to decide jurisdictional or arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the Arbitration; such questions shall be reserved for a court of competent jurisdiction.

g.    Awards.

All awards shall be provided in the manner required by law, and shall be final and binding on both parties to the maximum extent permitted by law.

The award shall be enforceable by either party in a court of competent jurisdiction pursuant to the terms of the Federal Arbitration Act ("FAA").

4.    At-Will Employment.

Nothing in this Agreement shall be deemed to constitute a contract of employment for any definite term, or to alter the at-will nature of your employment with the Firm.

5.    Choice of Law.

This Agreement shall be governed by the FAA and, to the extent, if any, that the FAA is held not to apply, by the law of the State of New York, without regard to its conflict of laws principles (including for purposes of determining contract formation), unless otherwise required by the law of the state in which you primarily reside and work.

6.    Integration.

Except as stated herein, this is the parties' entire agreement on the subject matter hereof, superseding all prior representations, negotiations or agreements.

7.    Severability.

In the event that any provision of this Agreement is determined to be invalid or unenforceable, it shall be severed from the Agreement, and the rest of the Agreement shall be enforced to the maximum extent permitted by law; **provided**, **however**, **that should any provision of this Agreement requiring that Covered Claims be arbitrated on an individual basis, or that Covered Claims may not be brought on a class, collective, consolidated or representative basis, be determined invalid or unenforceable with respect to a Covered Claim, then that Covered Claim shall not proceed in arbitration, but rather shall be required to be filed in a court of competent jurisdiction.** Any other Covered Claims, whether related or unrelated, that can validly be required to proceed on an individual basis shall remain subject to arbitration under the terms of this Agreement. Any Covered Claim that is filed in a court of competent jurisdiction pursuant to the terms of this paragraph shall be required to return to arbitration in the event the lawsuit does not proceed on a class, collective, consolidated or representative basis. In no event shall any class, collective, consolidated or representative proceeding be permitted to proceed in arbitration.

Agreed to on behalf of the Firm by:

/s/ Margaret E. Burke

Margaret E. Burke
PricewaterhouseCoopers LLP

## Exhibit B - Visa and Work Authorization

As an employee of the Firm, you must have valid employment authorization from the United States Citizenship and Immigration Services at all times. The Firm will petition for appropriate visa status on your behalf and your dependent family members, if any. You agree that all matters relating to the Firm's visa applications on behalf of yourself and your dependent family members, and any other immigration-related filings made in connection with your employment with the Firm, must be handled by immigration counsel for the Firm and coordinated by Firm personnel. The Firm will pay the related attorneys' fees and filing costs. You agree to cooperate fully with the Firm's counsel and personnel.

If your visa or any dependent family member's visa is scheduled to expire while you are employed by the Firm, the Firm, in its sole discretion, may apply for any necessary visa extensions for you and your dependent family members, again utilizing immigration counsel for the Firm and paying the related attorneys' fees and filing costs. You acknowledge and agree that it is your responsibility to monitor your and your dependents' visa status in the United States and to notify the Firm sufficiently in advance of any expiration dates or a change in circumstances that can be expected to affect your visa status or the visa status of your dependents.

The Firm reserves the right to change or eliminate its petition for, sponsorship of, or assistance with, any visa status application, in its sole discretion, at any time. If you leave the Firm's employ for any reason, the Firm has no obligation to continue to petition for visa status or sponsor or otherwise assist you or your dependent family members in the visa process.

**PwC GUID:**   kreinhardt004          **Contract Signature Date Time:**   07/05/2017 10:29AM

Return to Personal Information Summary

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KYLE REINHARDT,

        *Plaintiff,*

    v.

GUIDEHOUSE INC.
and
PRICEWATERHOUSECOOPERS LLP
and
KIM CIRKA,

        *Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

## <u>DECLARATION OF DON MCCRORY</u>

I, Don McCrory, declare and state as follows:

1.      I submit this declaration in support of Defendant's Motion to Compel Arbitration and Stay Litigation.  The facts set forth in this affidavit are based upon my personal knowledge and upon information from business records in my custody and control that are maintained by PricewaterhouseCoopers LLP ("PwC") and its affiliates and subsidiaries.  If called upon to do so, I would be competent to testify to the matters set forth in this declaration.

2.      Since 2008, I have been a Principal in PwC.  During this time, my responsibilities have included the compliance and oversight of government contract compliance matters for PwC, including its affiliates and subsidiaries.

3.      I understand that Kyle Reinhardt commenced the above-captioned action on February 2, 2022.  From that date through the date of this Declaration, PwC has not been a party to any non-commercial contract with the U.S. Department of Defense in excess of $1 million that was executed on or after February 17, 2010.

DocuSign Envelope ID: EA9C0E52-C528-40AC-83E4-0A2076470CF9

I, Don McCrory, declare under penalty of perjury pursuant to the laws of the United States and the District of Columbia that the foregoing is true and correct to the best of my personal knowledge, information and belief.

DATED:          March 31, 2022

Pawleys Island, South Carolina

DocuSigned by:

*Don McCrory*

BBB974EDA31F486

Don McCrory

Filed
D.C. Superior Court
04/01/2022 17:25PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008

                          Plaintiff,

      v.

GUIDEHOUSE, INC.,
1200 19th Street, NW
Suite 700
Washington, DC 20036

PricewaterhouseCooper LLP,
655 New York Ave NW
Washington, DC 20001

Kim Cirka,
902 Lincoln Ave.
Falls Church, VA 22046,

                    Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

## NOTICE OF APPERANCE

PLEASE TAKE NOTICE that John W. H. Harding of Winston & Strawn LLP, with offices located at 1901 L Street NW, Washington, D.C. 20036, hereby appears on behalf of Defendant Guidehouse Inc. in the above captioned matter. I hereby certify that I am admitted to practice before this Court.

Dated: April 1, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.

## CERTIFICATE OF SERVICE

I certify that, on the 1st day of April, 2022, I caused this document to be filed electronically through the Court's electronic-filing system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: April 1, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.

Filed
D.C. Superior Court
04/01/2022 17:33PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008

          Plaintiff,

     v.

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC 20036

PricewaterhouseCooper LLP,
655 New York Ave NW
Washington, DC 20001

Kim Cirka
902 Lincoln Ave.
Falls Church, VA 22046,

         Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

## <u>NOTICE OF APPERANCE</u>

PLEASE TAKE NOTICE that Stephen Sheinfeld of Winston & Strawn LLP, with offices

located at 200 Park Avenue, New York, New York 10166, hereby appears on behalf of Defendant

Guidehouse Inc. in the above captioned matter. I hereby certify that I am admitted to practice

before this Court.

Dated: April 1, 2022

Respectfully submitted,

*/s/ Stephen L. Sheinfeld*
Stephen L. Sheinfeld #399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Attorney for Defendant Guidehouse Inc.

## CERTIFICATE OF SERVICE

I certify that, on the 1st day of April, 2022, I caused this document to be filed electronically through the Court's electronic-filing system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: April 1, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.

Filed
D.C. Superior Court
04/01/2022 17:45PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008,

                Plaintiff,

      v.

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC 20036,

PricewaterhouseCoopers LLP
655 New York Ave NW
Washington, DC 20001

Kim Cirka
902 Lincoln Ave.
Falls Church, VA 22046,

                Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

## DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Superior Court's Rules of Civil Procedure, Defendant Guidehouse Inc. certifies that it is a corporation organized under the laws of the State of Delaware, that Guidehouse LLP is its parent, and that no publicly held corporation owns ten percent or more of its stock.

Dated: April 1, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Stephen L. Sheinfeld #399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Benjamin M. Ostrander*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (telephone)
(312) 558-5700 (fax)
BOstrander@winston.com

Attorneys for Defendant Guidehouse Inc.

* pro hac application forthcoming

**CERTIFICATE OF SERVICE**

I certify that, on the 1st day of April, 2022, I caused this document to be filed electronically through the Court's electronic-filing system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: April 1, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.

Filed
D.C. Superior Court
04/01/2022 17:57PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| KYLE REINHARDT<br>3041 Sedgwick St. NW<br>104D<br>Washington, DC 20008,<br><br>                    Plaintiff,<br><br>      v.<br><br>GUIDEHOUSE, INC.<br>1200 19th Street, NW<br>Suite 700<br>Washington, DC 20036,<br><br>PricewaterhouseCoopers LLP<br>655 New York Ave NW<br>Washington, DC 20001<br><br>Kim Cirka<br>902 Lincoln Ave.<br>Falls Church, VA 22046,<br><br>                 Defendants. | Civil Action No. 2022 CA 000530 B<br><br>Hon. Maurice A. Ross<br>Next Court Date: July 22, 2022<br>Event: Initial Scheduling Conference |

### DEFENDANT GUIDEHOUSE INC.'S
### MOTION TO STAY AND TO COMPEL ARBITRATION

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, and D.C. Code §§ 16-4407(e)–(f), Defendant Guidehouse Inc. ("Guidehouse") hereby moves this Court for an order staying this judicial proceeding and compelling arbitration of Plaintiff's claims. In support of the motion, Guidehouse provides the attached points and authorities.

Dated: April 1, 2022

GUIDEHOUSE INC.

By Counsel
/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St. NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Stephen L. Sheinfeld #399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Benjamin M. Ostrander*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (telephone)
(312) 558-5700 (fax)
BOstrander@winston.com

Attorneys for Defendant Guidehouse Inc.

* *pro hac vice* application forthcoming

## RULE 12-I CERTIFICATION

I hereby certify that counsel for Defendant Guidehouse Inc. made good-faith efforts to resolve the issues raised by this motion and spoke with counsel for Plaintiff Kyle Reinhardt on March 8, 2022; March 10, 2022; and March 16, 2022 but was unable to obtain consent to the relief sought.

Dated: April 1, 2022

GUIDEHOUSE INC.

By Counsel
/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Stephen L. Sheinfeld #399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Benjamin M. Ostrander*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (telephone)
(312) 558-5700 (fax)
BOstrander@winston.com

Attorneys for Defendant Guidehouse Inc.

* *pro hac vice* application forthcoming

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008

                 Plaintiff,

        v.

GUIDEHOUSE, INC.,
1200 19th Street, NW
Suite 700
Washington, DC 20036

PricewaterhouseCoopers LLP,
655 New York Ave NW
Washington, DC 20001

Kim Cirka,
902 Lincoln Ave.
Falls Church, VA 22046,

               Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

**POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT GUIDEHOUSE INC.'S**
**MOTION TO STAY AND TO COMPEL ARBITRATION**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 1

ARGUMENT ........................................................................................................ 3

I.      This Judicial Proceeding Should Be Stayed While the Court Considers Whether to
        Order Arbitration............................................................................................ 3

II.     Reinhardt Must Arbitrate His Claims Pursuant to the Arbitration Agreement ................. 4

        A.      Both the FAA and D.C. Code Require Reinhardt to Arbitrate. ............................ 4

        B.      The Arbitration Agreement Is an Enforceable Agreement to Arbitrate ................. 5

        C.      Reinhardt's Claims Fall Within the Scope of the Arbitration Agreement............ 6

        D.      There Is No Basis For Refusing to Enforce the Arbitration Agreement ............. 10

                1.      The Arbitration Agreement Is Not Unconscionable. .............................. 10

                2.      Reinhardt's Breach of Contract Claim Does Not Render the
                        Arbitration Agreement Unenforceable. ................................................. 12

CONCLUSION ................................................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*2200 M St. LLC v. Mackell*,
940 A.2d 143 (D.C. 2007)...........................................................................................7

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)......................................................................................................4

*Ashford v. PricewaterhouseCoopers LLP*,
954 F.3d 678 (4th Cir. 2020).......................................................................................6

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)......................................................................................................4

*Benefits Commc'n Corp. v. Klieforth*,
642 A.2d 1299 (D.C. 1994)..........................................................................................8

*Booker v. Robert Half Int'l, Inc.*,
315 F. Supp. 2d 94 (D.D.C. 2004)...............................................................................9

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)...................................................................................................13

*Chatziplis v. PricewaterhouseCoopers LLP*,
No. 17-CIV-4109 ER, 2018 WL 3323820 (S.D.N.Y. 2018)........................................6

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)......................................................................................................4

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
793 F. Supp. 2d 311 (D.D.C. 2011)..............................................................................6

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999).......................................................................................11

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018)..................................................................................................4

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)....................................................................................................10

*Friend v. Friend*,
609 A.2d 1137 (D.C. 1992)...........................................................................................5

*Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.,*
    174 F. Supp. 3d 378 (D.D.C. 2016) ................................................................ 10

*Gillman v. Chase Manhattan Bank, N.A.,*
    73 N.Y.2d 1 (1988) .................................................................................. 10, 11, 12

*Gilmer v. Interstate/Johnson Lane Corp.,*
    500 U.S. 20 (1991) ...................................................................................... 11

*Harrell v. PricewaterhouseCoopers LLP,*
    No. 3:16-cv-3771, ECF No. 18 (N.D. Tex. Jan. 12, 2017) ...................... 6

*Hughes v. CACI, Inc.,*
    384 F. Supp. 2d 89 (D.D.C. 2005) ............................................................ 7

*Jahanbein v. Ndidi Condo. Unit Owners Ass'n, Inc.,*
    85 A.3d 824 (D.C. 2014) ....................................................................... 5, 7, 9

*Kauffman v. Int'l Bhd. of Teamsters,*
    950 A.2d 44 (D.C. 2008) ............................................................................ 6

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark,*
    137 S. Ct. 1421 (2017) ............................................................................... 4

*Lopata v. Coyne,*
    735 A.2d 931 (D.C. 1999) .......................................................................... 7

*Masurovsky v. Green,*
    687 A.2d 198 (D.C. 1996) .......................................................................... 7

*Meshel v. Ohev Sholom Talmud Torah,*
    869 A.2d 343 (D.C. 2005) .......................................................................... 5

*Nanosolutions, LLC v. Prajza,*
    793 F. Supp. 2d 46 (D.D.C. 2011) ........................................................... 13

*Nayal v. HIP Network Servs. IPA, Inc.,*
    620 F. Supp. 2d 566 (S.D.N.Y. 2009) ..................................................... 11

*Nichols v. Wash. Mut. Bank,*
    2007 WL 4198252 (E.D.N.Y. Nov. 21, 2007) ...................................... 12

*Parker v. K & L Gates, LLP,*
    76 A.3d 859 (D.C. 2013) ......................................................................... 7, 9

*Porzio v. PricewaterhouseCoopers LLP,*
    No. 159531/2018, Doc. No. 20 (N.Y. Sup. Ct. June 25, 2019) .............. 6

*Ragone v. Atl. Video at Manhattan Ctr.*,
   595 F.3d 115 (2d Cir. 2010) ................................................................ 11

*Sablosky v. Edward S. Gordon Co.*,
   73 N.Y.2d 133 (1989) ........................................................................ 10

*TK Servs., Inc. v. RWD Consulting, LLC*,
   263 F. Supp. 3d 64 (D.D.C. 2017) ...................................................... 9

*TRG Customer Sols., Inc. v. Smith*,
   226 A.3d 751 (D.C. 2020) .................................................................. 5

*Wolff v. Westwood Mgmt., LLC*,
   503 F. Supp. 2d 274 (D.D.C. 2007) .................................................. 12

**Statutes**

9 U.S.C. § 1 ............................................................................................ 4

9 U.S.C. § 2 ............................................................................................ 4

9 U.S.C. § 3 ............................................................................................ 5

D.C. Code § 16-4406(a) .......................................................................... 5

D.C. Code § 16-4407(a)(2) ...................................................................... 5

D.C. Code § 16-4407(e) .......................................................................... 3

D.C. Human Rights Act .................................................................... 3, 7, 8

D.C. Wage Payment and Collection Law ............................................ 3, 9

## INTRODUCTION

On July 5, 2017, Plaintiff Kyle Reinhardt ("Reinhardt") entered into an employment agreement with Defendant Guidehouse in which he agreed to be bound by the terms of an arbitration agreement (the "Arbitration Agreement") requiring both Reinhardt and Guidehouse to resolve "all Covered Claims … exclusively through final and binding arbitration." "Covered Claims" includes all claims against Guidehouse "relating to or arising out of" Reinhardt's employment with Guidehouse, or his separation from such employment. Ignoring his contractually mandated duty to arbitrate, Reinhardt now seeks to pursue claims against Guidehouse in this judicial proceeding relating to and arising out of his employment with Guidehouse and the termination of that employment. As Reinhardt's claims fall squarely within the scope of the valid and enforceable Arbitration Agreement, this Court should stay this proceeding and compel arbitration of such claims.

## FACTUAL BACKGROUND

Guidehouse is a management consulting firm. (Declaration of Jennifer Moltzan, dated April 1, 2022 ("Moltzan Decl."), ¶ 1.) On July 5, 2017, in consideration of his promotion to the position of Director and continued employment, Reinhardt entered into an employment agreement with Guidehouse (the "Employment Agreement"). (*Id.*, Ex. 1 at p. 16.) In the Employment Agreement, both Reinhardt and Guidehouse "agree[d] to be bound by the terms of the arbitration agreement … which requires both [Reinhardt] and [Guidehouse] to submit to final and binding arbitration all claims covered under the arbitration agreement." (*Id.*, Ex. 1 at p. 9, § 16.) The Arbitration Agreement is expressly incorporated within and attached as Exhibit A to the Employment Agreement. (*Id.*)

The Arbitration Agreement requires both Reinhardt and Guidehouse to "resolve all Covered Claims … exclusively through final and binding arbitration." (*Id.*, Ex. 1 at p. 11, § 1.a.) "Covered Claims" are broadly defined as follows:

> Except as expressly set forth below, this Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment (collectively, "Employment-Related Claims"), that the Firm may have against you, or that you may have against the Firm (and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents), including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered Claims").

(*Id.*, Ex. 1 at p. 11, § 1.c.) Thus, "Covered Claims" includes any claims "relating to or arising out of" Reinhardt's employment at Guidehouse, or the termination of such employment. (*Id.*) Moreover, the Arbitration Agreement provides that "Covered Claims" specifically include, "without limitation," claims under "state and local wage and hour laws," "state and local laws concerning discrimination and retaliation," "state and local laws regarding employment," and "claims for breach of contract." (*Id.*) The Arbitration Agreement is expressly governed by the Federal Arbitration Act ("FAA"). (*Id.*, Ex. 1, at p. 11, § 5.)

On September 23, 2021, Guidehouse terminated Reinhardt's employment for performance issues. (*Id.* at ¶ 11.) Reinhardt filed a complaint with the District of Columbia Office of Human Rights ("DCOHR") on October 14, 2021, but withdrew that complaint on February 2, 2022. (Compl., ¶¶ 112–13.) That same day, in disregard of his obligations under the Arbitration Agreement, Reinhardt commenced this judicial proceeding alleging claims against Guidehouse and others "relating to or arising out of" his employment with and termination from Guidehouse.

Specifically, Reinhardt purports to assert claims against Guidehouse for workplace sex discrimination under the D.C. Human Rights Act ("DCHRA") (Count I), workplace sexual abuse

under the DCHRA (Count II), workplace retaliation under the DCHRA (Count III), and intentional infliction of emotional distress (Count V)—each of which purports to relate to or arise from conduct that allegedly occurred during the course of and in connection with his Guidehouse employment.  In addition, Reinhardt purports to assert claims for breach of contract (Count VI) and violation of the D.C. Wage Payment and Collection Law (Count VII) against Guidehouse.[1]

All claims against Guidehouse are "Covered Claims" under the Arbitration Agreement as Reinhardt alleges that they relate to or arise out of his employment with and termination from Guidehouse.  Although counsel for Guidehouse notified Reinhardt's counsel of the existence of the Arbitration Agreement and requested that Reinhardt withdraw this judicial proceeding and pursue his claims in arbitration in accordance with the Arbitration Agreement, Reinhardt has refused to do so, necessitating the instant motion to compel.

## ARGUMENT

### I.   This Judicial Proceeding Should Be Stayed While the Court Considers Whether to Order Arbitration.

This Court should order Reinhardt to arbitrate his claims pursuant to the Arbitration Agreement.  D.C. Code provides that "[i]f a party makes a motion to the court to order arbitration, the court, on just terms, shall stay any judicial proceeding that involves a claim alleged to be subject to the arbitration until the court renders a final decision" on arbitrability.  D.C. Code § 16-4407(e).  Consistent with that Code provision, this judicial proceeding should be stayed until the

---

[1]     Reinhardt also purports to bring these same counts against defendant PricewaterhouseCoopers LLP ("PwC"), by which he was employed prior to the carve-out of its public sector business into Guidehouse LLP in 2018.  (Compl., ¶ 1.)  Throughout the Complaint, Reinhardt refers to both PwC's public sector carve-out and Guidehouse Inc. as "Guidehouse."  *Id.*  Reinhardt also brings Counts I–III against defendant Kim Cirka (his former supervisor), and purports to assert a claim for battery (Count IV) solely against Cirka.

Court rules on whether Reinhardt must arbitrate.  If this Court orders Reinhardt to bring his claims in arbitration, the stay will remain in effect during the pendency of the arbitration.  *Id.* § 16-4407(f).

## II.     Reinhardt Must Arbitrate His Claims Pursuant to the Arbitration Agreement.

### A.     Both the FAA and D.C. Code Require Reinhardt to Arbitrate.

The Arbitration Agreement expressly provides that it is governed by the FAA.  (Moltzan Dec., Ex. 1, at p. 11, § 5.)  The FAA applies to all written agreements to arbitrate "evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2; *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that 9 U.S.C. § 1 exempts only employment contracts of transportation workers from coverage of the FAA).  There can be no question that the Arbitration Agreement is governed by the FAA.  *Id.*

The FAA codifies the "liberal federal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).   It provides that all arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  As such, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms."  *AT&T Mobility*, 563 U.S. at 339; *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting that the FAA "require[s] courts to respect and enforce agreements to arbitrate"); *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1428 (2017) ("The Act, to be sure, requires a State to enforce all arbitration agreements."); *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) ("courts must rigorously enforce arbitration agreements according to their terms") (internal quotation marks omitted).

Like the FAA, the District of Columbia Revised Uniform Arbitration Act ("RUAA") also "broadly protect[s] the right of a party to contract for the use of arbitration as an alternative dispute-resolution mechanism."  *TRG Customer Sols., Inc. v. Smith*, 226 A.3d 751, 755 (D.C. 2020).

Specifically, the RUAA—like the FAA—states that arbitration agreements are "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." D.C. Code § 16-4406(a). Under District of Columbia law, there is a "*strong preference favoring arbitration* when a contract contains an arbitration clause." *TRG Customer Sols.*, 226 A.3d at 755 (emphasis added); *see also Friend v. Friend*, 609 A.2d 1137, 1139 (D.C. 1992) ("Federal and District of Columbia statutes are in agreement on the issue of favoring arbitration when the parties have entered into a contract containing an arbitration clause.") (internal quotation marks omitted).

Under either the FAA or RUAA, the Court's analysis is the same and requires arbitration where a court finds that "the parties have an enforceable agreement to arbitrate and that 'the underlying dispute between the parties falls within the scope of the agreement.'" *Jahanbein v. Ndidi Condo. Unit Owners Ass'n, Inc.*, 85 A.3d 824, 827 (D.C. 2014) (quoting *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 354 (D.C. 2005)). Once a determination is made that the underlying dispute is subject to arbitration, both the FAA and the RUAA require the Court to compel arbitration. *See* 9 U.S.C. § 3 (providing for a stay of litigation pending arbitration "in accordance with the terms of the agreement"); *id.*, § 4 (providing for an "order directing the parties to proceed to arbitration in accordance with the terms of the agreement"); D.C. Code § 16-4407(a)(2) ("if the refusing party opposes the motion [to compel arbitration], the court shall proceed to summarily decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate").

B.    **The Arbitration Agreement Is an Enforceable Agreement to Arbitrate.**

Reinhardt and Guidehouse have an enforceable agreement to arbitrate. As a condition of his promotion to Director at Guidehouse, Reinhardt explicitly agreed to be bound by the Arbitration Agreement. (Moltzan Decl. at ¶¶ 4, 12; Ex. 1 at p. 11, § 1.a. ("**By signing this**

**employment agreement, you have accepted this [Arbitration] Agreement, and you and the Firm are bound by its terms**.") (emphasis in original).)  The Employment Agreement binds both Reinhardt and Guidehouse and requires both to submit to final and binding arbitration all claims covered under the Arbitration Agreement.  (*Id.*, Ex. 1 at p. 9, § 16.)  The Arbitration Agreement, in turn, requires both Reinhardt and Guidehouse "to resolve all Covered Claims … exclusively through final and binding arbitration."  (*Id.*, Ex. 1 at p. 11, § 1.a.)  In exchange for entering into the Arbitration Agreement, Reinhardt received valuable consideration—specifically, a promotion to Director, continued employment, and Guidehouse's mutual promise to arbitrate.  (*Id.*, Ex. 1 at p. 11, §§ 1.a., 1.c.)  Moreover, "the District of Columbia adheres to the majority position that continued employment may serve as consideration for a new agreement if the employment is at-will."  *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 343 (D.D.C. 2011) (citing *Kauffman v. Int'l Bhd. of Teamsters*, 950 A.2d 44, 48 (D.C. 2008)).  Therefore, there can be no dispute that a valid and enforceable agreement to arbitrate exists and that Reinhardt is bound by the Arbitration Agreement.[2]

### C.    Reinhardt's Claims Fall Within the Scope of the Arbitration Agreement.

In determining whether Reinhardt's claims fall within the scope of the Arbitration Agreement, the Court must determine "whether the arbitration clause is susceptible of an interpretation that covers the dispute."[3]  *Parker v. K & L Gates, LLP*, 76 A.3d 859, 867 (D.C.

---

[2]    Courts have repeatedly found PwC arbitration agreements containing terms nearly identical to the Arbitration Agreement here to be valid and enforceable.  *See, e.g.*, *Ashford v. PricewaterhouseCoopers LLP*, 954 F.3d 678, 683–86 (4th Cir. 2020) (reversing and remanding with instructions to dismiss the complaint and compel arbitration); *Chatziplis v. PricewaterhouseCoopers LLP*, No. 17-CIV-4109 ER, 2018 WL 3323820, at *1 (S.D.N.Y. 2018) (granting motion to compel arbitration and staying case); *Harrell v. PricewaterhouseCoopers LLP*, No. 3:16-cv-3771, ECF No. 18 (N.D. Tex. Jan. 12, 2017) (same); *Porzio v. PricewaterhouseCoopers LLP*, No. 159531/2018, Doc. No. 20 (N.Y. Sup. Ct. June 25, 2019) (same).

[3]    The Court should determine this gateway issue of "arbitrability" in accordance with the Arbitration Agreement, which specifically provides that the "Arbitrator" does not have the authority to decide "arbitrability disputes."  (Moltzan Decl., Ex. 1, at p. 14, § 3.f.)

2013) (internal quotation marks omitted). "If the clause is susceptible to such an interpretation, then the trial court must order arbitration." *Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1996). "Any ambiguity or doubt over whether a claim is covered by the Arbitration Agreement must be "resolved in favor of arbitration." *Jahanbein*, 85 A.3d at 827. Therefore, "[u]pon a finding of the existence of an enforceable arbitration clause, a presumption in favor of arbitration attaches." *2200 M St. LLC v. Mackell*, 940 A.2d 143, 151 (D.C. 2007) (quoting *Lopata v. Coyne*, 735 A.2d 931, 936 (D.C. 1999)).

Here, Reinhardt's complaint alleges generally that Guidehouse and Cirka created a hostile workplace environment in which Reinhardt was sexually harassed, retaliated against for not "playing the game," wrongfully denied a promotion, placed on a performance improvement plan, and terminated. (*See* Compl., ¶¶ 2–13.) The claims fall within the scope of the Arbitration Agreement because they constitute "Covered Claims," i.e., claims that Reinhardt alleges "relat[e] to or aris[e] out of" his employment with Guidehouse and the termination thereof. (*See* Moltzan Decl., Ex. 1 at p. 11, § 1.c.)

Specifically, with respect to Counts I through III under the DCHRA, the definition of "Covered Claims" explicitly includes "state and local laws concerning discrimination and retaliation," like the DCHRA. (Moltzan Decl., Ex. 1 at p.11, § 1.c.) *See, e.g., Hughes v. CACI, Inc.*, 384 F. Supp. 2d 89, 95, 97–98 (D.D.C. 2005) (finding DCHRA claims fell within scope of arbitration provision where agreement stated that it applied to any claim "arising out of or relating to [the] employment (including without limitation to any claim of discrimination whether based on race … or any other legally protected status, and whether based on federal or State law"). Nor is there any question under District of Columbia law that claims under the DCHRA may be subject

to arbitration, and "agreements to arbitrate employment discrimination claims are enforceable." *See Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1304 (D.C. 1994).

Moreover, Reinhardt explicitly alleges that these claims relate to and arise out of his employment and his termination of employment with Guidehouse.  (*See* Compl., ¶ 128 (Count I: "Defendant Guidehouse discriminated against Reinhardt through the actions of its partner Cirka's sexual harassment and assault, and in doing so, created an illegal and hostile work environment."); *id.* at ¶ 135 (Count II: "Defendants subjected Reinhardt to discrimination based on his status as a victim of sexual abuse when they (a) failed to promote him to partner; (b) placed him on a pretextual performance improvement plan; (c) created an intimidating and hostile work environment; and (d) fired him."); *id.* at ¶ 145 (Count III: Defendants took adverse actions against Reinhardt by (a) terminating his employment; (b) placing Reinhardt on a pretextual performance improvement plan; and (c) failing to promote Reinhardt to partner.")).  Thus, Counts I through III unquestionably fall within the Arbitration Agreement's definition of "Covered Claims."  (*See* Moltzan Decl., Ex. 1 at p. 11, § 1.c.)

Count V (intentional infliction of emotional distress)[4] is also a "Covered Claim" that Reinhardt must arbitrate.  According to Reinhardt's complaint, Guidehouse—as a consulting firm—"built [business] relationships through dinners and drinks," and it was during these "dinner[s] and drinks" with Cirka that the alleged instances of purported workplace harassment occurred.  (*See* Compl., ¶¶ 3–8, 37–96.)  Significantly, Reinhardt himself describes these "dinner[s] and drinks" with Cirka as a "regular part of Reinhardt's job at Guidehouse."  (*Id.* at ¶ 28.)  Indeed, according to Reinhardt, these dinners and drinks were a "job requirement." (*Id.* at ¶ 9.)  Because Reinhardt tethers his claim for intentional infliction of emotional distress to alleged

---

[4]      Reinhardt does not assert Count IV (battery) against Guidehouse.

conduct that occurred during work "dinner and drinks" with Cirka, this too is a "Covered Claim" under the Arbitration Agreement. *See Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 96–98 (D.D.C. 2004) (concluding that plaintiff's claims fell within employment agreement arbitration provision that covered "[a]ny dispute arising out of or relating to Employee's employment").

In addition, in Count V Reinhardt alleges that he suffers such emotional distress as a result of, among other things, employment "discrimination" and "retaliation" against him (Compl., ¶ 155), including with respect to the alleged failure to promote him, the performance improvement plan, and the termination of his employment. (*See id.* at ¶¶ 97–112.) Such allegations bring Count V squarely within the Arbitration Agreement's definition of "Covered Claims." (Moltzan Decl., Ex. 1 at p. 11, § 1.c.) At a minimum, the Arbitration Agreement is "susceptible to an interpretation" that it covers the claim in Count V, *see Parker*, 76 A.3d at 867, and given the presumption in favor of arbitration, any ambiguity or doubt must be resolved in favor of arbitration. *Jahanbein*, 85 A.3d at 827.

Both Count VI (breach of contract) and Count VII (violation of the D.C. Wage Payment and Collection Law) against Guidehouse also fall squarely within the scope of the Arbitration Agreement, which specifically includes both "claims for breach of contract" and claims under "state and local wage and hour laws" within its definition of as "Covered Claims." (Moltzan Decl. Ex. 1 at p. 11, § 1.c.) *See, e.g., TK Servs., Inc. v. RWD Consulting, LLC*, 263 F. Supp. 3d 64, 68 (D.D.C. 2017) (acknowledging that there could be no dispute that breach of contract claim fell within the ambit of arbitration provision that covered "any claim concerning an alleged breach" of the contract).

Finally, the alleged factual basis for both Count VI and Count VII is that Guidehouse supposedly refused to pay severance owed Reinhardt in breach of the Employment Agreement.[5]

---

[5] *See* Compl., ¶ 160 (Count VI: "Defendants have breached the employment contract by failing to pay Reinhardt the severance due under the contract."); *id.*, ¶ 165 (Count VII: "Defendants Guidehouse and PWC [sic] have thus far refused to pay Reinhardt the severance due under his contract.").

Accordingly, in addition to the reasons set forth in the preceding paragraph, these claims are "Covered Claims" because they relate to or arise out of alleged breaches of Reinhardt's Employment Agreement. (Moltzan Decl., Ex. 1 at p. 11, § 1.c.)

**D.     There Is No Basis For Refusing to Enforce the Arbitration Agreement.**

To the extent Reinhardt argues that his claims are not arbitrable because the Arbitration Agreement is somehow unconscionable, or that his alleged breach of contract claim renders the Arbitration Agreement unenforceable, such arguments are meritless and the Court should reject them outright.

**1.     The Arbitration Agreement Is Not Unconscionable.**

To defeat the Arbitration Agreement on the ground of unconscionability, Reinhardt must establish that the Arbitration Agreement is both substantively and procedurally unconscionable. *Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 138–89 (1989).[6]  Reinhardt cannot satisfy either prong of this standard.

"The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10–11 (1988). In analyzing whether procedural unconscionability exists, courts consider "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the

---

[6]     The Arbitration Agreement's choice-of-law provision states: "This Agreement shall be governed by the FAA and, to the extent, if any, that the FAA is held not to apply, by the law of the State of New York, without regard to its conflict of laws principles (including for purposes of determining contract formation)." (Moltzan Declaration, Ex. 1 at p. 15, § 5.) Under the FAA, state contract law governs any questions of whether the parties formed a valid agreement. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). Under D.C. law, "[c]hoice of law provisions in contracts are enforceable, and, when they exist, courts must apply the state law specified in the contract." *Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*, 174 F. Supp. 3d 378, 386 (D.D.C. 2016). Accordingly, New York law governs any assertion of unconscionability as to the Arbitration Agreement.

party claiming unconscionability, and whether there was disparity in bargaining power." *Id.* (internal citations omitted).

Offering an arbitration agreement on a "take-it-or-leave-it" basis "is not sufficient under New York law to render the provision procedurally unconscionable." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009); *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) ("the FAA certainly does not preclude the enforcement of employment contracts which make employment conditional upon an employee's acceptance of mandatory arbitration"). Moreover, "'[m]ere inequality in bargaining power' between employers and employees is not alone sufficient to hold arbitration agreements unenforceable." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991)).

Here, the terms of the Arbitration Agreement were clearly stated and incorporated into Reinhardt's Employment Agreement. And acceptance of the Arbitration Agreement was a "mandatory condition" of Reinhardt's continued employment with Guidehouse. (Moltzan Decl., Ex. 1 at p. 11, § 1.a.) Reinhardt admits he is a "highly educated military veteran" with advanced degrees from prestigious educational institutions. (*See* Compl., ¶¶ 15, 24.) As a sophisticated, highly educated actor, Reinhardt cannot claim that he lacked a meaningful choice in connection with his acceptance of the Arbitration Agreement, since he simply could have rejected the offer of promotion to Director. *Cf. Ragone*, 595 F.3d at 122 (holding arbitration agreement offered on a take-it-or-leave-it basis was not procedurally unconscionable, and noting that "New York law does not absolve [plaintiff] of this obligation because she 'does not have a college degree and has no experience or background in business or human resources'"). Accordingly, the Arbitration Agreement cannot be deemed procedurally unconscionable.

In determining issues of substantive unconscionability, courts examine whether the terms of the agreement are unreasonably favorable to the party trying to enforce it. *Gillman*, 73 N.Y.2d at 12. Here, the Arbitration Agreement does not favor either party; both Guidehouse and Reinhardt have identical, mutual obligations to bring all "Covered Claims" against the other in arbitration. (*See, e.g.*, Moltzan Decl., Ex. 1 at p. 11, § 1.a. ("This Agreement requires both you and the Firm to resolve all Covered Claims (as described below) exclusively through final and binding arbitration."); *id.*, Ex. 1 at p. 11, § 1.c. ("Covered Claims" include "Employment-Related Claims" "that the Firm may have against you, or that you may have against the Firm")). As courts have recognized, "[m]andatory arbitration clauses that bind both parties are generally not substantively unconscionable." *Nichols v. Wash. Mut. Bank*, 2007 WL 4198252, at *8 (E.D.N.Y. Nov. 21, 2007). Because in the instant case both parties have reciprocal obligations under the Arbitration Agreement, any semblance of substantive unconscionability is absent.

### 2. Reinhardt's Breach of Contract Claim Does Not Render the Arbitration Agreement Unenforceable.

Similarly, Reinhardt's assertions (in Counts VI and VII) that Guidehouse breached certain provisions of the Employment Agreement—not the Arbitration Agreement—provide no basis for refusing to enforce the Arbitration Agreement. "It is well settled that under the FAA, a district court's consideration of a motion to compel arbitration is limited to determining whether the parties entered into a valid agreement to arbitrate, and does not reach the merits of the parties' claims." *Wolff v. Westwood Mgmt., LLC*, 503 F. Supp. 2d 274, 283 (D.D.C. 2007). It is also settled that, on a motion to compel arbitration, the FAA prohibits a district court from considering challenges to "the contract as a whole" and only permits a court to determine challenges specifically directed to the agreement to arbitrate. *Nanosolutions, LLC v. Prajza*, 793 F. Supp. 2d 46, 54–55 (D.D.C. 2011) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006)).

Here, because Reinhardt's contract claims in Counts VI and VII are predicated on alleged breaches of other provisions of the Employment Agreement—not breaches of the Arbitration Agreement—such claims are irrelevant to the Court's determination of arbitrability on this motion.

## **CONCLUSION**

For the reasons set forth above, this Court should issue an order staying this judicial proceeding and directing Reinhardt to bring his claims against Guidehouse in arbitration in accordance with the parties' Arbitration Agreement, the FAA, and the RUAA.

Dated: April 1, 2022

GUIDEHOUSE INC.

By Counsel
/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St. NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Stephen L. Sheinfeld #399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Benjamin M. Ostrander*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (telephone)
(312) 558-5700 (fax)
BOstrander@winston.com

Attorneys for Defendant Guidehouse Inc.

* *pro hac vice* application forthcoming

## CERTIFICATE OF SERVICE

I certify that, on the 1st day of April, 2022, I caused this document to be filed electronically through the Court's electronic-filing system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: April 1, 2022

GUIDEHOUSE INC.

By Counsel
/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.

Exhibit A

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

KYLE REINHARDT,

                Plaintiff,

     v.

GUIDEHOUSE INC.,
PRICEWATERHOUSECOOPERS, LLP,
KIM CIRKA,

                Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

## DECLARATION OF JENNIFER MOLTZAN

     I, Jennifer Moltzan, pursuant to D.C. Superior Court Rule of Civil Procedure 9-I, state as follows:

     1.     I am currently employed at Guidehouse Inc. as a Director, Human Capital. Guidehouse is a consulting firm serving both the public and commercial sectors. I was previously employed at PricewaterhouseCoopers LLP ("PwC") from December 12, 2011 through December 31, 2014, and at PricewaterhouseCoopers Public Sector LLP ("Public Sector") from January 1, 2015 through December 31, 2019, including after Public Sector changed its name to Guidehouse LLP on June 13, 2018. I am competent and authorized to make this declaration and do so based upon my personal knowledge or my review of business records maintained by Guidehouse Inc. in the regular course of its business activity. I am over the age of eighteen (18), and, if called as a witness, I could and would testify competently as to the facts set forth herein.

     2.     Reinhardt began his employment with PwC on or about September 10, 2012 in PwC's consulting line of client service.

3.      From January 1, 2015 to May 1, 2018, Public Sector operated as the public sector consulting business and a subsidiary of PwC.

4.      On July 5, 2017, in consideration of his promotion to the position of Director at Public Sector, and as a condition of his continued employment, Reinhardt entered into an Employment Agreement. A true and correct copy of Reinhardt's Employment Agreement is attached as Exhibit 1. The Arbitration Agreement is incorporated within, and attached as Exhibit A to, the Employment Agreement. *Id.* at pp. 9, 11–15.

5.      Reinhardt electronically signed and agreed to the Employment Agreement and Arbitration Agreement on July 5, 2017. *Id.* at p. 16.

6.      On May 1, 2018, all of the ownership interests in Public Sector were acquired, Public Sector's business continued under the new ownership, and employees of Public Sector, like Reinhardt, continued their employment.

7.      On June 13, 2018, Public Sector changed its name to "Guidehouse LLP."

8.      On January 1, 2020, Guidehouse LLP transferred and assigned the employment agreements of all its employees—including Reinhardt—to Guidehouse Inc., its subsidiary. In fact, Guidehouse LLP transferred all of its assets and business to Guidehouse Inc. at that time.

9.      Under Section 14 of Reinhardt's Employment Agreement, Reinhardt agreed that Guidehouse LLP (formerly known as Public Sector) may assign its rights and delegate its duties under the Employment Agreement, which expressly incorporates the Arbitration Agreement attached thereto, to any affiliate of Guidehouse LLP or to any transferee of all or a portion of the assets or business of Guidehouse LLP, such as Guidehouse Inc. Ex. 1 at pp. 9–10, § 14.

10.     Reinhardt remained continuously employed in the position of Director after the acquisition, after Public Sector's name was changed to Guidehouse LLP, and after Guidehouse

LLP transferred and assigned Reinhardt's Employment Agreement and Arbitration Agreement to Guidehouse Inc.

11.    Reinhardt's employment was terminated by Guidehouse Inc. on September 23, 2021 for performance issues.

12.    As set forth in Section 16 of the Employment Agreement, both Reinhardt and Guidehouse "agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both [Reinhardt] and [Guidehouse] to submit to final and binding arbitration all claims covered under the arbitration agreement." Ex. 1 at p. 9, § 16.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  April 1, 2022

Jennifer Moltzan

EXHIBIT 1

Reinhardt,Kyle                          **Employee**                    **EmplID:** 00300254756

## PricewaterhouseCoopers Public Sector LLP Employment Agreement

In consideration of your promotion to the position of Director at PricewaterhouseCoopers Public Sector LLP (the "Firm"), and for other good and valuable consideration, the adequacy, sufficiency and receipt of which are hereby acknowledged, you, Kyle Reinhardt, hereby acknowledge and agree that:

1. **Compensation**.

a. **Salary**. As a Director in the Firm's Washington, DC office, you will be compensated at a rate of $15,250.00 per month, payable semi-monthly, which represents $183,000.00 when computed on an annual basis. Your compensation generally will be reviewed once each fiscal year for the purpose of determining whether any adjustment is appropriate; however, the Firm may make changes to or adjust compensation, up or down, during the year for business or other reasons. Salary increases, if any, generally are made effective July 1.

b. **Incentive Compensation**. Under the Firm's current incentive programs, you may be eligible for an annual performance bonus equal to a percentage of your base salary. The amount of such bonus, if any, will be based on your staff level, Firm performance, and your individual performance. The annual performance bonus currently is expected to be paid once each fiscal year to employees; the amount and timing of, and eligibility for, any bonuses are at the sole discretion of the Firm. In addition to an annual performance bonus, you may be eligible to participate in other Firm rewards and recognition programs. The Firm provides rewards and bonuses as an incentive for your continued employment. You must therefore be actively employed by the Firm on the date any bonus or reward is to be paid in order to earn and be eligible to receive it.

2. **Benefits**.

You will remain eligible to participate in the comprehensive benefits program offered by the Firm to its employees, subject to the terms and conditions of the respective plans. The Firm reserves the right to change or eliminate these benefits in its sole discretion at any time. Also, the Firm will continue to reimburse you for appropriately documented, reasonable expenses you incur while working on Firm business, in accordance with its business expense reimbursement policies.

3. **Duties and Responsibilities**.

You agree that you will continue to devote substantially all of your working time and attention to the performance of your assigned duties as required, and will not, without the written consent of the Firm, engage, directly or indirectly, in any other employment, business or professional activity for compensation, profit or financial gain. You also agree that you will not assume any paid or unpaid directorships; however, this

restriction does not apply to directorships in non-client charitable, civic, educational, social or other similar nonprofit organizations, to the extent such activities do not conflict with the Firm's policies, including, without limitation, its independence policy.

4. **Employment-at-Will**.

This Employment Agreement does not constitute, and may not be construed as, a commitment to employment for any specific duration. The duration and terms and conditions of your employment relationship with the Firm will continue to be at-will, which means that the Firm may change the terms and conditions of the employment relationship, and that you may leave the Firm, or the Firm may require you to leave its employ, for any reason or no reason, at any time.

5. **Termination of Employment**.

a. **Termination by the Firm**. If your employment is terminated by the Firm for reasons other than professional, legal, ethical or Firm policy violations by you, subject to the severance plan in effect for the Firm's employees (the "Severance Plan"), you will be provided with: (i) one month's notice, if you have been employed for more than six months but less than two years; (ii) two months' notice, if you have been employed for two years but less than five years; or (iii) three months' notice, if you have been employed for five or more years. The Firm reserves the right under the Severance Plan to pay your base salary in lieu of continued employment for any or all of the applicable notice period. For purposes of this section 5(a), your years of service shall include the period during which you were continuously employed by PricewaterhouseCoopers LLP ("PwC US") or any of its subsidiaries immediately prior to your employment by the Firm.

b. **Termination by You**. If you resign, you agree to provide the Firm with at least two weeks' notice to allow an orderly transition of your responsibilities. If the Firm chooses to end your employment before the end of the two weeks, it will pay your base salary for the rest of that two week period. If you do not provide at least two weeks' notice, you will be paid only through your last day of employment, even if the Firm chooses not to continue your employment for the full notice period that you provided. You agree that, prior to your departure, you will provide the Firm with the name of your subsequent employer or other professional affiliation and the position you intend to assume.

6. **Ethics, Independence and Other Compliance Responsibilities**.

a. **General**. You agree that it is your personal responsibility to comply with the Firm's policies, including all Firm specific ethics related policies and compliance programs, as well as the PwC Global Ethics Code of Conduct and Global Risk Management Standards, the PwC US supplement to the Global Code of Conduct (known as "Our Standards"), and the laws and regulations applicable to the Firm's business, including, without limitation:

- Maintaining your independence in accordance with the independence policy of

PwC US and the rules of applicable regulatory bodies;
- Consistently demonstrating ethical conduct in accordance with Firm policies;
- Maintaining your CPA license(s) as required by Firm policies and relevant jurisdictions;
- Cooperating and complying with the regulatory requirements of the Public Company Accounting Oversight Board (PCAOB), including, without limitation, complying with and cooperating as requested with internal investigations and inquiries, providing testimony, producing documents, and, for managerial staff members working on an audit engagement, contacting the PwC US Ethics HelpLine immediately to report certain criminal or regulatory proceedings.

If you are ever uncertain about your obligations, you agree to contact the PwC US Ethics & Compliance Office for clarification and guidance.

b. **Independence**. The U.S. accounting profession is subject to many regulations designed to maintain public trust, including independence rules established by the SEC, PCAOB, AICPA and other regulatory bodies that govern the profession. "Independence" refers to the ability of individuals who provide professional services at public accounting firms to act with integrity, objectivity and impartiality in their work, and encompasses a number of rules, including, without limitation, those relating to personal and business relationships and permissible personal financial holdings. Employees of the Firm are subject to the independence rules applicable to PwC US because of the Firm's relationship to PwC US. Independence obligations prohibit, among other things, you, your spouse/spouse equivalent and your dependents from holding certain positions with or investing in certain audit/attest clients of firms in the PricewaterhouseCoopers global network of firms (the "Network Firms"), and such clients' affiliates. Similarly, a nondependent close relative's position with, or material investment in, an audit/attest client of a Network Firm may impair your compliance with PwC US's independence rules.

Because it is important that you comply with PwC US's independence policy, you acknowledge that you are familiar with PwC US's independence policy. You agree, throughout your career with the Firm, to remain alert to changes in your clients, role, location or financial interests and relationships that may affect your independence status. Periodically, you will be required to confirm your compliance with PwC US's independence policy.

In connection with your independence obligations, the Firm, PwC US or its regulators may request, and you agree to provide, relevant and up-to-date financial and tax information relating to you, your spouse/spouse equivalent, and your dependents. If you are a managerial staff member or employed in the Global Assurance Delivery Center, you also may be required to maintain a current record of your financial interests and other financial relationships (but not their value) in a PricewaterhouseCoopers global network database. If an impairment of PwC US's independence or a conflict of interest exists or is likely to occur, you may be required to dispose of securities or resolve other independence issues on short notice and on terms that are disadvantageous to you. The Firm also may require that you relocate to another Firm office or even separate from its employ.

c. **Work Authorization**. If you are or will be on a Firm-sponsored work visa, you must remain in compliance with, and agree to, the Visa and Work Authorization requirements attached hereto as Exhibit B, which is incorporated herein by reference.

7. **Confidential and Proprietary Information**.

Information, documents and materials relating to any Network Firm and their respective parents, affiliates, subsidiaries, subcontractors, agents, clients, vendors, licensors or suppliers ("Confidential Information") must be treated as confidential and proprietary and may only be used, distributed, disclosed or accessed by you for business purposes related to your employment duties with the Firm. You have an obligation to maintain Confidential Information in strict confidence and to protect and safeguard Confidential Information from unauthorized use, distribution and disclosure. By way of example, Confidential Information may include trade secrets; inventions (whether or not patentable); professional and technical manuals; business forms and processes; computer systems (including hardware, software, databases and information technology systems); client service or other methodologies; sales and related forecasts; marketing and business development plans and strategies; client and prospective client files, lists and materials; research materials; work product and deliverables; and project notes and plans. Information shall not be deemed Confidential Information if it is or becomes available in the public domain other than as a result of an unauthorized use, disclosure or action by you, at your direction or on your behalf, or by any other person who directly or indirectly receives such information from you.

Because Confidential Information is extremely valuable and may be subject to laws restricting disclosure or other obligations of confidentiality, the Network Firms take measures to maintain its confidentiality and guard its secrecy. Confidential Information may not be copied, disclosed, distributed, accessed or used by you (or at your direction or on your behalf) during your employment with the Firm except to the extent necessary to carry out Firm business and, where applicable, only as required or authorized under the terms of any agreements between or among the Network Firms and their respective parents, affiliates, subsidiaries, clients, subcontractors, agents, licensors, vendors or suppliers. When you leave the Firm, you agree not to use, distribute, disclose or access Confidential Information or to take or keep, or provide to any third party, any Confidential Information, irrespective of format, and you agree to return all Confidential Information to the Firm before your departure. The restrictions and obligations in this section apply regardless of whether you created, participated in creating, were in possession of, or had access to information, documents or materials constituting, summarizing, utilizing, containing or otherwise referencing Confidential Information. If you are ever asked to disclose any Confidential Information, whether pursuant to law, statute, rule or regulation (including any subpoena or similar form of process), by professional standards or guidelines, or otherwise, the Firm requests that you contact PwC US's Office of the General Counsel. These confidentiality restrictions are permanent and do not terminate, lapse, expire or otherwise cease upon your departure from the Firm.

Notwithstanding anything to the contrary contained in this Employment Agreement, you may, without informing or obtaining prior authorization of the Firm: (i) disclose trade

secrets in confidence to a federal, state or local government official, either directly or indirectly, or to your attorney, solely for the purpose of reporting or investigating a suspected violation of law that directly pertains to the trade secrets; (ii) disclose trade secrets in a complaint or other document filed in an arbitral, judicial or administrative proceeding that directly pertains to the trade secrets, if such filing is made under seal; and, (iii) disclose trade secrets to your attorney and use the trade secrets in an arbitral, judicial or administrative proceeding brought by you against the Firm alleging retaliation for your having reported a violation of law, provided that you file any document containing the trade secrets under seal and do not otherwise disclose the trade secrets, except as required by court order.

## 8. **Insider Information**.

You are prohibited from using or sharing information not publicly disclosed, which you obtain during the course of your work for the Firm, for your personal gain or advantage in securities transactions, or for the personal gain or advantage of anyone with whom you improperly share this information. This restriction applies to such information related to any company, not just the Firm's clients and their affiliates. The foregoing obligation is in addition to any obligation that you have not to purchase or hold securities of entities with respect to which the Firm must maintain independence.

## 9. **Intellectual Property**.

You agree that, upon request by the Firm, you will inform the Firm whether or not you are the owner, in whole or in part, of any patents, design rights (registered and unregistered), trademarks, service marks, copyrights, database rights, trade secrets, or any applications for any such rights (collectively, "Intellectual Property"). If you are the owner of any such Intellectual Property, you further agree that you will furnish all detail regarding such Intellectual Property as requested by the Firm. You agree that you will not incorporate, or permit to be incorporated, any such Intellectual Property, or any Intellectual Property owned by any third party, into a Firm product, process or service without the Firm's prior written consent. Nevertheless, if, in the course of your employment with the Firm, you incorporate into a Firm product, process or service any Intellectual Property owned by you, you hereby grant to the Firm a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, sublicensable, worldwide license to reproduce, make derivative works of, distribute, perform, display, import, make, have made, modify, use, sell, offer to sell, and exploit in any other way such Intellectual Property as part of or in connection with such product, process or service, and to practice any method related thereto.

You agree to disclose promptly to the Firm any and all inventions, discoveries, techniques, technologies, methodologies, writings, software, improvements, and any other works developed, conceived or created by you, either alone or in conjunction with others, at any time during your employment and related to the actual or expected business or activities of the Firm ("Works"), including, without limitation, Works created in connection with services provided to clients. You hereby assign all of your rights, titles and interests in Works (including, without limitation, all intellectual property contained therein) to the Firm. Whenever requested to do so by the

Firm, you agree to cooperate and do all things necessary, including executing all applications, assignments or other instruments that the Firm shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country, or otherwise protect the Firm's interests therein. If you do not execute such instruments within five days of their being presented to you, you hereby appoint the Firm with limited power of attorney to execute all such instruments. This power of attorney is a right coupled with an interest and is irrevocable. These obligations shall continue beyond the conclusion of your employment, and shall be binding upon your assigns, executors, administrators and other legal representatives. All Works shall be considered Confidential Information.

Notwithstanding the foregoing, any provision in this Employment Agreement requiring you to assign or license, or to offer to assign or license, your rights in any Work to the Firm does not apply to an invention or work of authorship that you developed entirely on your own time without using or referring to the Firm's resources, equipment, supplies, facilities, Confidential Information or trade secrets; provided, however, that such provisions shall remain applicable to those inventions or works of authorship that either (i) at the time of creation, conception or reduction to practice of the work or invention relate to the Firm's business, or to actual or demonstrably anticipated research or development of the Firm, or (ii) result from any work performed by you for the Firm. You acknowledge that you bear the burden of proving that an invention or work of authorship is exempt from the assignment provisions of this Employment Agreement. You agree to disclose to the Firm, in confidence, all inventions or works of authorship made solely by you or jointly with others at any time during the term of your employment with the Firm, for a review process under which the Firm may determine such issues as may arise, including the Firm's rights and your rights in such inventions or works of authorship.

10. **Continuing Obligations**.

You represent that you have not taken, and agree that you will not take, in connection with your employment with the Firm, any action that would violate any contractual or other restriction or obligation that is binding on you or any continuing duty you may owe to others. Without limiting the generality of the foregoing, if you have signed a confidentiality, non-disclosure or other similar type of agreement with any former employer or other party, you represent that you have complied, and agree you will continue to comply, with the terms of any such agreement to the extent that its terms are valid pursuant to applicable law. You further represent that you have not improperly used, shared, disclosed, distributed or accessed, and agree that you will not improperly use, share, disclose, distribute or access, the confidential or proprietary information of a third party in connection with your employment with the Firm. You represent and warrant that, after undertaking a careful search (including, without limitation, searches of any computers, cell phones, other electronic devices and hard copy documents), you have returned all property (including, without limitation, property containing confidential information) belonging to all former employers or other parties. Moreover, you agree to indemnify and hold harmless the Firm, its past and present direct and indirect parents, subsidiaries, affiliates, divisions, predecessors, successors and assigns, and their past and present partners, principals, employees, officers,

managers, directors, administrators, attorneys, representatives and agents, from and against any and all claims, awards, judgments, settlements, attorneys' fees and costs (except costs unique to arbitration, which the Firm shall pay if and as required by any applicable arbitration agreement) and other losses resulting from your breach of this provision.

If you are a former federal government or military employee and are subject to an opinion letter issued by a federal government agency ethics officer, you represent that you have provided a copy of such opinion letter to the Firm. You also represent that you have fully complied, and agree that you will continue to fully comply, with the guidance set forth in such letter, and that you have not engaged, and will not engage, in any activity that reasonably could be perceived as a personal conflict of interest under such letter. You agree to inform the PwC US Ethics & Compliance Office or the PwC US's Office of the General Counsel immediately if anyone requests that you take any action that would cause you to violate the guidance set forth in such opinion letter.

11. **Solicitation of Clients**.

a. **Prohibition on Solicitation**. You acknowledge that, because of the nature of your work for the Firm, you will develop, learn of, have access to, or be provided with Confidential Information. You further acknowledge that your solicitation or serving of certain Firm clients or potential clients after the termination of your employment inevitably would involve the unauthorized use or disclosure of Confidential Information, and impair the protectable relationships and goodwill of the Firm. Accordingly, you agree that, for two years following your departure from the Firm for any reason, you will not directly or indirectly solicit, accept as a client, or perform services of any type that the Firm can render ("Services") for, any person or entity: (i) for which you provided Services as an employee of the Firm or that received the benefit of such Services at any time during the two years prior to your departure; or (ii) for which you participated in a proposal to provide Services at any time during the one year prior to your departure. You further agree that you will not assist others in such solicitation, client acceptance, or performance of Services. It shall not be relevant that a person or entity desires or prefers that someone other than the Firm render Services or that the person or entity is already served by you or any third party with which you become associated.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm resulting from any breach by you of section 11(a) is uncertain and will be difficult to ascertain or calculate with precision. If you breach section 11(a), in addition to any other legal and equitable remedies the Firm may have, you agree to pay to the Firm liquidated damages in an amount equal to 25% of the gross fees paid for Services rendered in, or as a result of a, violation of section 11(a). Such percentage shall be paid with respect to all such Services rendered by you or a third party at any time during a period of three years from the first date of such violation. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm will incur as a result of your breach of section 11(a). You agree to make the payment to the Firm within 30 days after each such payment of fees has been made by the client.

12. **Solicitation of Personnel**.

a. **Prohibition on Solicitation**. You agree that, during your employment and for two years following your departure from the Firm for any reason, you will not directly or indirectly solicit, induce or retain, or assist others in soliciting, inducing or retaining, current or "Former" Personnel to become associated with, or perform services of the type the Firm or a parent, subsidiary or affiliate of the Firm (each a "Firm Affiliate") can render on behalf of, you or any employer or third party, or to otherwise disrupt, impair, damage or interfere with the Firm's or a Firm Affiliate's relationship with Personnel. "Personnel" means (i) Firm partners, principals, officers, managers, directors, and employees; and (ii) Firm Affiliate partners, principals, officers, managers, directors, and employees with whom you had material personal contact while providing services as an employee of the Firm at any time within 12 months before your departure from the Firm. "Former" Personnel are Personnel who leave the Firm or a Firm Affiliate within six months before or after you leave the Firm.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm or a Firm Affiliate resulting from any breach by you of section 12(a) will be difficult to ascertain or calculate with precision. If you breach section 12(a), in addition to any other legal and equitable remedies the Firm or such Firm Affiliate may have, you agree to pay to the Firm or Firm Affiliate liquidated damages in an amount equal to 30% of the solicited, induced or retained individual's gross annual compensation at the time of departure (including, without limitation, base salary, commission, bonus and the like) to cover replacement costs, and an additional 10% of such annual compensation to cover costs associated with training such individual's replacement. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm or Firm Affiliate will incur as a result of your breach of section 12(a). You agree to make the payment of such damages to the Firm or Firm Affiliate within 30 days from the mailing of a written notice to you advising you of the amount due.

13. **Injunctive Relief**.

In the event of a breach or threatened breach by you of any provision of sections 7, 9, 11 or 12 of this Employment Agreement, you agree that the Firm or Firm Affiliate, as applicable, in addition to any other legal and equitable remedies available to it, shall be entitled to provisional and injunctive relief from an appropriate forum, subject to the arbitration agreement attached hereto as Exhibit A. You further agree that no bond shall be required to be posted by the Firm or Firm Affiliate, as applicable, in connection with any such application for provisional or injunctive relief. The Firm or Firm Affiliate, as applicable, may pursue any remedy available to it (including, without limitation, those remedies set forth in sections 11(b) and 12(b) above), concurrently or consecutively in any order, and the pursuit of one such remedy will not be deemed to be an election of remedies or waiver of the right to pursue any other remedy.

14. **Assignability**.

You may not assign any of your rights or obligations under this Employment Agreement. This Employment Agreement shall be binding upon and inure to the benefit

of the Firm's successors and assigns. Without limiting the foregoing, the Firm may assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Firm or to any transferee of all or a portion of the assets or business to which this Employment Agreement relates.

15. **Severability**.

Except with respect to the terms set forth in the arbitration agreement attached hereto as Exhibit A, which contains its own severability provision, if any term or condition set forth in this Employment Agreement is found by a court, arbitral tribunal or other tribunal to be unenforceable, then the remaining terms and conditions will remain in full force and effect. Terms and conditions found to be unenforceable, if any, will be modified by the court or tribunal to conform to a provision that most closely expresses the intent of the unenforceable term or condition.

16. **Dispute Resolution**.

Unless you are an Excluded Employee (as defined below), you and the Firm agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement. You are an "Excluded Employee" if, at the time you enter into this Employment Agreement, you fall within any of the following exceptions: 1) you are currently a named plaintiff or member of a certified class in litigation pending against the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; 2) you have pending administrative charges against the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; 3) you are otherwise represented by counsel in a current legal dispute with and known to the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States; or 4) the most recent time the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States previously presented you with an arbitration agreement, you were given an option to decline and you declined that agreement. If you are an Excluded Employee, the arbitration agreement attached as Exhibit A will not apply to you, and any existing arbitration agreements you have with the Firm, PwC US or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States shall remain in full force and effect in accordance with their terms.

17. **Government Access**.

Nothing in this Employment Agreement is intended to or shall (x) prevent, impede or interfere with your ability to file a charge or complaint with any federal, state or local government agency or commission, or any self-regulatory authority (each, a "Government Agency"), or (y) limit your ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding conducted by any Government Agency, including providing documents or other information, without notice to or prior authorization from the Firm.

18. **Applicable Law**.

This Employment Agreement is governed by the laws of the State of New York, without regard to its conflict of laws principles and provisions, and irrespective of your practice location, unless otherwise required by the law of the state in which you primarily reside and work.

19. **Representations**.

You acknowledge that you have not relied on any representations or statements, whether oral or written, regarding the subject matter of this Employment Agreement, other than as contained in this Employment Agreement.

20. **Entire Agreement; Modifications**.

You acknowledge that this Employment Agreement, including Exhibit A (unless you are an Excluded Employee) and Exhibit B (if you are or will be on a Firm-sponsored work visa), supersedes all prior oral or written agreements or understandings with the Firm, except for any existing agreements with the Firm regarding repayment obligations, which shall remain in full force and effect in accordance with their terms, and except that, if you are an Excluded Employee, any existing arbitration agreements you have with the Firm, PwC US, or any of the Firm's or PwC US's subsidiaries or affiliates based in the United States shall remain in full force and effect in accordance with their terms. This Employment Agreement may be modified only by a writing signed by the leader of your practice unit, or his or her designee; provided, however, that any modification of section 4 of this Employment Agreement must be signed by the Firm's President.

21. **Headings**.

Section headings are used herein for convenience of reference and shall not affect the meaning of any provision of this Employment Agreement.

22. **Electronic Signature**.

To evidence your acceptance of the terms and conditions of this Employment Agreement, you have electronically signed this Employment Agreement. You acknowledge and agree that your electronic signature is the legal equivalent of signing this Employment Agreement by hand.

## Exhibit A

## Arbitration Agreement

We value our employees and recognize the importance of maintaining strong employee relations. We recognize, however, the possibility that legal disputes may arise between you and PricewaterhouseCoopers LLP, and/or any of its subsidiaries or affiliates based in the United States (collectively the "Firm"). This agreement (the "Agreement") requires that legal disputes be resolved through arbitration in accordance with the terms of this Agreement. For good and valuable consideration, the adequacy, sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.       Scope.

a.       Agreement to Arbitrate.

This Agreement requires both you and the Firm to resolve all Covered Claims (as described below) exclusively through final and binding arbitration. This Agreement becomes effective on the date you sign the employment agreement to which this Agreement is attached (the "Effective Date"), and survives and continues to apply following termination of employment. This Agreement is a mandatory condition of your employment with the Firm. **By signing the employment agreement, you have accepted this Agreement, and you and the Firm are bound by its terms.**

b.       Waiver of Trial; Waiver of Class, Collective, Consolidated or Representative Action.

**The parties mutually waive their right to a trial before a judge or jury in federal, state or local court in favor of arbitration under this Agreement.**

**This Agreement applies to Covered Claims that could have proceeded on an individual, class, collective, consolidated or representative basis, had they been pursued in another forum, such as a court of law. This Agreement requires that such claims be submitted to arbitration and that they be arbitrated on an individual basis only. Neither you nor the Firm is permitted to bring Covered Claims on a class, collective, consolidated or representative basis.**

c.       Covered Claims.

Except as expressly set forth below, this Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment (collectively, "Employment-Related Claims"), that the Firm may have against you, or that you may have against the Firm (and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents), including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered

Claims"). Covered Claims include, without limitation, claims under the Fair Labor Standards Act, the Family and Medical Leave Act, the Equal Pay Act, the Americans with Disabilities Act, the Rehabilitation Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, the Employee Retirement Income Security Act, state and local wage and hour laws, state and local laws concerning discrimination and retaliation, and any other federal, state and local laws regarding employment, and all amendments thereto, claims for breach of contract, claims for breach of post-employment restrictive covenants, claims for breach of fiduciary duty, claims for fraud or misappropriation, claims for misappropriation of trade secrets, and any other claims arising under any federal, state or local statute ordinance, regulation, public policy or common law.

d.      Claims Not Subject to Arbitration.

The following types of claims are expressly excluded from the definition of Covered Claims:

(i) Employment-Related Claims arising before the Effective Date, to the extent such claims both (a) are not covered by any prior arbitration agreement between you and the Firm, and (b) are the subject of an action filed before the Effective Date in a court or agency of competent jurisdiction

(ii) Claims for unemployment insurance or workers' compensation benefits, except that claims for retaliation pursuant to these laws shall constitute Covered Claims;

(iii) Sarbanes-Oxley Act, Consumer Financial Protection Bureau and Commodity Futures Trading Commission whistleblower complaints;

(iv) Claims for benefits under the Employee Retirement Income Security Act ("ERISA"), which must be resolved in accordance with the terms and procedures set forth in the applicable plan documents;

(v) Claims that are by contract, regulation or rule explicitly subject to a different arbitration procedure (e.g., FINRA);

(vi) Disputes arising under the National Labor Relations Act;

(vii) Claims arising under patent, copyright or trademark law;

(viii) Any claims that, at the time they are asserted, are not permitted to be subject to a pre-dispute arbitration agreement under a contract between the Firm entity by which you are employed and an agency of the U.S. federal government (or applicable subcontract) that is governed by Section 8116 of the Department of Defense Appropriations Act of 2010; Subpart 222.74 of the Defense Federal Acquisition Regulation Supplement; Section 6 of Executive Order No. 17673 ("Fair Pay and Safe Workplaces"); and/or any other similar provision of law; and

(ix) Any other claims that are not permitted to be subject to a pre-dispute arbitration agreement under applicable law.

This Agreement does not affect your right to file a charge with, make a complaint to, or otherwise participate in an investigation by the U.S. Equal Employment Opportunity Commission, U.S. Department of Labor, the National Labor Relations Board, the Public Company Accounting Oversight Board, state boards of accountancy, or other federal, state, or local government agency, nor does it affect the enforcement authority of such agencies. However, you may seek monetary relief with respect to a Covered Claim only through an arbitration conducted pursuant to this Agreement.

2.    Injunctive Relief.

You or the Firm may seek emergency, temporary or preliminary injunctive relief from a court of competent jurisdiction in aid of arbitration or pending final adjudication of a claim in arbitration where the arbitration award may be rendered ineffectual without such relief.

3.    Arbitration Procedure and Applicable Rules.

a.    Rules and Procedures.

The arbitration shall be held under the auspices of JAMS, in accordance with JAMS Employment Arbitration Rules and Procedures (effective July 15, 2009), except to the extent such rules are inconsistent with this Agreement, and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Copies of the applicable rules and procedures may be found at www.jamsadr.com.

b.    Initiating Arbitration.

To initiate arbitration proceedings, you must follow the instructions for the submittal of arbitration to JAMS based on a pre-dispute provision, which are set forth in the demand for arbitration form, available at www.jamsadr.com, except that you need not submit the case management fee as the Firm will submit this fee on your behalf.

To be timely, the demand for arbitration form must be received by JAMS within the statute of limitations period applicable to the legal claims described in the demand for arbitration form.

c.    Costs and Fees.

The Firm shall pay all costs that are unique to arbitration, including the costs of JAMS and the Arbitrator. Each party shall pay its own attorneys' fees and other costs that are not unique to the arbitration (i.e., costs that each party would incur if the claim were litigated in a court), except that the Arbitrator may award attorneys' fees and other costs that are not unique to the arbitration to a party in accordance with the law governing the claim to the same extent a court could do so.

Postponement and cancellation fees shall be payable, at the discretion of the Arbitrator, by the party causing the postponement or cancellation

d.     Location of Arbitration.

The arbitration will take place in the county in which your assigned work office is located, unless the parties mutually agree to an alternative location.

e.     Confidentiality.

To the maximum extent permitted by law, all aspects of the arbitration proceedings, including any award made, shall be kept confidential, except as necessary to comply with a subpoena, court order or other legal requirement, to prosecute or defend a Covered Claim, to enforce an arbitration award or to meet a reasonable business need of the Firm.

f.     Arbitrator Powers and Authority; Limitations.

The Arbitrator shall have the authority to resolve all Covered Claims with finality, in accordance with the rules of JAMS, **except that the Arbitrator shall not have the authority to hear a Covered Claim on a class, collective, consolidated or representative basis, nor shall the Arbitrator have the authority to grant class-wide relief, relief on a consolidated basis, or other relief extending beyond the individual claimant.**

The Arbitrator shall have the authority to award all remedies available to the Firm, and to you, individually, under applicable law.

The Arbitrator shall not have the authority to decide jurisdictional or arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the Arbitration; such questions shall be reserved for a court of competent jurisdiction.

g.     Awards.

All awards shall be provided in the manner required by law, and shall be final and binding on both parties to the maximum extent permitted by law.

The award shall be enforceable by either party in a court of competent jurisdiction pursuant to the terms of the Federal Arbitration Act ("FAA").

4.     At-Will Employment.

Nothing in this Agreement shall be deemed to constitute a contract of employment for any definite term, or to alter the at-will nature of your employment with the Firm.

5. <u>Choice of Law.</u>

This Agreement shall be governed by the FAA and, to the extent, if any, that the FAA is held not to apply, by the law of the State of New York, without regard to its conflict of laws principles (including for purposes of determining contract formation), unless otherwise required by the law of the state in which you primarily reside and work.

6. <u>Integration.</u>

Except as stated herein, this is the parties' entire agreement on the subject matter hereof, superseding all prior representations, negotiations or agreements.

7. <u>Severability.</u>

In the event that any provision of this Agreement is determined to be invalid or unenforceable, it shall be severed from the Agreement, and the rest of the Agreement shall be enforced to the maximum extent permitted by law; **provided, however, that should any provision of this Agreement requiring that Covered Claims be arbitrated on an individual basis, or that Covered Claims may not be brought on a class, collective, consolidated or representative basis, be determined invalid or unenforceable with respect to a Covered Claim, then that Covered Claim shall not proceed in arbitration, but rather shall be required to be filed in a court of competent jurisdiction.** Any other Covered Claims, whether related or unrelated, that can validly be required to proceed on an individual basis shall remain subject to arbitration under the terms of this Agreement. Any Covered Claim that is filed in a court of competent jurisdiction pursuant to the terms of this paragraph shall be required to return to arbitration in the event the lawsuit does not proceed on a class, collective, consolidated or representative basis. In no event shall any class, collective, consolidated or representative proceeding be permitted to proceed in arbitration.

Agreed to on behalf of the Firm by:

/s/ Margaret E. Burke

Margaret E. Burke
PricewaterhouseCoopers LLP

## Exhibit B - Visa and Work Authorization

As an employee of the Firm, you must have valid employment authorization from the United States Citizenship and Immigration Services at all times. The Firm will petition for appropriate visa status on your behalf and your dependent family members, if any. You agree that all matters relating to the Firm's visa applications on behalf of yourself and your dependent family members, and any other immigration-related filings made in connection with your employment with the Firm, must be handled by immigration counsel for the Firm and coordinated by Firm personnel. The Firm will pay the related attorneys' fees and filing costs. You agree to cooperate fully with the Firm's counsel and personnel.

If your visa or any dependent family member's visa is scheduled to expire while you are employed by the Firm, the Firm, in its sole discretion, may apply for any necessary visa extensions for you and your dependent family members, again utilizing immigration counsel for the Firm and paying the related attorneys' fees and filing costs. You acknowledge and agree that it is your responsibility to monitor your and your dependents' visa status in the United States and to notify the Firm sufficiently in advance of any expiration dates or a change in circumstances that can be expected to affect your visa status or the visa status of your dependents.

The Firm reserves the right to change or eliminate its petition for, sponsorship of, or assistance with, any visa status application, in its sole discretion, at any time. If you leave the Firm's employ for any reason, the Firm has no obligation to continue to petition for visa status or sponsor or otherwise assist you or your dependent family members in the visa process.

**PwC GUID:**   kreinhardt004          **Contract Signature Date Time:**   07/05/2017 10:29AM

Return to Personal Information Summary

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

KYLE REINHARDT,

               Plaintiff,

    v.

GUIDEHOUSE INC.,
PRICEWATERHOUSECOOPERS, LLP,
KIM CIRKA,

               Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

### [PROPOSED] ORDER

Upon consideration of Defendant Guidehouse Inc.'s Motion to Stay and to Compel Arbitration, any opposition and reply thereto, and the entire record herein, it is on this _____ day of _____, 2022 hereby

ORDERED that Defendant Guidehouse's motion to compel arbitration is GRANTED; and it is

FURTHER ORDERED that the judicial proceeding is stayed and Plaintiff, Kyle Reinhardt, is ordered to submit his claims in arbitration.

_____
Judge Maurice A. Ross

Copies to:

John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St. NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Samuel J. Buffone, Jr. #1721688
John W. Black #989303
BLACK & BUFFONE PLLC
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
(202) 997-8562
Sam@blackandbuffone.com

Stephen L. Sheinfeld #399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Benjamin M. Ostrander*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (telephone)
(312) 558-5700 (fax)
BOstrander@winston.com

Attorneys for Defendant Guidehouse Inc.

* *pro hac vice* application forthcoming


Carson H. Sullivan # 488139
Christine L. Cedar #242003
PAUL HASTINGS LLP
2050 M Street, NW
Washington, D.C. 20036
202-551-1700 (telephone)
202-551-1704 (fax)
carsonsullivan@paulhastings.com
christinecedar@paulhastings.com

Attorneys for Defendant
PricewaterhouseCoopers LLC

John@Blackandbuffone.com

Attorneys for Plaintiff Kyle Reinhardt

Charles B. Molster, III #386821
THE LAW OFFICES OF CHARLES B. MOLSTER,
III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, DC 20007
(202) 787-1312 (telephone)
cmolster@molsterlaw.com

Attorney for Defendant Kim Cirka

Filed
D.C. Superior Court
04/01/2022 17:33PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008

                Plaintiff,

      v.

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC 20036

PricewaterhouseCooper LLP,
655 New York Ave NW
Washington, DC 20001

Kim Cirka
902 Lincoln Ave.
Falls Church, VA 22046,

           Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

## NOTICE OF APPERANCE

PLEASE TAKE NOTICE that Stephen Sheinfeld of Winston & Strawn LLP, with offices located at 200 Park Avenue, New York, New York 10166, hereby appears on behalf of Defendant Guidehouse Inc. in the above captioned matter. I hereby certify that I am admitted to practice before this Court.

Dated: April 1, 2022

Respectfully submitted,

*/s/ Stephen L. Sheinfeld*
Stephen L. Sheinfeld #399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Attorney for Defendant Guidehouse Inc.

**CERTIFICATE OF SERVICE**

I certify that, on the 1st day of April, 2022, I caused this document to be filed electronically through the Court's electronic-filing system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: April 1, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.

Filed
D.C. Superior Court
04/01/2022 19:25PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT,

               Plaintiff,

      v.

GUIDEHOUSE INC., *et al.*,

               Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference-60

## DEFENDANT KIM CIRKA'S
## MOTION TO STAY AND TO COMPEL ARBITRATION

Pursuant to the Federal Arbitration Act ("FAA"), 9 USC § 3, and D.C. Code §§16-4407(e)–(f), defendant Kim Cirka ("Cirka") hereby moves this Court for an order staying this judicial proceeding and compelling arbitration of plaintiff Kyle Reinhardt's claims. In support of the motion, Cirka provides the attached points and authorities.

Dated: April 1, 2022

Respectfully submitted,

_____/s/_____

Charles B. Molster, III D.C Bar No. 386821
THE LAW OFFICES OF CHARLES B. MOLSTER, III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, D.C. 20007
(202) 787-1312 (telephone)
cmolster@molsterlaw.com

*Attorney for Kim Cirka*

## RULE 12-I CERTIFICATION

I hereby certify that counsel for defendant Kim Cirka made good faith efforts to resolve the issues raised by this motion and spoke with counsel for plaintiff, Kyle Reinhardt, but was unable to obtain consent to the relief sought.

Dated: April 1, 2022

Respectfully submitted,

_____/s/_____
Charles B. Molster, III D.C Bar No. 386821
THE LAW OFFICES OF CHARLES B. MOLSTER, III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, D.C. 20007
(202) 787-1312 (telephone)
cmolster@molsterlaw.com

*Attorney for Kim Cirka*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

KYLE REINHARDT,

               Plaintiff,

     v.

GUIDEHOUSE INC., *et al.,*

               Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference-60

**POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT KIM CIRKA'S**
**MOTION TO STAY AND TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.      This Judicial Proceeding Should be Stayed While the Court Considers Whether to
        Order Arbitration. ............................................................................................... 3

II.     Reinhardt Must Arbitrate His Claims Pursuant to the Arbitration Agreement. ................. 4

        A.      Both the FAA and D.C. Code Require Reinhardt to Arbitrate................................ 4

        B.      The Arbitration Agreement Is an Enforceable Agreement to Arbitrate. ................ 6

        C.      Reinhardt's Claims Fall within the Scope of the Arbitration Agreement. ............. 6

        D.      There Is No Basis For Refusing to Enforce the Arbitration Agreement................. 9

                1.      The Arbitration Agreement Is Not Unconscionable. ............................... 10

CONCLUSION ............................................................................................................. 12

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*2200 M St. LLC v. Mackell*,
    940 A.2d 143 (D.C. 2007) ............................................................................................................7

*Am. Exp. Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013)....................................................................................................................4

*Ashford v. PricewaterhouseCoopers LLP*,
    954 F.3d 678 (4th Cir. 2020) .....................................................................................................6

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)....................................................................................................................4

*Benefits Commc'n Corp. v. Klieforth*,
    642 A.2d 1299 (D.C. 1994) ........................................................................................................8

*Booker v. Robert Half Int'l, Inc.*,
    315 F. Supp. 2d 94 (D.D.C. 2004) .............................................................................................9

*Chatziplis v. PricewaterhouseCoopers LLP*,
    No. 17-CIV-4109 ER, 2018 WL 3323820 (S.D.N.Y. 2018) ....................................................6

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)....................................................................................................................4

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
    793 F. Supp. 2d 311 (D.D.C. 2011) ...........................................................................................6

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    191 F.3d 198 (2d Cir. 1999)......................................................................................................11

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ...............................................................................................................4

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995)..................................................................................................................10

*Friend v. Friend*,
    609 A.2d 1137 (D.C. 1992) ........................................................................................................5

*Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*,
    174 F. Supp. 3d 378 (D.D.C. 2016) .........................................................................................10

*Gillman v. Chase Manhattan Bank, N.A.*,
    73 N.Y.2d 1 (1988) .............................................................................................................10, 11

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) ..................................................................................11

*Harrell v. PricewaterhouseCoopers LLP*,
    No. 3:16-cv-3771, ECF No. 18 (N.D. Tex. Jan. 12, 2017) ......................6

*Hughes v. CACI, Inc.*,
    384 F. Supp. 2d 89 (D.D.C. 2005) ............................................................7

*Jahanbein v. Ndidi Condo. Unit Owners Ass'n, Inc.*,
    85 A.3d 824 (D.C. 2014) ..............................................................5, 7, 9

*Kauffman v. Int'l Bhd. of Teamsters*,
    950 A.2d 44 (D.C. 2008) ...........................................................................6

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
    137 S. Ct. 1421 (2017) ...............................................................................4

*Lopata v. Coyne*,
    735 A.2d 931 (D.C. 1999) ..........................................................................7

*Masurovsky v. Green*,
    687 A.2d 198 (D.C. 1996) ..........................................................................7

*Meshel v. Ohev Sholom Talmud Torah*,
    869 A.2d 343 (D.C. 2005) ..........................................................................5

*Nayal v. HIP Network Servs. IPA, Inc.*,
    620 F. Supp. 2d 566 (S.D.N.Y. 2009) ....................................................10

*Nichols v. Wash. Mut. Bank*,
    2007 WL 4198252 (E.D.N.Y. Nov. 21, 2007) .......................................12

*Parker v. K & L Gates, LLP*,
    76 A.3d 859 (D.C. 2013) ........................................................................7, 9

*Porzio v. PricewaterhouseCoopers LLP*,
    No. 159531/2018, Doc. No. 20 (N.Y. Sup. Ct. June 25, 2019) ...............6

*Ragone v. Atl. Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010)...............................................................10, 11

*Sablosky v. Edward S. Gordon Co.*,
    73 N.Y.2d 133 (1989) ..............................................................................10

*TRG Customer Sols., Inc. v. Smith*,
    226 A.3d 751 (D.C. 2020) ..........................................................................5

**Statutes**

9 U.S.C. § 1 ..................................................................................................................4

9 U.S.C. § 2 ..................................................................................................................4

9 U.S.C. § 3 ..................................................................................................................5

D.C. Code § 16-4406(a) ...............................................................................................5

D.C. Code § 16-4407(a)(2) ..........................................................................................5

D.C. Code § 16-4407(e) ...............................................................................................3

D.C. Human Rights Act .......................................................................................3, 7, 8

D.C. Revised Uniform Arbitration Act ...................................................................5, 12

D.C. Wage Payment and Collection Law ....................................................................3

## INTRODUCTION

On July 5, 2017, plaintiff, Kyle Reinhardt ("Reinhardt"), entered into an employment agreement with defendant Guidehouse, Inc. ("Guidehouse") in which he agreed to be bound by the terms of an arbitration agreement (the "Arbitration Agreement") requiring both Reinhardt and Guidehouse to resolve "all Covered Claims … exclusively through final and binding arbitration." "Covered Claims" includes all claims against Guidehouse *and Cirka* "relating to or arising out of" Reinhardt's employment with Guidehouse, or his separation from such employment.  Ignoring his contractually mandated duty to arbitrate, Reinhardt now seeks to pursue claims against Guidehouse and Cirka relating to and arising out of his employment with Guidehouse and the termination of that employment.  As Reinhardt's claims fall squarely within the scope of the valid and enforceable Arbitration Agreement, including his claims against Cirka, this Court should stay this proceeding and compel arbitration of such claims.

## FACTUAL BACKGROUND

Guidehouse is a management consulting firm.  (Declaration of Jennifer Moltzan, dated April 1, 2022 ("Moltzan Decl."), ¶ 1, attached as Exhibit A to the Points and Authorities in Support of Defendant Guidehouse Inc.'s Motion to Stay and Compel Arbitration.)  On July 5, 2017, in consideration of his promotion to the position of Director and continued employment, Reinhardt entered into an employment agreement with Guidehouse (the "Employment Agreement").  (*Id.*, Ex. 1 at p. 16.)  In the Employment Agreement, both Reinhardt and Guidehouse "agree[d] to be bound by the terms of the arbitration agreement … which requires both [Reinhardt] and [Guidehouse] to submit to final and binding arbitration all claims covered under the arbitration agreement."  (*Id.*, Ex. 1 at p. 9, § 16.)  The Arbitration Agreement is expressly incorporated within and attached as Exhibit A to the Employment Agreement.  (*Id.*)

1

The Arbitration Agreement requires both Reinhardt and Guidehouse to "resolve all Covered Claims … exclusively through final and binding arbitration." (*Id.*, Ex. 1 at p. 11, § 1.a.) "Covered Claims" are broadly defined as follows:

> Except as expressly set forth below, this Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment (collectively, "Employment-Related Claims"), that the Firm may have against you, or that you may have against the Firm ***(and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents), including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered Claims").***

(*Id.*, Ex. 1 at p. 11, § 1.c.) Thus, "Covered Claims" includes any claims "relating to or arising out of" Reinhardt's employment at Guidehouse, or the termination of such employment. (*Id.*) Moreover, the Arbitration Agreement provides that "Covered Claims" specifically include, "without limitation," claims under "state and local wage and hour laws," "state and local laws concerning discrimination and retaliation," "state and local laws regarding employment," and "claims for breach of contract." (*Id.*) The "Covered Claims" also include any claims by Reinhardt against Cirka, who was an employee of Guidehouse, and Reinhardt's former supervisor. The Arbitration Agreement is expressly governed by the Federal Arbitration Act ("FAA"). (*Id.*, Ex. 1, at p. 11, § 5)

On September 23, 2021, Guidehouse terminated Reinhardt's employment for significant performance issues. (*Id.* at ¶ 11.) Reinhardt filed a complaint with the District of Columbia Office of Human Rights ("DCOHR") on October 14, 2021, but withdrew that complaint on February 2, 2022. (Compl., ¶¶ 112–13.) That same day, in disregard of his obligations under the Arbitration Agreement, Reinhardt commenced this judicial proceeding alleging claims against Guidehouse, Cirka, and PWC "relating to or arising out of" his employment with and termination from

Guidehouse.

Specifically, Reinhardt asserts claims against Guidehouse and Cirka for workplace sex discrimination under the DCHRA Rights Act ("DCHRA") (Count I), workplace sexual abuse under the DCHRA (Count II), workplace retaliation under the DCHRA (Count III), and intentional infliction of emotional distress (Count V)—each of which purports to relate to or arise from conduct that allegedly occurred during the course of and in connection with his Guidehouse employment. Reinhardt also asserts a battery claim against Cirka (Count IV).   In addition, Reinhardt asserts claims for breach of contract (Count VI) and violation of the D.C. Wage Payment and Collection Law (Count VII) against Guidehouse.[1]

All claims against Guidehouse and Cirka are "Covered Claims" under the Arbitration Agreement as Reinhardt alleges that they relate to or arise out of his employment with and termination from Guidehouse. Although counsel for Guidehouse and Cirka notified Reinhardt's counsel of the existence of the Arbitration Agreement and requested that Reinhardt withdraw this judicial proceeding and pursue his claims in arbitration in accordance with the Arbitration Agreement, Reinhardt has refused to do so, necessitating the instant motion to compel.

## ARGUMENT

I. **This Judicial Proceeding Should be Stayed While the Court Considers Whether to Order Arbitration.**

This Court should order Reinhardt to arbitrate his claims pursuant to the Arbitration Agreement. D.C. Code provides that "[i]f a party makes a motion to the court to order arbitration, the court, on just terms, shall stay any judicial proceeding that involves a claim alleged to be subject to the arbitration until the court renders a final decision" on arbitrability. D.C. Code § 16-4407(e).

---

[1]      Reinhardt also purports to bring these same counts against Guidehouse's predecessor, defendant PricewaterhouseCoopers LLP ("PwC"), by which he was employed prior to the carve-out of its public service business into Guidehouse in 2018. (Compl., ¶ 1.) Throughout the Complaint, Reinhardt refers to both PwC's public sector carve out and Guidehouse Inc. as "Guidehouse." *Id.*

Consistent with that Code provision, this judicial proceeding should be stayed until the Court rules on whether Reinhardt must arbitrate.  If this Court orders Reinhardt to bring his claims in arbitration, the stay will remain in effect during the pendency of the arbitration.  *Id.* § 16-4407(f).

## II.   Reinhardt Must Arbitrate His Claims Pursuant to the Arbitration Agreement.

### A.   Both the FAA and D.C. Code Require Reinhardt to Arbitrate.

The Arbitration Agreement expressly provides that it is governed by the FAA. (Moltzan Dec., Ex. 1, at p. 11, § 5.) The FAA applies to all written agreements to arbitrate "evidencing a transaction involving [interstate] commerce."  9 U.S.C. § 2; *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that 9 U.S.C. § 1 exempts only employment contracts of transportation workers from coverage of the FAA).  There can be no question that the Arbitration Agreement is governed by the FAA.  *Id.*

The FAA codifies the "liberal federal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted).  It provides that all arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  As such, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms."  *AT&T Mobility*, 563 U.S. at 339; *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting that the FAA "require[s] courts to respect and enforce agreements to arbitrate"); *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1428 (2017) ("The Act, to be sure, requires a State to enforce all arbitration agreements."); *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) ("courts must rigorously enforce arbitration agreements according to their terms") (internal quotation marks omitted).

Like the FAA, the District of Columbia Revised Uniform Arbitration Act ("RUAA") also "broadly protect[s] the right of a party to contract for the use of arbitration as an alternative dispute-resolution mechanism." *TRG Customer Sols., Inc. v. Smith*, 226 A.3d 751, 755 (D.C. 2020). Specifically, the RUAA—like the FAA—states that arbitration agreements are "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." D.C. Code § 16-4406(a). Under District of Columbia law, there is a "*strong preference favoring arbitration* when a contract contains an arbitration clause." *TRG Customer Sols.*, 226 A.3d at 755; *see also Friend v. Friend*, 609 A.2d 1137, 1139 (D.C. 1992) ("Federal and District of Columbia statutes are in agreement on the issue of favoring arbitration when the parties have entered into a contract containing an arbitration clause.") (internal quotation marks omitted).

Under either the FAA or RUAA, the Court's analysis is the same and requires arbitration where a court finds that "the parties have an enforceable agreement to arbitrate and that 'the underlying dispute between the parties falls within the scope of the agreement.'" *Jahanbein v. Ndidi Condo. Unit Owners Ass'n, Inc.*, 85 A.3d 824, 827 (D.C. 2014) (quoting *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 354 (D.C. 2005)). Once a determination is made that the underlying dispute is subject to arbitration, both the FAA and the RUAA require the Court to compel arbitration. *See* 9 U.S.C. § 3 (providing for a stay of litigation pending arbitration "in accordance with the terms of the agreement"); *Id.*, § 4 (providing for an "order directing the parties to proceed to arbitration in accordance with the terms of the agreement"); D.C. Code § 16-4407(a)(2) ("if the refusing party opposes the motion [to compel arbitration], the court shall proceed to summarily decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate").

**B.      The Arbitration Agreement Is an Enforceable Agreement to Arbitrate.**

Reinhardt and Guidehouse have an enforceable agreement to arbitrate.  As a condition of his promotion to Director at Guidehouse, Reinhardt explicitly agreed to be bound by the Arbitration Agreement.  (Moltzan Decl. at ¶¶ 3, 12; Ex. 1 at p. 11, § 1.a. ("**By signing this employment agreement, you have accepted this [Arbitration] Agreement, and you and the Firm are bound by its terms**.") (emphasis in original).)  The Employment Agreement binds both Reinhardt and Guidehouse and requires both to submit to final and binding arbitration for all claims covered under the Arbitration Agreement.  (*Id.*, Ex. 1 at p. 9, § 16.)  The Arbitration Agreement, in turn, requires both Reinhardt and Guidehouse "to resolve all Covered Claims … exclusively through final and binding arbitration." (*Id.*, Ex. 1 at p. 11, § 1.a.) In exchange for entering into the Arbitration Agreement, Reinhardt received valuable consideration—specifically, a promotion to Director, continued employment and Guidehouse's mutual promise to arbitrate.  (*Id.*, Ex. 1 at p. 11, §§ 1.a., 1.c.) Moreover, "the District of Columbia adheres to the majority position that continued employment may serve as consideration for a new agreement if the employment is at-will." *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 343 (D.D.C. 2011) (citing *Kauffman v. Int'l Bhd. of Teamsters*, 950 A.2d 44, 48 (D.C. 2008)). Therefore, there can be no dispute that a valid and enforceable agreement to arbitrate exists and that Reinhardt is bound by the Arbitration Agreement.[2]

**C.      Reinhardt's Claims Fall within the Scope of the Arbitration Agreement.**

---

[2] Courts have repeatedly found PwC arbitration agreements containing terms nearly identical to the Arbitration Agreement here to be valid and enforceable.  *See, e.g.*, *Ashford v. PricewaterhouseCoopers LLP*, 954 F.3d 678, 683–86 (4th Cir. 2020) (reversing and remanding with instructions to dismiss the complaint and compel arbitration); *Chatziplis v. PricewaterhouseCoopers LLP*, No. 17-CIV-4109 ER, 2018 WL 3323820, at *1 (S.D.N.Y. 2018) (granting motion to compel arbitration and staying case); *Harrell v. PricewaterhouseCoopers LLP*, No. 3:16-cv-3771, ECF No. 18 (N.D. Tex. Jan. 12, 2017) (same); *Porzio v. PricewaterhouseCoopers LLC*, No. 159531/2018 (N.Y. Sup. Ct. June 25, 2019) (same).

In determining whether Reinhardt's claims fall within the scope of the Arbitration Agreement, the Court must determine "whether the arbitration clause is susceptible of an interpretation that covers the dispute."[3] *Parker v. K & L Gates, LLP*, 76 A.3d 859, 867 (D.C. 2013) (internal quotation marks omitted). "If the clause is susceptible to such an interpretation, then the trial court must order arbitration." *Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1996). Any ambiguity or doubt over whether a claim is covered by the Arbitration Agreement must be "resolved in favor of arbitration." *Jahanbein*, 85 A.3d at 827. Therefore, "[u]pon a finding of the existence of an enforceable arbitration clause, a presumption in favor of arbitration attaches." *2200 M St. LLC v. Mackell*, 940 A.2d 143, 151 (D.C. 2007) (quoting *Lopata v. Coyne*, 735 A.2d 931, 936 (D.C. 1999)).

Here, Reinhardt's complaint alleges generally that Guidehouse and Cirka created a hostile workplace environment in which Reinhardt was sexually harassed, retaliated against for not "playing the game," wrongfully denied a promotion, placed on a performance improvement plan, and terminated. (*See* Compl., ¶¶ 2–13.) The claims fall within the scope of the Arbitration Agreement because they constitute "Covered Claims," i.e., claims that Reinhardt alleges "relat[e] to or aris[e] out of" his employment with Guidehouse and the termination thereof. (*See* Moltzan Decl., Ex. 1 at p. 11, § 1.c.)

Specifically, with respect to Counts I through III under the DCHRA, the definition of "Covered Claims" explicitly includes "state and local laws concerning discrimination and retaliation," like the DCHRA. (Moltzan Decl., Ex. 1 at p.11 section 1.c.) *See, e.g.*, *Hughes v. CACI, Inc.*, 384 F. Supp. 2d 89, 95, 97–98 (D.D.C. 2005) (finding DCHRA claims fell within

---

[3] The Court should determine this gateway issue of "arbitrability" in accordance with the Arbitration Agreement, which specifically provides that the "Arbitrator" does not have the authority to decide "arbitrability disputes." (Moltzan Decl., Ex. 1, at p. 14, § 3.f.)

scope of arbitration provision where agreement stated that it applied to any claim "arising out of or relating to [the] employment (including without limitation to any claim of discrimination whether based on race … or any other legally protected status, and whether based on federal or State law"). Nor is there any question under District of Columbia law that claims under the DCHRA may be subject to arbitration, and "agreements to arbitrate employment discrimination claims are enforceable." *See Benefits Commc'n Corp. v. Klieforth*, 642 A.2d 1299, 1304 (D.C. 1994).

Moreover, Reinhardt explicitly alleges that these claims relate to and arise out of his employment and his termination of employment with Guidehouse. (*See* Compl., ¶ 128 (Count I: "Defendant Guidehouse discriminated against Reinhardt through the actions of its partner Cirka's sexual harassment and assault, and in doing so, created an illegal and hostile work environment."); *id.* at ¶ 135 (Count II: "Defendants subjected Reinhardt to discrimination based on his status as a victim of sexual abuse when they (a) failed to promote him to partner; (b) placed him on a pretextual performance improvement plan; (c) created an intimidating and hostile work environment; and (d) fired him."); *id.* at ¶ 145 (Count III: "Defendants took adverse actions against Reinhardt by (a) terminating his employment; (b) placing Reinhardt on a pretextual performance improvement plan; and (c) failing to promote Reinhardt to partner.")). Thus, Counts I through III unquestionably fall within the Arbitration Agreement's definition of "Covered Claims." (*See* Moltzan Decl., Ex. 1 at p. 11, § 1.c.)

For the same reasons, and because Cirka was an employee of Guidehouse (and Reinhardt's former supervisor) Count I-IV (including the battery claim (Count IV)) unquestionably fall within the Arbitration Agreements definition of "Covered Claims."

Counts IV (battery as to Cirka) and Count V (intentional infliction of emotional distress as to Guidehouse and Cirka) are "Covered Claims" that Reinhardt is required to arbitrate. According

to Reinhardt's complaint, Guidehouse—as a public sector consulting firm—"built [business] relationships through dinners and drinks," and it was during these "dinner and drinks" with Cirka where the numerous alleged instances of purported workplace harassment occurred. *See* Compl., ¶¶ 3–8, 37–96. Notably, Reinhardt describes these "dinner[s] and drinks" with Cirka as a "regular part of Reinhardt's job at Guidehouse." *Id.* at ¶ 28. According to Reinhardt, these dinners and drinks were a "job requirement." *Id.* at ¶ 9. Thus, because Reinhardt tethers his claims for battery and intentional infliction of emotional distress to alleged conduct that occurred during work "dinner and drinks" with Cirka, those too are "Covered Claims" "relating to and arising out of" his employment. *See Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 96–98 (D.D.C. 2004) (finding that plaintiff's claims fell within arbitration provision in employment agreement which covered "[a]ny dispute arising out of or relating to Employee's employment").

In addition, Count V for intentional infliction of emotional distress alleges that Reinhardt suffers from such distress from, among other things, employment "discrimination" and "retaliation" against Reinhardt, *see id.* at ¶ 155, which relate to the alleged failure to promote Reinhardt, the performance improvement plan, and the termination of his employment. *See id.* at ¶¶ 97–112. These allegations also bring Count V within the "Covered Claims" because they are "relating to or arising out of" Reinhardt's employment with and termination from Guidehouse. (Moltzan, Ex. 1 at p. 11, § 1.c.) At a minimum, the Arbitration Agreement is "susceptible to an interpretation" that it covers the claims in Counts IV and V, *see Parker*, 76 A.3d at 867, and given the presumption in favor of arbitration, any ambiguity or doubt must be decided in favor of arbitration. *Jahanbein*, 85 A.3d at 827.

**D.     There Is No Basis For Refusing to Enforce the Arbitration Agreement.**

To the extent Reinhardt argues that his claims are not arbitrable because the Arbitration Agreement is somehow unconscionable, or that his alleged breach of contract claim renders the

Arbitration Agreement unenforceable, such arguments are meritless and the Court should reject them outright.

### 1. The Arbitration Agreement Is Not Unconscionable.

To defeat the Arbitration Agreement on the ground of unconscionability, Reinhardt must establish that the Arbitration Agreement is both substantively and procedurally unconscionable. *Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 138–89 (1989).[4] Reinhardt cannot satisfy either prong of this standard.

"The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10–11 (1988). In analyzing whether procedural unconscionability exists, courts consider "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Id.* (internal citations omitted).

Offering an arbitration agreement on a "take-it-or-leave-it" basis "is not sufficient under New York law to render the provision procedurally unconscionable." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009); *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) ("the FAA certainly does not preclude the enforcement of employment contracts which make employment conditional upon an employee's acceptance of

---

[4] The Arbitration Agreement's choice-of-law provision states: "This Agreement shall be governed by the FAA and, to the extent, if any, that the FAA is held not to apply, by the law of the State of New York, without regard to its conflict of laws principles (including for purposes of determining contract formation)." (Moltzan Declaration at p. 15, § 5.) Under the FAA, state contract law governs any questions of whether the parties formed a valid agreement. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). Under D.C. law, "[c]hoice of law provisions in contracts are enforceable, and, when they exist, courts must apply the state law specified in the contract." *Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*, 174 F. Supp. 3d 378, 386 (D.D.C. 2016). Accordingly, New York law governs any assertion of unconscionability as to the Arbitration Agreement.

mandatory arbitration"). Moreover, "'[m]ere inequality in bargaining power' between employers and employees is not alone sufficient to hold arbitration agreements unenforceable." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991)).

Here, the terms of the Arbitration Agreement were clearly stated and incorporated into Reinhardt's Employment Agreement. And acceptance of the Arbitration Agreement was a "mandatory condition" of Reinhardt's continued employment with Guidehouse. (Moltzan Decl., Ex. 1 at p. 11, § 1.a.) Reinhardt admits he is a "highly educated military veteran" with advanced degrees from prestigious educational institutions. (*See* Compl., ¶¶ 15, 24.) As a sophisticated, highly-educated actor Reinhardt cannot claim that he lacked a meaningful choice in connection with his acceptance of the Arbitration Agreement, since he simply could have rejected the offer of promotion to Director. Cf. *Ragone*, 595 F.3d at 122 (holding arbitration agreement offered on a take-it-or-leave-it basis was not procedurally unconscionable, and noting that "New York law does not absolve [plaintiff] of this obligation because she 'does not have a college degree and has no experience or background in business or human resources'"). Accordingly, the Arbitration Agreement cannot be deemed procedurally unconscionable.

In determining issues of substantive unconscionability, courts examine whether the terms of the agreement are unreasonably favorable to the party trying to enforce it. *Gillman*, 73 N.Y.2d at 12. Here, the Arbitration Agreement does not favor either party; both Guidehouse and Reinhardt have identical, mutual obligations to bring all "Covered Claims" against the other in arbitration. (*See, e.g.*, Moltzan Decl., Ex. 1 at p. 11, § 1.a. ("This Agreement requires both you and the Firm to resolve all Covered Claims (as described below) exclusively through final and binding arbitration."); *id.*, Ex. 1 at p. 11, § 1.c. ("Covered Claims" include "Employment-Related Claims" "that the Firm may have against you, or that you may have against the Firm")). As courts have

recognized, "[m]andatory arbitration clauses that bind both parties are generally not substantively unconscionable." *Nichols v. Washington Mut. Bank*, 2007 WL 4198252, at *8 (E.D.N.Y. Nov. 21, 2007). Because in the instant case the parties have reciprocal obligations under the Arbitration Agreement, any semblance of substantive unconscionability is absent.

## CONCLUSION

For the reasons set forth above, this Court should issue an order staying this judicial proceeding and directing Reinhardt to bring his claims against Guidehouse and Cirka in arbitration in accordance with the parties' Arbitration Agreement, the FAA and the RUAA.

Dated: April 1, 2022

Respectfully submitted,

_____/s/_____
Charles B. Molster, III D.C Bar No. 386821
THE LAW OFFICES OF CHARLES B. MOLSTER, III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, D.C. 20007
(202) 787-1312 (telephone)
cmolster@molsterlaw.com

*Attorney for Kim Cirka*

12

**CERTIFICATE OF SERVICE**

I certify that, on the 1st day of April, 2022, I caused this document to be filed electronically

through the Court's electronic-filing system, which automatically sent a notice of electronic filing

to all counsel of record.

_____/s/_____

Charles B. Molster, III

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

KYLE REINHARDT,

                    Plaintiff,

        v.

GUIDEHOUSE INC., *et al.*,

                    Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Maurice A. Ross
Next Court Date: July 22, 2022
Event: Initial Scheduling Conference

**[PROPOSED] ORDER**

UPON CONSIDERATION of defendant Kim Cirka's Motion to Stay and to Compel Arbitration, any opposition and reply thereto, and the entire record herein, it is on this _____ day of _____, 2022 hereby

ORDERED that defendant Cirka's motion to compel arbitration is GRANTED; and it is

FURTHER ORDERED that the judicial proceeding is stayed and plaintiff, Kyle Reinhardt, is ordered to submit his claims in arbitration.

 

                              _____
                              Judge Maurice A. Ross

Copies to:

Charles B. Molster, III
#386821
THE LAW OFFICES OF CHARLES B. MOLSTER, III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, D.C. 20007
(202) 787-1312 (telephone)
cmolster@molsterlaw.com

Attorney for Defendant Kim Cirka

Samuel J. Buffone, Jr.
#1721688
John W. Black
#989303
Black & Buffone PLLC
1400 Eye St. NW Suite 200
Washington, D.C. 20005
(202) 997-8562
Sam@blackandbuffone.com
John@blackandbuffone.com

Attorneys for Plaintiff
Kyle Reinhardt

**PRIVILEGED & CONFIDENTIAL**
**DRAFT**

John W.H. Harding
#1028734
WINSTON & STRAWN LLP
1901 L. St NW
Washington, DC 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Stephen L. Sheinfeld
#399612
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700 (telephone)
(212) 294-4700 (fax)
SSheinfe@winston.com

Benjamin M. Ostrander*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (telephone)
(312) 558-5700 (fax)
BOstrander@winston.com

Attorneys for Defendant Guidehouse Inc.

* pro hac application pending

Carson H. Sullivan
#488139
Christine L. Cedar
#242003
PAUL HASTINGS LLP
2050 M Street, NW
Washington, D.C. 20036
202-551-1700 (telephone)
202-551-1704 (fax)
carsonsullivan@paulhastings.com
christinecedar@paulhastings.com

Attorneys for Defendant
PricewaterhouseCoopers LLC

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008,

                Plaintiff,

      v.

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC 20036,

PricewaterhouseCoopers LLP
655 New York Ave NW
Washington, DC 20001,

Kim Cirka
902 Lincoln Ave.
Falls Church, VA 22046,

                Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event: Initial Scheduling Conference,
July 22, 2022

## NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE

Pursuant to District of Columbia Superior Court Civil Rule 41(a)(1)(A)(i), Plaintiff Kyle Reinhardt, by and through its counsel, hereby gives notice of its voluntary dismissal without prejudice of all claims against Defendant PricewaterhouseCoopers LLP (PwC). Defendant PwC has not yet served an answer or moved for summary judgment. Under Rule 41(a)(1)(B), such dismissal is without prejudice.

Dated: April 21, 2022                    **BLACK & BUFFONE PLLC**


                                         By:  _s/ Samuel J. Buffone, Jr._
                                                 Samuel J. Buffone, Jr.

                                         Samuel J. Buffone, Jr.
                                         D.C. Bar 1721688
                                         John W. Black
                                         D.C. Bar 989303
                                         1400 Eye St. NW
                                         Suite 200
                                         Washington, D.C. 20005
                                         Telephone: (202) 997-8562
                                         Sam@blackandbuffone.com
                                         John@blackandbuffone.com

                                         *Attorneys for Plaintiff Kyle Reinhardt*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008,

                Plaintiff,

      v.

GUIDEHOUSE, INC.
1200 19th Street, NW
Suite 700
Washington, DC 20036,

PricewaterhouseCooper LLP
655 New York Ave NW
Washington, DC 20001,

Kim Cirka
902 Lincoln Ave.
Falls Church, VA 22046,

                Defendants.

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event: Initial Scheduling Conference,
July 22, 2022

## [PROPOSED] ORDER DISMISSING PRICEWATERHOUSECOOPER LLP WITHOUT PREJUDICE

UPON CONSIDERATION of Plaintiff Kyle Reinhardt's notice of voluntary dismissal without prejudice pursuant to District of Columbia Superior Court Civil Rule 41, it is thereupon this _____ day of _____ 2022,

**ORDERED** that Defendant PricewaterhouseCooper LLP is dismissed without prejudice.

_____
Date

_____
HONORABLE Judge Ross

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008,

        *Plaintiff,*

  v.

GUIDEHOUSE INC.
1200 19th Street NW
Suite 700
Washington, DC 20036

     and

KIM CIRKA
902 Lincoln Ave.
Falls Church, VA 22046,

       *Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event: Initial Scheduling Conference,
July 22, 2022


**PLAINTIFF KYLE REINHARDT'S CONSOLIDATED STATEMENT OF POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANTS GUIDEHOUSE'S AND KIM
CIRKA'S MOTIONS TO COMPEL ARBITRATION AND TO STAY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS .......................................................................... 2

STANDARD OF REVIEW .......................................................................... 4

ARGUMENT ............................................................................................ 5

   I.   NEITHER GUIDEHOUSE NOR CIRKA CAN ENFORCE THE PWC ARBITRATION
AGREEMENT ........................................................................................ 6

     A.  The Policy Favoring Arbitration Agreements Applies Only When There Is an
Enforceable Arbitration Agreement ........................................................ 6

     B.  Guidehouse is Not a Subsidiary or Affiliate of PwC, and Is Not Covered by the PwC
Arbitration Agreement .......................................................................... 8

     C.  Cirka Cannot Enforce the PwC Arbitration Agreement Because She Is No Longer a
PwC Partner ...................................................................................... 11

     D.  Any Ambiguity in the Employment Agreement Should Be Resolved in Reinhardt's
Favor ............................................................................................... 12

   II.   CERTAIN OF REINHARDT'S CLAIMS ARE NOT COVERED CLAIMS UNDER THE
PWC ARBITRATION AGREEMENT ........................................................ 14

     A.  Sexual Battery ............................................................................. 15

     B.  Intentional Infliction of Emotional Distress ....................................... 15

   III.   PUBLIC POLICY FAVORS DENIAL OF DEFENDANTS' MOTIONS .................. 17

   IV.   THE COURT SHOULD DENY A STAY ................................................. 18

CONCLUSION ....................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*151 West Assocs. V. Printsiples Fabric Corp.*, 61 N.Y.2d 732 (N.Y. 1984)................................ 13

*Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863 (D.C. Cir. 2008)........................ 4

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013)...................................................... 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 5

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) ............................. 4, 7, 14

*Bailey v. Fannie Mae*, 209 F.3d 740 (D.C. Cir. 2000)..................................................................... 7

*Bailey v. Fed. Nat'l Mortg. Ass'n*, 209 F.3d 740 (D.C. Cir. 2000) .............................................. 10

*Ballard & Assocs., Inv. v. Mangum*, 368 a.2d 548 (D.C. 1977) .................................................... 7

*Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61 (D.D.C. 2003).......................................... 4

Choharis v. State Farm, 961 A.2d 1080 (D.C. 2008)...................................................................... 17

*Computer Assoc. Intl., Inc v U.S. Balloon Mfg. Co., Inc.*,

 10 A.D.3d 699 (N.Y. App. Div. 2004) ................................................................................ 9

*Darrow v. Dillingham & Murphy LLP*, 902 A.2d 135 (D.C. 2006) ............................................. 16

*Davis v. Winfield*, 664 A.2d 836 (D.C. 1995)................................................................................. 8

*Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213 (1985)............................................................... 7

*Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293 (S.D.N.Y. 2005)........................................ 10

*Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011)........................................... 15

*Dyer v. Bilaal*, 983 A.2d 349 (D.C. 2009) ................................................................................... 13

*E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279 (2002)................................................................. 9, 14

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995)........................................................... 5

*George Town Club at Suter's Tavern, Inc. v. Salamanca*,

 No. 06-2181, 2007 WL 1041657 (D.D.C. 2017) ............................................................... 7

*Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U.S. 287 (2010) .................................. 15

*Greenfield v. Philles Records*, 98 N.Y.2d 562 (N.Y. Ct. App. 2002)................................. 8, 9, 13

*Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84 (D.D.C. 2012)............................... 4, 5

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ...................................................... 5

*Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997)............... 5

*Jacobson v. Sassower*, 66 N.Y.2d 991 (N.Y. 1985) ...................................................... 13

*King v. Kidd*, 640 A.2d 656 (D.C. 1993) ...................................................................... 16

*Klein v. Weiss*, 284 Md. 36 (Md. 1978) ........................................................................ 8

*Little Nest Cmty. Nursery LLC v. 501 Church LLC,* 31 N.Y.S.3d 922 (N.Y. Sup. Ct. 2016) ...... 10

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48 (N.Y. App. Div. 2015).. 9

*Mastro v. PEPCO*, 447 F.3d 843 (D.C. Cir. 2006)......................................................... 5

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) ........................... 9

*McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77 (D.D.C. 2016)............................... 4, 5

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614 (1985) ........ 4

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)................. 7

*Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347 (N.Y. Ct. App. 1996)........ 13

*MPEG LA, LLC v. Samsung Elecs. Co.*, 166 A.D.3d 13 (N.Y. App. Div 2018)................. 13

*NPS Comm'cns Inc. v. The Continental Group, Inc.*, 760 F.2d 463 (2d Cir. 1995).............. 14

*Quizinsight.com P'ship v. Tabak,* No. 18-cv-1878 (D.D.C. Sep. 4, 2019)................... 16

*R/S Assoc. v New York Job Dev. Auth.*, 98 N.Y.2d 29 (N.Y. Ct. App. 2002)................ 8

*Riverside S. Planning Corp. v. CRP/Extell Riverside*, *L.P.*,

     60 A.D.3d 61 (N.Y. App. Div. 2008) .......................................................... 13

*Scott v. Harris*, 550 U.S. 372 (2007) ......................................................................... 5

*Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294 (D.C. Cir. 1987) ........................................... 5

*Telecom Italia, SpA v. Wholesale Telecom Corp.* 248 F.3d 1109 (11th Cir. 2001)............... 15, 16

*Texas 1845, LLC v Kyaw*, 117 A.D.3d 1028 (N.Y. App. Div. 2014) ........................................... 9

*Weckesser v. Knight Enters. S.E., LLC*, 735 Fed.Appx. 816 (4th Cir. 2018) ............................... 7

## Statutes

9 U.S.C. § 2 ........................................................................................................................ 7

DC Code § 16–4406(a) (2019) ............................................................................................. 7

Pub. L. No. 117-90 (2022) ................................................................................................... 17

## Other Authorities

1 Arthur L. Corbin, Corbin on Contracts § 1.9 (1993).......................................................... 9

## INTRODUCTION

Defendants Guidehouse Inc. (Guidehouse) and Kim Cirka (Cirka) moved to compel arbitration and stay this case based on an agreement to which they are not a party. In 2017, Reinhardt's then employer, PricewaterhouseCoopers Public Sector LLP, made Reinhardt sign a new employment agreement (the Employment Agreement). That Employment Agreement attached an arbitration agreement (the PwC Arbitration Agreement) between Reinhardt and PricewaterhouseCoopers Public Sector LLP's then parent company, PricewaterhouseCoopers LLP.[1] The PwC Arbitration Agreement requires Reinhardt to arbitrate certain claims against PricewaterhouseCoopers LLP (PwC) and its subsidiaries or affiliates based in the United States. Guidehouse Mem. of Points and Auth. (Guidehouse Mem.), Declaration of Jennifer Moltzan, (Moltzan Decl.) Ex. 1 at 11.

On May 1, 2018, all ownership interests in PricewaterhouseCoopers Public Sector LLP were purchased, and PricewaterhouseCoopers Public Sector LLP became Guidehouse. Moltzan Decl. at ¶ 6. At that point, Guidehouse ceased to be an affiliate or subsidiary of PricewaterhouseCoopers LLP, and was no longer covered by the PwC Arbitration Agreement. While Reinhardt continued to work for Guidehouse, Guidehouse chose to have Reinhardt continue under his existing Employment Agreement, even though the Employment Agreement contained many provisions that were superfluous now that Guidehouse was no longer affiliated with PricewaterhouseCoopers LLP. *Id.* One of those superfluous provisions is the reference to the PwC Arbitration Agreement. Cirka, as a former PwC partner and now a former partner of Guidehouse, has an even more attenuated relationship to the PwC Arbitration Agreement. Because neither Guidehouse nor Cirka are parties to any arbitration agreement with Reinhardt,

---

[1] While Reinhardt originally sued PricewaterhouseCoopers LLP, he voluntarily dismissed those claims without prejudice. PricewaterhouseCoopers LLP's motion is now moot.

Defendant Guidehouse Inc.'s Motion to Stay and to Compel Arbitration and Defendant Kim Cirka's Motion to Stay and to Compel Arbitration (together, the Motions) should be denied.

## STATEMENT OF FACTS

Reinhardt began working for PricewaterhouseCoopers LLP in 2012. Compl. ¶ 1. In January 2017, PwC created PricewaterhouseCoopers Public Sector LLP (Public Sector). Moltzan Decl. ¶ 3. On July 5, 2017, Reinhardt signed a new employment contract, this time with Public Sector (the Employment Agreement). Moltzan Decl., Ex. 1, Empl. Agmt. The Employment Agreement referenced and included a separate arbitration agreement with PricewaterhouseCoopers LLP (the PwC Arbitration Agreement). *Id.*; Ex. 1, PwC Arb. Agmt. The Employment Agreement was drafted by Public Sector and Reinhardt had no say in the language. Declaration of Kyle Reinhardt (Reinhardt Decl.) at ¶¶ 5-6, attached hereto as Exhibit A.

The Employment Agreement stated in pertinent part: "you and the Firm agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement." Empl. Agmt. at ¶ 16. That section merely describes the operation of the PwC Arbitration Agreement and does not alter any provision of the PwC Arbitration Agreement. *See id.*

The PwC Arbitration Agreement "requires both you and the Firm to resolve all Covered Claims (as described below) exclusively through final and binding arbitration." PwC Arb. Agmt. at ¶ 1.a. The PwC Arbitration Agreement defines the Firm as "PricewaterhouseCoopers LLP, and/or any of its subsidiaries or affiliates based in the United States." *Id.* at 1. The PwC Arbitration Agreement was electronically signed by PricewaterhouseCoopers LLP, not PricewaterhouseCoopers Public Sector LLP, through the electronic signature of Margaret E. Burke. *Id.* at 15. The PwC Arbitration Agreement makes clear that it is a stand-alone agreement

2

and contains an integration clause: "except as stated herein, this is the parties' entire agreement on the subject matter hereof, superseding all prior representations, negotiations or agreements." *Id.* at ¶ 6. No other arbitration agreement is at issue in this dispute.

Similarly, the Employment Agreement is clearly a stand-alone and separate agreement from the PwC Arbitration Agreement. Of particular note, the Employment Agreement defines the Firm differently than did the PwC Arbitration Agreement. In the Employment Agreement, "Firm" is defined only as "PricewaterhouseCoopers Public Sector LLP." Empl. Agmt. at 1. The Employment Agreement references the PwC Arbitration Agreement as a separate agreement, indicating in the "Severability" paragraph that the Arbitration Agreement contains its *own* severability clause. *See* Empl. Agmt. at ¶ 15.

At the time of the Employment Agreement, language purporting to incorporate the PwC Arbitration Agreement made cohesive sense, as PricewaterhouseCoopers Public Sector LLP was an affiliate or subsidiary of PricewaterhouseCoopers LLP. *See id.* at ¶ 16. However, in 2017, PricewaterhouseCoopers LLP sold PricewaterhouseCoopers Public Sector LLP to a new owner, who renamed the company Guidehouse LLP. Moltzan Decl. at ¶¶ 6-7. At that time, many provisions of the Employment Agreement became superfluous as Guidehouse was no longer an affiliate of PricewaterhouseCoopers LLP. For example, the Employment Agreement purports to require compliance with "PwC Global Ethics Code of Conduct and Global Risk Management Standards, the PwC US Supplement to the Global Code of Conduct." Empl. Agmt. at ¶ 6.a. Further, the Employment Agreement states that "Employees of the Firm are subject to the independence rules applicable to PwC US because of the Firm's relationship to PwC US." *Id.* at ¶ 6.b. The Employment Agreement further requires certain reporting to "the PwC US Ethics &

Compliance Office or the PwC US's Office of General Counsel[.]" *Id.* at ¶ 10. Each of these provisions became superfluous once Public Sector was no longer an affiliate of PwC.

Guidehouse let these superfluous provisions linger, choosing to not ask Reinhardt to sign a new employment contract with a new arbitration agreement that would encompass claims between Guidehouse and Reinhardt. Reinhardt Decl. at ¶ 12.

The PwC Arbitration Agreement is clear that the scope is limited to claims involving PricewaterhouseCoopers LLP and its U.S. subsidiaries or affiliates. The covered claims are limited to those "that the Firm may have against you, or that you may have against the Firm (and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents)[.]" PwC Arb. Agmt. at ¶ 1.c. Neither Guidehouse nor Cirka fall within this definition.

## STANDARD OF REVIEW

The first task of a court asked to compel arbitration is to determine whether the parties agreed to arbitrate the dispute. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985). "[W]hether any agreement to arbitrate exists . . . 'is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 87 (D.D.C. 2016) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 648 (1986)). In undertaking this analysis, a court should apply the same standard of review used in resolving motions for summary judgment. *See Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 67 (D.D.C. 2003); *see also Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008).

The party seeking to compel arbitration must first provide evidence sufficient to demonstrate an enforceable agreement to arbitrate. *Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84, 89 (D.D.C. 2012). The burden then shifts to the opposing party to raise a genuine issue of

material fact as to the making of the agreement, using evidence comparable to that identified in a summary judgment analysis. *See id.* A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *See Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *See Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. PEPCO*, 447 F.3d 843, 850 (D.C. Cir. 2006).

Further, in determining whether an agreement to arbitrate exists, the Court applies "ordinary state-law principles that govern the formation of contracts." *McMullen*, 164 F. Supp. 3d at 87 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Here, to the extent any agreement exists, it would have been formed in D.C., with D.C. resident Reinhardt, and would have been performed in and applied to conduct in D.C. Therefore, D.C. law applies to the question of whether the parties formed an agreement to arbitrate. *See id.* (citing *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997)). However, because both Agreements include New York choice of law provisions, New York law applies to the contracts themselves. *See* Empl. Agmt. at ¶ 18; PwC Arb. Agmt. at ¶ 5.

## ARGUMENT

Two distinct contracts are at issue in this dispute. The first is the PwC Arbitration Agreement between Reinhardt and PwC. This contract is clear on its face. The PwC Arbitration Agreement applies *only* to the parties specifically identified in that agreement. Neither Guidehouse, a company now entirely independent from PwC, nor Cirka, a former PwC partner

and now-former Guidehouse partner, are parties to or covered by the PwC Arbitration Agreement. Once Guidehouse became an entity independent of PwC, it lost the protection provided by the PwC Arbitration Agreement. Likewise, when Cirka's partnership at PwC ended, so did her rights under the PwC Arbitration Agreement. And, once she was no longer employed by Guidehouse, she lost any protection her status as a Guidehouse partner may have conferred on her.

The second contract at issue is Reinhardt's Employment Agreement with Public Sector, a subsidiary of PwC at the time the contract was written and signed, but later spun off to become an independent company and renamed Guidehouse LLP. Reinhardt continued working for Guidehouse pursuant to this Employment Agreement until the date of his improper firing. While this contract continued to define the terms of Reinhardt's employment, it now contained several superfluous provisions which were no longer applicable once Guidehouse became an independent company, no longer affiliated with PwC. One such superfluous term is Paragraph 16, which makes clear the PwC Arbitration Agreement was entered into contemporaneously with the Employment Agreement but does not change any terms of the PwC Arbitration Agreement.

Finally, public policy favors the denial of Defendants' Motions to Compel Arbitration. This case is premised chiefly on Reinhardt's allegations of sexual battery, sexual harassment, and retaliation for being so victimized. As Congress recently recognized, claims such as these should not be subject to mandatory pre-dispute arbitration.

## I. NEITHER GUIDEHOUSE NOR CIRKA CAN ENFORCE THE PWC ARBITRATION AGREEMENT

### A. The Policy Favoring Arbitration Agreements Applies Only When There Is an Enforceable Arbitration Agreement

The Federal Arbitration Act (FAA) provides that certain arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2. Similarly, the District of Columbia Revised Uniform

Arbitration Act (RUAA) supports the arbitration of issues when the parties have agreed to do so.

D.C. Code § 16-4406(a). The FAA "is a congressional declaration of a liberal federal policy

favoring arbitration agreements[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460

U.S. 1, 24 (1983). Courts must therefore "'rigorously enforce' arbitration agreements according

to their terms[.]" *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting

*Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). A condition precedent of the FFA

and the RUAA is an enforceable arbitration agreement. *See id.*; *see also Weckesser v. Knight

Enters. S.E., LLC*, 735 Fed.Appx. 816, 819 (4th Cir. 2018) (liberal policy in favor of arbitration

is not limitless and applies only if an employer can produce an enforceable agreement with the

employee under applicable state contract law; the FAA does not alter background principles of

state contract law regarding who is bound by agreements); *George Town Club at Suter's Tavern,

Inc. v. Salamanca*, No. 06-2181, 2007 WL 1041657 at *2 (D.D.C. 2017) (despite presumption in

favor of arbitration, parties cannot be forced into arbitration unless they have agreed to do so).

"[A]rbitration is a matter of contract and a party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648

(citations omitted). "Under applicable District of Columbia law, 'arbitration is predicated upon

the consent of the parties to a dispute, and the determination of whether the parties have

consented to arbitrate is a matter to be determined by the courts on the basis of the contracts

between the parties.'" *Bailey v. Fannie Mae*, 209 F.3d 740, 746 (D.C. Cir. 2000) (quoting

*Ballard & Assocs., Inv. v. Mangum*, 368 a.2d 548, 551 (D.C. 1977). "[A]n enforceable contract

does not exist unless there has been a 'meeting of the minds' as to all material terms. In other

words, a contract is not formed unless the parties reach an accord on all material terms and

indicate an intention to be bound." *Id.*; *see also Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) ("One of the essential elements for formation of a contract . . . is a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms." (quoting *Klein v. Weiss*, 284 Md. 36, 63 (Md. 1978))). Here, there is no arbitration agreement that covers *any* claims between Reinhardt and Guidehouse or Cirka because Reinhardt agreed to arbitrate claims *only* against PwC and its subsidiaries or affiliates based in the United States. Neither Guidehouse nor Cirka is a subsidiary or affiliate of PwC. Guidehouse's and Cirka's attempt to rewrite the plain terms of the PwC Arbitration Agreement and compel arbitration is improper, and the Motions should be denied.

### B.      Guidehouse is Not a Subsidiary or Affiliate of PwC, and Is Not Covered by the PwC Arbitration Agreement

The PwC Arbitration Agreement is unambiguous. It provides, in pertinent part: "We recognize, however, the possibility that legal disputes may arise between you and PricewaterhouseCoopers LLP, and/or any of its ***subsidiaries or affiliates*** based in the United States (collectively the 'Firm')." PwC Arbitration Agreement at Intro (emphasis added). In 2017, PricewaterhouseCoopers LLP sold PricewaterhouseCoopers Public Sector LLP to a new owner, who renamed the company Guidehouse LLP. Moltzan Decl. at ¶ 6-7. After this sale, Public Sector (now Guidehouse) ceased to be a "subsidiary or affiliate" and thus was no longer covered by the PwC Arbitration Agreement.

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. Ct. App. 2002); *see R/S Assoc. v New York Job Dev. Auth.*, 98 N.Y.2d 29, 32 (N.Y. Ct. App. 2002). "An agreement is unambiguous if the language it uses has a definite and

precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Texas 1845, LLC v Kyaw*, 117 A.D.3d 1028, 1031 (N.Y. App. Div. 2014); *see Computer Assoc. Intl., Inc. v U.S. Balloon Mfg. Co., Inc.*, 10 A.D.3d 699 (N.Y. App. Div. 2004). "A contract is unambiguous if 'on its face [it] is reasonably susceptible of only one meaning[.]'" *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 54 (N.Y. App. Div. 2015) (quoting *Greenfield*, 98 N.Y. 2d at 570; *see also* 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1.9, at 25 (1993) ("Agreement consists of mutual expressions; it does not consist of harmonious intentions or states of mind.").

The PwC Arbitration Agreement is not intended as a catchall for all claims Reinhardt may ever have against any party. Here, the plain language of the PwC Arbitration Agreement purposefully limits the application to cover only certain parties: namely, Reinhardt and PwC and its affiliates or subsidiaries based in the United States. The limited nature of its application is supported by the fact that it does not even apply to *all* PwC subsidiaries and affiliates—only those based in the United States.

As a non-party to the PwC Arbitration Agreement, Guidehouse cannot enforce its terms. "'[T]he FAA's pro-arbitration policy does not operate without regard to the wishes of the contracting parties.' For nothing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995)). "Because arbitration is a matter of contract, exceptional circumstances must apply before a court will allow a non-contracting party to impose a contractual agreement to arbitrate." *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 297 (S.D.N.Y. 2005) (citation

omitted). "Arbitration is predicated upon the consent of the parties to a dispute, and the determination of whether the parties have consented to arbitrate is a matter to be determined by the courts on the basis of contracts between the parties." *Bailey v. Fed. Nat'l Mortg. Ass'n,* 209 F.3d 740, 746 (D.C. Cir. 2000) (citation omitted).

Nor is Guidehouse saved by the Employment Agreement, which purports to incorporate the PwC Arbitration Agreement into its terms. The Employment Agreement provides that "you and the Firm agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement." Empl. Agmt. at ¶ 16. This provision merely restates that, at the time of executing the agreement, Public Sector was a subsidiary and/or affiliate of PwC based in the United States. As the PwC Arbitration Agreement states explicitly, it is a stand-alone agreement. The PwC Arbitration Agreement contains an integration clause stating that: "except as stated herein, this is the parties' entire agreement on the subject matter hereof, superseding all prior representations, negotiations or agreements." PwC Arb. Agmt. at ¶ 6. Once Public Sector became an independent company, this incorporation became superfluous. The incorporation reference should be read to *describe* the operation of the PwC Arbitration Agreement. The incorporation reference clearly does not attempt to *expand* the PwC Arbitration Agreement to parties outside the definitions provided in the PwC Arbitration Agreement. Nor could it, as the PwC Arbitration Agreement's integration clause prohibits modification by parol evidence. *See, e.g. Little Nest Cmty. Nursery LLC v. 501 Church LLC,* 31 N.Y.S.3d 922 (N.Y. Sup. Ct. 2016) (collecting cases).

Indeed, as is apparent from the Employment Agreement itself, *many* of its provisions ceased to be applicable the moment Public Sector separated completely from PwC's global

10

umbrella. For example, the Employment Agreement required compliance with "PwC Global Ethics Code of Conduct and Global Risk Management Standards, the PwC US Supplement to the Global Code of Conduct." Empl. Agmt. at ¶ 6.a. Further, the Employment Agreement states that, "Employees of the Firm are subject to the independence rules applicable to PwC US because of the Firm's relationship to PwC US." *Id.* at ¶ 6.b. The Employment Agreement further required certain reporting to "the PwC US Ethics & Compliance Office or the PwC US's Office of General Counsel[.]" *Id.* at ¶ 10. Guidehouse could not now take the position that any of *these* provisions are valid and enforceable, which necessarily concedes that certain aspects of the Employment Agreement are invalid or superfluous. Once Public Sector/Guidehouse became independent from PwC, these terms were rendered superfluous, and over the several years since it spun off on its own, Guidehouse has made no attempt to amend Reinhardt's Employment Agreement.

Accordingly, because the plain terms of the PwC Arbitration Agreement do not apply to Guidehouse, Guidehouse cannot compel arbitration of Reinhardt's claims.

### C.  Cirka Cannot Enforce the PwC Arbitration Agreement Because She Is No Longer a PwC Partner

Cirka purports to compel arbitration by relying on language in the PwC Arbitration Agreement which extends the "Covered Claims" to those against "any of the Firm's partners, principals, officers, managers, directors, employees, or agents . . . ." PwC Arb. Agmt. at ¶ 1(c). Once again, here "Firm" is defined as PwC and its subsidiaries and affiliates based in the United States. *Id.* at 1. As with Guidehouse, because Cirka is no longer a partner, principal, officer, manager, director, employee, or agent of PwC, its subsidiaries, or its affiliates, she is not covered by the PwC Arbitration Agreement.

Yet Cirka's ability to enforce the PwC Agreement is even more attenuated. Cirka's Memorandum of Points and Authorities in support of her Motion indicates, without explanation, that Cirka "*was* an employee of Guidehouse[.]" Cirka Mem. at 2 (emphasis added); *see id.* at 8. Similarly, Cirka no longer appears on Guidehouse's website (Reinhardt Decl. at ¶ 13) and two other Guidehouse employees have been elevated into her former role (*Id.* at ¶¶ 14-15)*.* Accordingly, it appears she is no longer a partner or employee of Guidehouse either. So, while Guidehouse may argue that Reinhardt's Employment Agreement has acted to expand the definition of "Firm" in the PwC Arbitration Agreement to include Guidehouse, Cirka has not advanced any argument that the PwC Arbitration Agreement covers *former* partners or employees of Guidehouse. Any such argument would strain credulity.

Cirka's Motion must be denied because she is not included among the parties covered by the PwC Arbitration Agreement, and the claims against her, as a former partner at PwC and Guidehouse, are not within the "Covered Claims."

### D.   Any Ambiguity in the Employment Agreement Should Be Resolved in Reinhardt's Favor

The language of the PwC Arbitration Agreement is unambiguous and does not extend to cover non-subsidiaries (such as Guidehouse) or former Partners (such as Cirka). Defendants have not advanced any interpretation of Reinhardt's Employment Agreement that would expand the scope of the PwC Arbitration Agreement. To the extent Defendants argue for the first time in their reply that the agreement is ambiguous, this argument will also fail.

At worst, the incorporation clause is ambiguous as to whether it modifies the clear terms of the PwC Arbitration Agreement and overcomes its express integration clause. Whether a contract contains an ambiguity is a legal matter for the court to decide. "[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently[.]" *Mount*

*Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 352 (N.Y. Ct. App. 1996). "[A] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more meanings." *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (N.Y. App. Div. 2008). "Whether there is an ambiguity is determined by looking within the four corners of the document, not to outside sources." *MPEG LA, LLC v. Samsung Elecs. Co.*, 166 A.D.3d 13, 17 (N.Y. App. Div 2018) (internal quotation omitted). "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *See Greenfield*, 98 N.Y.2d at 569. "The existence of ambiguity is determined by examining the entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed, with the wording to be considered in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Riverside*, 60 A.D.3d at 66-67 (internal quotation omitted).

"It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it." *151 West Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734 (N.Y. 1984). This rule applies "most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language." *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (N.Y. 1985); *see also Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) ("In such instances, though, any ambiguity as to the contract's meaning will be construed strongly against the drafter.") (citations omitted).

Here, the drafter of the Employment Agreement was Public Sector, which became Guidehouse. Reinhardt Decl. at ¶¶ 5, 10. And while Reinhardt is well educated and experienced in his field, he had no say in the drafting of the Employment Agreement and was not represented by an attorney when negotiating or agreeing to it. *Id.* at ¶ 6. Accordingly, the contract's meaning

should be construed in Reinhardt's favor, and the Employment Agreement should not be read to expand and distort the original meaning of the PwC Arbitration Agreement to require arbitration here. *See also AT&T Techs.*, 475 U.S. at 648 ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quotation omitted)). Guidehouse had ample opportunity over the four years after it became an independent company to require a new and unambiguous employment agreement with a clear arbitration agreement and did not. It should not reap the benefit of any ambiguity that has resulted from its inaction.

Likewise, when the Employment Agreement was drafted, Cirka was a Public Sector Partner and should be deemed to be a drafter of that contract as well. *See* Cirka Mem. at 2. Thus, any ambiguity present there should be construed against her as well.

## II. CERTAIN OF REINHARDT'S CLAIMS ARE NOT COVERED CLAIMS UNDER THE PWC ARBITRATION AGREEMENT

Even if certain claims are subject to arbitration, this Court should retain jurisdiction over the others. Where, as here, the parties did not agree to arbitrate *all* claims, the Court must retain those not subject to arbitration. *See Waffle House, Inc.*, 534 U.S. at 293 (the FAA "does not require parties to arbitrate when they have not agreed to do so." (quotation omitted)); *see also NPS Comm'cns Inc. v. The Continental Group, Inc.*, 760 F.2d 463, 465 (2d Cir. 1995) (retaining non-arbitrable antitrust claims while referring arbitrable claims to arbitration). Thus, even if this court were to conclude that certain counts of the Complaint are subject to the PwC Arbitration Agreement, it should retain jurisdiction over the Sexual Battery (Count IV) and Intentional Infliction of Emotion Distress (Count V) claims.

### A.    Sexual Battery

While Cirka's Motion attempts to force arbitration of all Reinhardt's claims against her, she gives short shrift to Reinhardt's claim against her for battery. That is for good reason. Cirka cannot escape that this claim does not fall within the "Covered Claims" in PwC's Arbitration Agreement and should reside exclusively in court. Cirka proffers no authority that a claim for sexual battery is subject to arbitration, and instead relies on a strained reading of the Complaint's allegations that Reinhardt was required to regularly attend work functions, including dinner and drinks. To be clear, the Complaint does not allege that Cirka's sexual battery arose out of his employment at Guidehouse or PwC. In determining whether a dispute "relates to" an agreement, courts ask whether the dispute "was an immediate, foreseeable result of the performance of contractual duties." *Telecom Italia, SpA v. Wholesale Telecom Corp*. 248 F.3d 1109, 1116 (11th Cir. 2001) (holding that a tortious interference claim does not arise out of a contract). Otherwise, the term "related to" means a direct relationship, as otherwise it would "stretch to the horizon and beyond." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011). While Cirka was his boss at Guidehouse, and dinner and drinks were part of Reinhardt's job, being battered was not an "immediate, foreseeable result" of Reinhardt performing his employment duties. Cirka's actions plainly fall well outside even the broadest interpretation of activities required by Reinhardt's job, and Reinhardt's claim of sexual battery should be heard in court. *See Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*.").

### B.    Intentional Infliction of Emotional Distress

Reinhardt's claims against Guidehouse and Cirka for intentional infliction of emotional distress are not subject to the PwC Arbitration Agreement's definition of "Covered Claims."

Guidehouse and Cirka both concede, as they must, that many of the facts supporting the claims of intentional infliction of emotional distress came from his boss (Cirka), at work events (such as the mandatory dinners and drinks), or the treatment he suffered from his boss and his employer as a result of his status as a victim of sexual abuse. That notwithstanding, the tort of intentional infliction of emotional distress necessarily involves conduct that is so outrageous it falls outside any foreseeable employment duties, or actions "arising out of" Reinhardt's employment.

Under District of Columbia law, a claim of intentional infliction of emotional distress requires a showing of "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Darrow v. Dillingham & Murphy LLP*, 902 A.2d 135, 139 (D.C. 2006) (quotation omitted). Whether conduct is "extreme and outrageous" depends on "applicable contemporary community standards of offensiveness and decency, and the specific context in which the conduct took place." *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (citations omitted).

With this standard in mind, it is clear that when entering into the PwC Arbitration Agreement, Reinhardt could not have reasonably expected that he could be subject to intentional infliction of emotional distress as part of his employment at PwC, much less as part of employment at a successor company trying to enforce the PwC Arbitration Agreement. As the Eleventh Circuit explained, "[d]isputes that are not related—with at least some directness—to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause." *Telecom Italia*, 248 F.3d at 1116; *see also Quizinsight.com P'ship v. Tabak,* 2019 WL 4194433 at *16 (D.D.C. Sep. 4, 2019) (concluding that merely because claims arose from a "series of actions that took place at the same time" as those subject to arbitration, they did not arise out of the contract at issue).

16

Reinhardt's tort claim of intentional infliction of emotional distress exists "in its own right independent of the contract" and Guidehouse's and Cirka's duty of care with respect to this claim "flow from considerations other than the contractual relationship." *Choharis v. State Farm*, 961 A.2d 1080, 1089 (D.C. 2008). The tort stands "as a tort even if the contractual relationship did not exist." *Id.* Stated another way, Reinhardt's status as a contracted employee did not give rise to this claim.

Accordingly, Claim V for Intentional Infliction of Emotional Distress is not among the "Covered Claims" subject to arbitration under the PwC Arbitration Agreement.

## III.   PUBLIC POLICY FAVORS DENIAL OF DEFENDANTS' MOTIONS

On March 3, 2022, President Biden signed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the Act), Pub. L. No. 117-90, 136 Stat. 26, into law. The Act amends the FAA to make pre-dispute arbitration agreements for sexual assault and sexual harassment claims invalid and unenforceable. The Act applies to all pre-dispute arbitration clauses, including those executed before the law's enactment and applies to any and all claims that arose after the Act was signed into law.

While most of Reinhardt's claims arose before the Act was enacted, Reinhardt's claims continue to accrue. For example, on March 1, 2022, Guidehouse informed Reinhardt through counsel that Reinhardt could not solicit the United States Veterans Administration to propose a solution for digital asset management and design and construction. Reinhardt Decl. at ¶ 16. Guidehouse continues to retaliate, and Reinhardt's claims continue to accrue, as it improperly enforces the non-solicitation provision and fails to pay the required severance. Further, the Act is a clear and undeniable statement by Congress that forcing arbitration of sexual assault, sexual harassment, and related claims—such as those in Counts I, II, III, IV, and V—serves to silence victims of sexual violence and deprive victims of their day in court.

Here, where the Arbitration Agreement at issue does not specifically apply to Guidehouse or Cirka, and is only arguably incorporated into Reinhardt's Employment Agreement through a superfluous or otherwise ambiguous provision, public policy supports rejecting Defendants' Motion to Compel Arbitration. Reinhardt should, as Congress recognized, be able to pursue his claims in court, not be forced into confidential arbitration.

## IV.     THE COURT SHOULD DENY A STAY

Finally, as the claims are not subject to arbitration, there is no need to stay this proceeding. To the extent that the Court finds that some claims are subject to arbitration, there is no need to delay resolution of the remaining claims, and the Court should grant a limited stay only as to the claims the Court finds subject to arbitration.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Stay and Compel Arbitration should be denied.

Dated: April 22, 2022                                **BLACK & BUFFONE PLLC**


By:  *s/ Samuel J. Buffone, Jr.*
              Samuel J. Buffone, Jr.

Samuel J. Buffone, Jr.
D.C. Bar 1721688
John W. Black
D.C. Bar 989303
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
Sam@blackandbuffone.com
John@blackandbuffone.com

***Attorneys for Plaintiff Kyle Reinhardt***

## CERTIFICATE OF SERVICE

I certify that, on the 22nd day of April, 2022, I caused this document to be filed electronically through the Court's electronic-filing system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: April 22, 2022                              **BLACK & BUFFONE PLLC**

By: _s/ Samuel J. Buffone, Jr._
          Samuel J. Buffone, Jr.

Samuel J. Buffone, Jr.
D.C. Bar 1721688
John W. Black
D.C. Bar 989303
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
Sam@blackandbuffone.com
John@blackandbuffone.com

*Attorneys for Plaintiff Kyle Reinhardt*

# EXHIBIT A

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

KYLE REINHARDT
3041 Sedgwick St. NW
104D
Washington, DC 20008,

                    *Plaintiff,*

        v.

GUIDEHOUSE INC.
1200 19th Street NW
Suite 700
Washington, DC 20036

            and

KIM CIRKA
902 Lincoln Ave.
Falls Church, VA 22046,

                    *Defendants.*

Civil Action No. 2022 CA 000530 B

Hon. Judge Maurice A. Ross

Next Event: Initial Scheduling Conference,
July 22, 2022

**DECLARATION OF KYLE REINHARDT**

I, Kyle Reinhardt, pursuant to D.C. Superior Court Rule of Civil Procedure 9-I, state as follows:

1.      I am competent and authorized to make this declaration and do so based on my personal knowledge or my review of publicly available information. I am over the age of eighteen (18), and, if called as a witness, I could and would testify competently as to the facts set forth herein.

2.      I served for twenty (20) years in the United States Air Force, retiring in 2012 with the rank of Lieutenant Colonel.

3.      After I left the Air Force, I was hired by PricewaterhouseCoopers LLP (PwC) to work as a consultant in their public service sector.

4.      On July 5, 2017, I electronically signed and entered into an Employment Agreement with a subsidiary of PwC named PricewaterhouseCoopers Public Sector LLP (Public Sector).

5.      I did not draft the Employment Agreement and had little or no say in the language contained therein.

6.      I was not represented by an attorney during any negotiation over the Employment Agreement, nor did I receive advice from an attorney prior to signing the Employment Agreement.

7.      Along with the Employment Agreement, I also entered into a separate arbitration agreement with PwC (the PwC Arbitration Agreement). The PwC Arbitration Agreement was attached as an exhibit to my Employment Agreement with Public Sector.

8.      I did not draft the PwC Arbitration Agreement and had little or no say in the language contained therein.

9.      I was not represented by an attorney during any negotiation over the PwC Arbitration Agreement, nor did I receive advice from an attorney prior to signing the PwC Arbitration Agreement.

10.      I understand that at some point in 2018, Public Sector was sold to a new owner and became an independent entity. As such I understand that Public Sector was no longer a subsidiary or affiliate of PwC. Public Sector was later renamed Guidehouse.

11.      I remained employed by Guidehouse until I was terminated on September 23, 2021.

Doc ID: 49152d4ef826bb870c07660246dff8f213961887

12.     At no point during my employment at Guidehouse did the company ask me to enter into a new employment agreement or amend my existing Employment Agreement.

13.     At some point in the past several weeks, my former boss at Guidehouse, Kim Cirka (Cirka), was removed from Guidehouse's website. As of the time I make this declaration, Cirka does not appear on Guidehouse's website.

14.     On April 7, 2022, Guidehouse published a statement on its website announcing that Sarah Garnett (Garnett) had been promoted to serve as Guidehouse's public sector health leader and Kristin Porter (Porter) had been promoted to oversee Guidehouse's Department of Veterans Affairs account team. Guidehouse's statement can be found at:

https://guidehouse.com/news/healthcare/2022/public-sector-leaders (last visited Apr. 21, 2022).

15.     It appears from Guidehouse's statement and my understanding of Guidehouse's internal structure that Garnett and Porter now have the responsibilities which were previously held by Cirka.

16.     On March 1, 2022, Guidehouse informed me, through counsel, that I was prohibited from proposing, on behalf of my new employer, a solution for digital asset management and design and construction to the United States Department of Veterans Affairs.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: April 22, 2022

_Kyle Reinhardt_
_____
Kyle Reinhardt

3

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |
|---|---|
| KYLE REINHARDT<br>3041 Sedgwick St. NW<br>104D<br>Washington, DC 20008,<br><br>*Plaintiff,*<br>v.<br><br>GUIDEHOUSE INC.<br>1200 19th Street NW<br>Suite 700<br>Washington, DC 20036<br><br>and<br><br>KIM CIRKA<br>902 Lincoln Ave.<br>Falls Church, VA 22046,<br><br>*Defendants.* | Civil Action No. 2022 CA 000530 B<br><br>Hon. Judge Maurice A. Ross<br><br>Next Event: Initial Scheduling Conference,<br>July 22, 2022 |

**[PROPOSED] ORDER DENYING DEFENDANTS GUIDEHOUSE'S AND KIM CIRKA'S MOTIONS TO COMPEL ARBITRATION AND TO STAY**

UPON CONSIDERATION of Defendants Guidehouse Inc.'s and Kim Cirka's Motions to Compel Arbitration and to Stay, Plaintiff Kyle Reinhardt's Consolidated Opposition thereto, and any replies, it is thereupon this _____ day of _____ 2022,

**ORDERED** that Defendants Guidehouse Inc.'s Motion is DENIED;

**ORDERED** that Defendant Kim Cirka's Motion is DENIED;

**ORDERED** that pursuant to this Court's March 29, 2022 Order Granting Joint Stipulation and Order Regarding Briefing Schedule for Defendants' Motions to Compel

Arbitration and to Stay, Defendants shall answer or otherwise respond to Plaintiff's Complaint

on or before 21 days following this Order

**So Ordered.**

_____

Judge Maurice A. Ross

Copies to:

Samuel J. Buffone, Jr., Esquire (E-Service)
*Counsel for Plaintiff*

John W.H. Harding, Esquire (E-Service)
*Counsel for Defendant Guidehouse, Inc.*

Charles B. Molster III, Esquire (E-Service)
*Counsel for Defendant Kim Cirka*