## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KYLE REINHARDT,<br><br>           Plaintiff,<br><br>     v.<br><br>GUIDEHOUSE, INC.,<br>PRICEWATERHOUSECOOPER LLP, and<br>KIM CIRKA,<br><br>           Defendants. | Civil Action No.: 1:22-cv-01237-CKK |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
## GUIDEHOUSE INC.'S MOTION TO STAY AND TO COMPEL ARBITRATION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................... 1

PROCEDURAL HISTORY...................................................................................................... 4

ARGUMENT .......................................................................................................................... 6

    I.      Guidehouse Can Enforce the Arbitration Agreement. ........................................... 6

          A.      Under Basic Rules of Contract Construction, the Employment
                 Agreement and the Arbitration Agreement Must Be Read
                 Together. ................................................................................................ 7

          B.      Reinhardt's Agreement to Arbitrate Is Not Limited to PwC and
                 PwC's Active Subsidiaries........................................................................ 9

          C.      Reinhardt Is Equitably Estopped from Denying His Contractual
                 Obligation to Arbitrate His Claims......................................................... 10

    II.     Reinhardt's Intentional Infliction of Emotional Distress Claim Is a
          Covered Claim. .................................................................................................. 13

    III.    Reinhardt's Public Policy Arguments Are Frivolous. ........................................ 15

CONCLUSION...................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Birmingham Assocs. Ltd. v. Abbott Labs*,
  547 F. Supp. 2d 295 (S.D.N.Y. 2008).......................................................................11

*Booker v. Robert Half Int'l, Inc.*,
  315 F. Supp. 2d 94 (D.D.C. 2004) ............................................................................14

*Cole v. Am. Bldg. Maint. Co. of N.Y.*,
  2005 WL 8167404 (D.D.C. Aug. 10, 2005) (Kollar-Kotelly, J.)...............................15

*Contec Corp. v. Remote Solution, Co.*,
  398 F.3d 205 (2d Cir. 2005)......................................................................................12

*Denney v. Jenkens & Gilchrist*,
  412 F. Supp. 2d 293 (S.D.N.Y. 2005).......................................................................10

*Doe v. Trump Corp.*,
  453 F. Supp. 3d 634 (S.D.N.Y. 2020).......................................................................11

*Donel Corp. v. Kosher Overseers Ass'n of Am., Inc.*,
  2001 WL 228364 (S.D.N.Y. Mar. 8, 2001) ................................................................7

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995).....................................................................................................8

*Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*,
  174 F. Supp. 3d 378 (D.D.C. 2016) ............................................................................8

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,
  LLC*,
  140 S. Ct. 1637 (2020)...............................................................................................11

*Glencore Ltd. v. Degussa Engineered Carbons L.P.*,
  848 F. Supp. 2d 410 (S.D.N.Y. 2012).........................................................................8

*Johns v. Newsmax Media, Inc.*,
  887 F. Supp. 2d 90 (D.D.C. 2012) ..............................................................................8

*Lapina v. Men Women N.Y. Model Mgmt. Inc.*,
  86 F. Supp. 3d 277 (S.D.N.Y. 2015)..........................................................................11

*Laumann v. Nat'l Hockey League*,
  989 F. Supp. 2d 329 (S.D.N.Y. 2013)........................................................................12

*Lismore v. Societe Generale Energy Corp.*,
   2012 WL 3577833 (S.D.N.Y. Aug. 17, 2012) ....................................................................12

*Martin v. Citibank, Inc.*,
   567 F. Supp. 2d 36 (D.D.C. 2008) .......................................................................................5

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   103 S. Ct. 927 (1983) ...........................................................................................................8

*Porzig v. Dresdner Kleinwort Benson N. Am. LLC*,
   1999 WL 518833 (S.D.N.Y. July 21, 1999) .........................................................................6

*Quizinsight.com P'ship v. Tabak*,
   2019 WL 4194433 (D.D.C. Sept. 4, 2019) .........................................................................15

*Ragone v. Atl. Video at Manhattan Ctr.*,
   595 F.3d 115 (2d Cir. 2010)...........................................................................................10, 12

*Reyes v. Gracefully, Inc.*,
   2018 WL 2209486 (S.D.N.Y. May 11, 2018) .....................................................................13

*Riley v. BMO Harris Bank, N.A.*,
   61 F. Supp. 3d 92 (D.D.C. 2014) (Kollar-Kotelly, J.) ........................................................10

*Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*,
   140 S. Ct. 696 (2020) ...........................................................................................................5

*Stromberg Sheet Metal Works, Inc. v. Wash. Gas Energy Sys., Inc.*,
   448 F. Supp. 2d 64 (D.D.C. 2006) .......................................................................................6

*Tower Ins. Co. of N.Y. v. Davis/Gilford*,
   967 F. Supp. 2d 72 (D.D.C. 2013) ...................................................................................2, 8

**Statutes**

9 U.S.C. § 3 ...................................................................................................................15, 16

28 U.S.C. § 1446(d) ...............................................................................................................5

## INTRODUCTION

Plaintiff Kyle Reinhardt's Opposition to Defendant Guidehouse Inc.'s ("Guidehouse") Motion to Stay and to Compel Arbitration confirms that all his claims against Guidehouse must be arbitrated in accordance with the terms of a mandatory binding arbitration agreement to which he freely consented.  Specifically, in his Opposition, Reinhardt does not dispute any of the following:

- On July 5, 2017, Reinhardt entered into an employment agreement ("Employment Agreement") that expressly incorporated and attached a copy of an arbitration agreement ("Arbitration Agreement").  Reinhardt entered into those agreements in connection with his promotion at PricewaterhouseCoopers Public Sector LLP ("Public Sector"), which was then a subsidiary of PricewaterhouseCoopers LLP ("PwC").  (*See* Dkt. 1-2 at 155, Declaration of Jennifer Moltzan, dated April 1, 2022 ("Moltzan Decl."), ¶ 4.)

- On May 1, 2018, PwC sold Public Sector in its entirety to a new owner.  Public Sector thereafter continued its operations as a distinct legal entity, and, on June 13, 2018, changed its name to Guidehouse LLP.  (*Id.*, ¶¶ 6–7.)

- On January 1, 2020, Guidehouse LLP assigned the Employment Agreement and incorporated Arbitration Agreement to its subsidiary, Guidehouse Inc.  (*Id.*, ¶ 8.)

- As a result of such transfer, the parties to the Employment Agreement and the incorporated Arbitration Agreement are Reinhardt and Guidehouse Inc.  Reinhardt concedes that the Employment Agreement is a valid agreement; indeed, one of Reinhardt's claims against Guidehouse Inc. in this action is based on Guidehouse's purported breach of that Employment Agreement.

- The Arbitration Agreement is neither procedurally nor substantively unconscionable.

- Counts I (discrimination under the District of Columbia Human Rights Act ("DCHRA")), II (discrimination under the DCHRA), III (retaliation under the DCHRA), VI (breach of the Employment Agreement), and VII (failure to pay wages under the District of Columbia Wage Payment and Collection Action ("DCWPCA")) of Reinhardt's Complaint fall squarely within the definition of "Covered Claims" contained in the Arbitration Agreement.

Unable to dispute any of the foregoing, Reinhardt instead offers a series of chaotic arguments that are untethered to any legal support and that in many instances are directly contradicted by Reinhardt's own words in the Complaint—all in a vain effort to evade application of the Arbitration Agreement.

First, Reinhardt wrongly contends that the Arbitration Agreement must be viewed as a "stand-alone agreement," separate from the Employment Agreement. (Dkt. 1-2 at 219.) But the law is crystal clear that where (as here) a "contract incorporates another writing, the two must be read *together* as the contract between the parties." *See Tower Ins. Co. of N.Y. v. Davis/Gilford*, 967 F. Supp. 2d 72, 79 (D.D.C. 2013) (emphasis added). There can be no dispute that the Arbitration Agreement is unambiguously incorporated by reference in and attached to the Employment Agreement. (Dkt. 1-2 at 166, Moltzan Decl., Ex. 1 at 9, § 16 ("[Y]ou and the Firm agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement.").)

Second, Reinhardt asserts—without providing any legal support—that Public Sector (and then Guidehouse LLP following the name change) somehow morphed from a party into a "non-party" to the Arbitration Agreement by virtue of the sale of Public Sector to a new owner. (*Id.* at 217.)   Reinhardt's argument relies exclusively on his erroneous contention that only active

"subsidiaries and affiliates" of PwC can enforce the Arbitration Agreement. (*Id.*) But Section 16 of Reinhardt's Employment Agreement unequivocally provides that Reinhardt and Public Sector (not Reinhardt and PwC's subsidiaries) agree to submit to final and binding arbitration all claims covered by the attached Arbitration Agreement, which is expressly incorporated by reference in the Employment Agreement. (*Id.* at 166, Moltzan Decl., Ex. 1 at 9, § 16.)[1]

Even if it were to disregard all of the foregoing, this Court should still compel Reinhardt to arbitrate his claims against Guidehouse under the doctrine of equitable estoppel as each of Reinhardt's claims in this action are intertwined with his former Guidehouse employment and with his rights and obligations under his Employment Agreement with Guidehouse, which (it bears repeating) expressly attached and incorporated the Arbitration Agreement he now seeks to avoid.

Next, Reinhardt's argument that Count V—his intentional infliction of emotional distress ("IIED") claim—does not constitute a "Covered Claim" under the Arbitration Agreement because he could not have "reasonably expected" to be subjected to intentional infliction of emotional distress during his employment finds support in neither the facts nor the law. On the facts, Reinhardt alleges in the Complaint that he had been subjected to more than a year of sexual harassment and had been sexually assaulted *before* he signed the Arbitration Agreement, obviating his denial of foreseeability. (Dkt. 1-2 at 225.) And, on the law, whatever Reinhardt "reasonably expected" is irrelevant. The term "Covered Claims" is not, as Reinhardt suggests, defined in the Arbitration Agreement as claims he could have "reasonably expected" to have against his employer before he signed the Arbitration Agreement. Instead, "Covered Claims" is broadly defined to include any and all claims "relating to

---

[1]     Even ignoring the explicit dispute resolution provision set forth in Section 16 of the Employment Agreement, Public Sector was a subsidiary of PwC at the time Reinhardt entered into the Arbitration Agreement. And nothing in the Arbitration Agreement suggests that Public Sector would immediately lose its rights under the Arbitration Agreement the moment it was no longer a subsidiary of PwC (and Reinhardt provides no legal support for that proposition).

or arising out of [his] employment agreement or termination of that agreement," or his employment or separation from that employment.  (*Id.* at 168, Moltzan Decl., Ex. 1 at 11, § 1.c.)  Reinhardt's IIED claim plainly falls within that definition as the alleged conduct underpinning that claim directly relates to his employment, including his claims of alleged workplace harassment, his placement on a work performance improvement plan, and the termination of his employment.  Reinhardt's efforts to unilaterally redefine "Covered Claims" and simultaneously flee from his own allegations in his Complaint fall flat.

Finally, Reinhardt's invocation of public policy arguments and the recently passed Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the "Act") to avoid arbitrating his claims against Guidehouse is inapposite.  As Reinhardt concedes, the Act applies only to claims and disputes arising after March 3, 2022 and does not apply retroactively to claims and disputes that arose before that date.  Because each of Reinhardt's claims arose well before that date, his public policy arguments directly conflict with federal law, are frivolous, and should not be entertained.

In sum, Reinhardt cannot have his cake and eat it too.  He cannot bring employment-related claims against Guidehouse and seek relief in this Court for alleged breaches of his Employment Agreement, while simultaneously arguing that Guidehouse cannot enforce the Arbitration Agreement that is expressly incorporated into and attached to the Employment Agreement.  Accordingly, for the reasons set forth below and in Guidehouse's opening memorandum of law, this Court should stay this action and compel Reinhardt to arbitration in accordance with the Federal Arbitration Act ("FAA").

## PROCEDURAL HISTORY

On February 2, 2022, Reinhardt filed his complaint against Guidehouse, Cirka, and PwC in the Superior Court for the District of Columbia, No. 2022-CA-000530-B (the "Superior Court Action").  (*See id.* at 6–38.)  On April 1, 2022, Guidehouse, Cirka, and PwC filed separate motions

to stay and to compel the arbitration of Reinhardt's claims.  (*Id.* at 61–201.)  On April 21, 2022, Reinhardt voluntarily dismissed PwC from the Superior Court Action, at which time the Superior Court Action first became removable to this Court.  (*Id.* at 202–04.)  On April 22, 2022, Reinhardt filed his Opposition to Guidehouse's and Cirka's motions.  (*Id.* at 205–34.)  Guidehouse and Cirka timely removed the Superior Court Action to this Court on May 4, 2022 (the "Removal").  (*See* Dkt. 1.)  In their notice of removal, Guidehouse and Cirka stated they "do not waive, and expressly preserve, any defenses that may exist, including, without limitation, that all the claims brought by Plaintiff are subject to mandatory, binding arbitration."  (*Id.* at 6, ¶ 24; *see also Martin v. Citibank, Inc.*, 567 F. Supp. 2d 36, 41 (D.D.C. 2008) (holding that the removal of an action to federal court does not constitute a waiver of the right to arbitrate).)

On May 9, 2022, five days after the Removal, the Superior Court purported to issue orders denying Guidehouse's and Cirka's motions to stay and to compel arbitration "**AS MOOT** as this matter has been removed to federal court." (Emphasis in original.)  The Superior Court, however, was divested of jurisdiction upon the Removal, and its purported orders issued thereafter are void.  *See* 28 U.S.C. 1446(d) (stating that once a notice of removal is filed, "the State court shall proceed no further unless and until the case is remanded"); *Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. 696, 700 (2020) ("[Upon removal] [t]he state court los[es] all jurisdiction over the case, and, being without jurisdiction, its subsequent proceedings and judgment [are] not . . . simply erroneous, but absolutely void," and "[e]very order thereafter made in that court [is] *coram non judice*, meaning not before a judge") (internal quotation marks and citations omitted).

On May 11, 2022, Guidehouse and Cirka refiled their respective motions to stay and to compel arbitration in this Court.

## ARGUMENT

### I.    Guidehouse Can Enforce the Arbitration Agreement.

Guidehouse's corporate form and basic contract law demonstrate that there is a valid agreement to arbitrate that is enforceable by Guidehouse.  Reinhardt does not dispute the pertinent sequence of corporate events, i.e., that: (1) on May 1, 2018, Public Sector was sold to a new owner and continued its operations; (2) on June 13, 2018, Public Sector changed its name to Guidehouse LLP;[2] and (3) on January 1, 2020, Guidehouse LLP assigned Reinhardt's Employment Agreement and Arbitration Agreement to its subsidiary, Guidehouse Inc.  Reinhardt also concedes that his employment under the Employment Agreement continued uninterrupted and remained valid from the date he signed it (July 5, 2017) through the date of his separation from Guidehouse Inc. (September 23, 2021).  (*See* Dkt. 1-2 at 155, Moltzan Decl., ¶¶ 4–8.)

Nor does Reinhardt challenge the validity of Guidehouse LLP's assignment of the Employment Agreement and Arbitration Agreement to Guidehouse Inc.  (*See id.* at 166, Moltzan Decl., Ex. 1 at 9, § 14 ("[Public Sector, now Guidehouse LLP] may assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Firm or to any transferee of all or a portion of the assets or business to which this Employment Agreement relates."); *see also Stromberg Sheet Metal Works, Inc. v. Wash. Gas Energy Sys., Inc.*, 448 F. Supp. 2d 64, 69 (D.D.C. 2006) (holding that an assignee of an arbitration agreement had the same rights as the assignor and could enforce the arbitration agreement; "[w]hile the agreement between TEG and WGL contains language limiting the obligation of parties to the agreement to arbitrate with non-parties to the agreement, it is

---

[2]      Guidehouse LLP is not merely a successor-in-interest to Public Sector; it is Public Sector under a different legal name.  But even assuming Guidehouse LLP could properly be viewed as a successor-in-interest to Public Sector by virtue of its legal name change, "[t]he law is clear that an arbitration agreement may be enforced both by and against the successors-in-interest of the original signatories."  *See Porzig v. Dresdner Kleinwort Benson N. Am. LLC*, 1999 WL 518833, at *5, n.5 (S.D.N.Y. July 21, 1999).

'well-settled that an assignee of a contract stands in the shoes of the assignor and acquires the same rights and liabilities as if he had been an original party to the contract'") (internal quotation marks omitted); *Donel Corp. v. Kosher Overseers Ass'n of Am., Inc.*, 2001 WL 228364, at *3 (S.D.N.Y. Mar. 8, 2001) (finding that assignee had right to arbitrate under arbitration agreement).)

Instead, Reinhardt contends that (1) the Arbitration Agreement is a "stand-alone agreement" that must be read in isolation, and (2) if so read, Guidehouse cannot enforce the Arbitration Agreement because it is neither a signatory nor a subsidiary of PwC. Both contentions are meritless.

## A. Under Basic Rules of Contract Construction, the Employment Agreement and the Arbitration Agreement Must Be Read Together.

The parties to the Employment Agreement are Reinhardt and Public Sector (defined as the "Firm"). (Dkt. 1-2 at 158, Moltzan Decl., Ex. 1 at 1.) In Section 16 ("Dispute Resolution"), the Employment Agreement provides that both Reinhardt and Public Sector "agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated by reference, and which requires both you and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement." (*Id.* at 166, Moltzan Decl., Ex. 1 at 9, § 16.) The Arbitration Agreement is attached as Exhibit A to the Employment Agreement. (*Id.* at 168–72, Moltzan Decl., Ex. 1 at 11–15.)

Despite this express and unambiguous incorporation of the Arbitration Agreement into the Employment Agreement, Reinhardt contends that the Arbitration Agreement is a "stand-alone agreement."[3] (*Id.* at 219.) But that contention is directly contrary to the basic tenet of contract

---

[3]     Reinhardt also claims that the incorporation provision in Section 16 of the Employment Agreement "merely restates that, at the time of executing the agreement, Public Sector was a subsidiary and/or affiliate of PwC based in the United States." (Dkt. 1-2 at 219.) This reading is not only disingenuous, but contrary to the plain language of Section 16, which expressly provides that Reinhardt and Public Sector "agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated by reference, and which requires both you and [Public Sector] to submit to final and binding arbitration all

construction that where (as here) a "contract incorporates another writing, the two must be read together as the contract between the parties." *Tower Ins. Co. of N.Y.*, 967 F. Supp. 2d at 79 (finding "no ambiguity in the incorporation clause" that expressly incorporated the arbitration provisions into an agreement by reference); *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 428 (S.D.N.Y. 2012) (noting that it is "well-settled" that "where a contract expressly incorporates a second document by reference, the second document becomes part of the contract").[4]

Significantly, Reinhardt admits that following PwC's sale of Public Sector, he "continued working for Guidehouse pursuant to this Employment Agreement," and that "this contract continued to define the terms of Reinhardt's employment."[5]   (Dkt. 1-2 at 215.)   Because the Arbitration Agreement is expressly incorporated within and attached to the Employment Agreement and must be read in conjunction with the Employment Agreement, the Arbitration Agreement also remained valid and enforceable by Guidehouse LLP and its assignee, Guidehouse Inc.[6]

---

claims covered under the arbitration agreement."  (*Id.* at 166, Moltzan Decl., Ex. 1 at 9, § 16.)  Nothing in Section 16 refers to subsidiaries of PwC.

[4]     Reinhardt does not dispute that the Employment Agreement and Arbitration Agreement are governed by New York law to the extent the FAA is held not to apply.  *See* Opp'n at 5.  Under the FAA, state contract law governs any questions of whether the parties formed a valid agreement.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995).  Under D.C. law, "[c]hoice of law provisions in contracts are enforceable, and, when they exist, courts must apply the state law specified in the contract." *Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*, 174 F. Supp. 3d 378, 386 (D.D.C. 2016).  Accordingly, New York law governs the question of whether there is a valid agreement to arbitrate.

[5]     Tellingly, Reinhardt also uses the term "Guidehouse" in his Complaint to refer to both Guidehouse Inc. and Public Sector.

[6]     This Court need not need resolve any alleged ambiguity in Section 16's incorporation clause in the Employment Agreement, as suggested by Reinhardt (*see* Dkt. 1-2 at 221–22), because it is unambiguous. But, to the extent the Court finds any ambiguity in the incorporation clause, "[d]oubts regarding an arbitration provision must be resolved in favor of coverage." *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 97 (D.D.C. 2012) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 103 S. Ct. 927, 941 (1983)).

**B.      Reinhardt's Agreement to Arbitrate Is Not Limited to PwC and PwC's Active Subsidiaries.**

Reinhardt argues—without any legal support—that Public Sector (and then Guidehouse LLP following the name change) somehow transformed from a party into a "non-party" to the Arbitration Agreement by virtue of PwC's 2018 sale of Public Sector to a new owner. (*Id.* at 217.)  Reinhardt's argument relies exclusively on his inaccurate assertion that only active "subsidiaries and affiliates" of PwC can enforce the Arbitration Agreement. (*Id.*)  This assertion fails for multiple reasons.

As an initial matter, Reinhardt's strained interpretation hinges on his misplaced contention that the Arbitration Agreement is a "stand-alone agreement," which as explained above, is not supported by basic contract law since the Arbitration Agreement is expressly incorporated into the Employment Agreement.  And, while the Arbitration Agreement does define the term "Firm" as PwC and its subsidiaries and affiliates (which, at the time Reinhardt signed the agreement, included Public Sector (now Guidehouse LLP)), the Employment Agreement defines "Firm" as Public Sector, and Section 16 of the Employment Agreement independently and unequivocally provides that Reinhardt and Public Sector (not Reinhardt and PwC's subsidiaries) agree to submit to final and binding arbitration all claims covered by the Arbitration Agreement. (*Id.* at 166, Moltzan Decl., Ex. 1 at 9, § 16.)

Next, even if the Arbitration Agreement were viewed in isolation and the affirmative dispute resolution provision in Section 16 of the Employment Agreement were ignored, Public Sector was a subsidiary of PwC, and therefore expressly covered under the Arbitration Agreement at the time that Reinhardt entered into the Arbitration Agreement.  There is no reasonable interpretation of the Arbitration Agreement where Public Sector would forfeit all of its rights under the Arbitration Agreement the moment it was no longer a subsidiary of PwC (and Reinhardt provides no legal support for such an interpretation).

### C.     Reinhardt Is Equitably Estopped from Denying His Contractual Obligation to Arbitrate His Claims.

In addition to Guidehouse's right to enforce the Arbitration Agreement in its capacity as a named party or assignee, the Arbitration Agreement remains enforceable by Guidehouse against Reinhardt under the doctrine of equitable estoppel.   "The purpose of the doctrine of equitable estoppel is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from rely[ing] on the contract when it works to [his] advantage [by establishing the claim], and repudiat[ing] it when it works to [his] disadvantage [by requiring arbitration]."   *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (internal quotation marks omitted).   That is precisely what Reinhardt attempts to achieve in this case, i.e., invoke the Employment Agreement where it is useful or necessary to establish his claims, but repudiate it when he believes it redounds to his disadvantage by requiring him to arbitrate such claims.

A non-signatory can compel a signatory to arbitrate claims under an equitable estoppel theory where, as here, (1) "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed," and (2) there is a "relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute" with the non-signatory.   *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010) (internal quotation marks and citations omitted); *see also Riley v. BMO Harris Bank, N.A.*, 61 F. Supp. 3d 92, 98–99 (D.D.C. 2014) (Kollar-Kotelly, J.) ("Under the doctrine of estoppel, a non-signatory can compel arbitration with a signatory when the non-signatory is seeking to resolve issues that are intertwined with an agreement that the signatory has signed.") (internal quotation marks omitted). Both prerequisites are satisfied here.

"'Intertwined-ness' depends on how related the factual issues of the claims are to the subject matter of the arbitration agreements." *Doe v. Trump Corp.*, 453 F. Supp. 3d 634, 640 (S.D.N.Y. 2020). "At a minimum, the signatory's claims must make … reference to or presume … the existence of the written agreement." *Birmingham Assocs. Ltd. v. Abbott Labs*, 547 F. Supp. 2d 295, 301 (S.D.N.Y. 2008) (internal quotation marks omitted). "The plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *Id.* (emphasis in original). Indeed, the U.S. Supreme Court has explained that "in the arbitration context, equitable estoppel allows a nonsignatory to a written agreement containing an arbitration clause to compel arbitration where a signatory to the written agreement must rely on the terms of that agreement in asserting its claims against the nonsignatory." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020).

Here, Reinhardt's claims are unquestionably "intertwined" with or related to the subject matter of the consolidated Employment Agreement and the Arbitration Agreement. Critically, Reinhardt purports to assert a claim against Guidehouse for alleged breach of the Employment Agreement for failure to pay severance in connection with the termination of his employment. (*See* Dkt. 1-2 at 30, 35–36, Compl., ¶¶ 114–116, 158–167.) In so doing, Reinhardt explicitly relies on the Employment Agreement "in asserting claims against the nonsignatory," Guidehouse. *GE Energy*, 140 S. Ct. at 1644; *see also Lapina v. Men Women N.Y. Model Mgmt. Inc.*, 86 F. Supp. 3d 277, 285 (S.D.N.Y. 2015) (equitably estopping plaintiffs from avoiding arbitration where plaintiffs asserted that the non-signatory "breached the 2013 Agreement containing the very arbitration clause [plaintiffs] seek to avoid"). Moreover, each of Reinhardt's other claims is a "Covered Claim" under the Arbitration Agreement as they "relat[e] to or aris[e] out of" Reinhardt's employment with

Guidehouse, or his separation from such employment.  (Dkt. 1-2 at 168, Moltzan Decl., Ex. 1 at 11, § 1.c.)  Thus, all Reinhardt's claims are intertwined with the Employment Agreement and the Arbitration Agreement.  *See Lismore v. Societe Generale Energy Corp.*, 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012) (finding that because plaintiff's claims "arise out of and relate to [his] employment… [t]he subject matter of the agreement and the subject matter of this dispute are intertwined").

With respect to the second prerequisite of applying equitable estoppel to compel arbitration (the relationship among the parties), such a relationship "has been found where the non-signatory is a parent company, corporate successor, guarantor, or corporate affiliate of a signatory."  *Laumann v. Nat'l Hockey League*, 989 F. Supp. 2d 329, 336 (S.D.N.Y. 2013).  For example, in *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205 (2d Cir. 2005), the Second Circuit found that a relationship sufficient to allow a non-signatory to compel arbitration existed where the signatory (Contec L.P.) changed its corporate form (to Contec LLC) and then merged with the non-signatory (Contec Corporation).  *Id.* at 207.  As in this case, "the parties apparently continued to conduct themselves as subject to the [agreement] regardless of change in corporate form."  *Id.* at 209; *see also Ragone*, 595 F.3d at 127–128 (compelling arbitration in workplace harassment suit under equitable estoppel doctrine where non-signatory acted as a "co-employer" of the plaintiff to an employment agreement containing an arbitration provision).

There is no dispute that Reinhardt continued to be employed under the terms of the Employment Agreement throughout the various behind-the-scenes corporate changes (i.e., the sale of Public Sector to new owners, Public Sector's name change to Guidehouse LLP, and Guidehouse LLP's assignment to Guidehouse Inc.).  A relationship existed among Public Sector, Guidehouse, and Reinhardt that justifies compelling Reinhardt to arbitrate his claims against non-signatory

Guidehouse under the equitable estoppel doctrine.  *Reyes v. Gracefully, Inc.*, 2018 WL 2209486, at *5 (S.D.N.Y. May 11, 2018) (compelling arbitration under an equitable estoppel doctrine where the undisputed evidence showed that the plaintiff worked [as here] in the same position "without interruption during [the] change in ownership structure").

## II.     Reinhardt's Intentional Infliction of Emotional Distress Claim Is a Covered Claim.

Reinhardt does not dispute that five of his six claims against Guidehouse—workplace discrimination and retaliation under the DCHRA in Counts I through III, breach of contract (Count VI), and violation of the DCWPCA (Count VII)—are employment-related "Covered Claims." Instead, Reinhardt contends that his IIED claim—an intentional tort claim he asserts against his former employer and former supervisor—is somehow not an employment-related Covered Claim, all while ignoring that his IIED claim is predicated on alleged employment harassment, discrimination, and retaliation.

According to the Complaint, the alleged instances of purported workplace harassment that comprise the IIED claim occurred at "dinner[s] and drinks" with Defendant Cirka (his then-supervisor), which events Reinhardt alleges were a "regular part" and even a "job requirement" of his employment at Guidehouse.  (Dkt. 1-2 at 10, 13, Compl., ¶¶ 9, 28.)  Indeed, Reinhardt argues in his Opposition that "many of the facts supporting the claims of intentional infliction of emotional distress" occurred at "work events."  (*Id*. at 225.)

Moreover, Reinhardt pleads that that Guidehouse's and Cirka's extreme and outrageous conduct as part of the IIED claim includes "Defendants' retaliation against Reinhardt."  (*Id*. at 35, Compl., ¶ 154.)  And each of Reinhardt's allegations regarding Defendants' supposed retaliation involve conduct that occurred in the context and during the course of his employment.  (*See id*. at 27, Compl., ¶ 102 ("Guidehouse marginalized Reinhardt by sending him out on the road."); *id*. at 29, Compl., ¶ 108 ("Cirka, along with the other Guidehouse partners, retaliated against Reinhardt by

refusing to promote him to partner."); *id.*, Compl., ¶ 110 ("Guidehouse then put Reinhardt on a pretextual performance improvement plan (PIP) on July 20, 2021 for the purpose of creating a false record to justify firing him."); *id.*, Compl., ¶ 111 ("With its tracks safely covered, Guidehouse fired Reinhardt.").)  Accordingly, the IIED claim, as specifically pled by Reinhardt, is a "Covered Claim" because it unquestionably "relat[es] to or aris[es] out of" his employment with Guidehouse and the termination thereof.  (*See id.* at 168, Moltzan Decl., Ex. 1 at 11, § 1.c.)

In his zeal to escape the factual allegations of his own Complaint, Reinhardt asserts that the IIED claim is not a "Covered Claim" because he "could not have reasonably expected that he could be subject to intentional infliction of emotional distress as part of his employment at PwC."  (*Id.* at 225.)  Setting aside Reinhardt's strained interpretation, the term "Covered Claims" is not defined as claims that Reinhardt "reasonably expected" he would have (including, make no mistake, those he asserts had already occurred), but any claims "relating to or arising out of his" his employment.  The phrase "relating to or arising out of"—the actual language contained in the Arbitration Agreement— "has been interpreted broadly."  *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 98 (D.D.C. 2004).  Thus, the "Covered Claims" provision in the Arbitration Agreement broadly encompasses all claims "relating to or arising out of" not only Reinhardt's Employment Agreement, but also Reinhardt's employment and his separation from that employment.  (Dkt. 1-2 at 168, Moltzan Decl., Ex. 1 at 11, § 1.c.) ("[T]his Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment (collectively, 'Employment-Related Claims').").

The decisions upon which Reinhardt purports to rely in support of his contention that an IIED claim is not a "Covered Claim" are inapposite since the Arbitration Agreement's definition of

"Covered Claims" is far broader than the definitions of covered claims in those cases. *See, e.g.*, *Quizinsight.com P'ship v. Tabak*, 2019 WL 4194433, at *5 (D.D.C. Sept. 4, 2019) (holding that arbitration provision in partnership agreement did not contain broad "arising out of or relating to" language and only covered "any dispute or controversy herein," and therefore did not encompass claims that did not involve the partnership agreement).

Reinhardt cannot run from his own pleading. Because he tethers his IIED claim to alleged conduct that occurred during "work events" (*see* Dkt. 1-2 at 225) and employment-related harassment, discrimination, and retaliation, Reinhardt places his IIED claim within the scope of a "Covered Claim" subject to mandatory, binding arbitration. Even if this Court were to conclude that the IIED claim is not a Covered Claim (which it is), so long as the Court finds the Arbitration Agreement enforceable, this action should be stayed under the FAA since Reinhardt concedes all of his other claims against Guidehouse are employment-related Covered Claims subject to mandatory, binding arbitration. *See Quizinsight.com P'ship v. Tabak*, 2019 WL 4194433, at *12 (D.D.C. Sept. 4, 2019) (staying claims not subject to arbitration "until the resolution of the compelled arbitration" because "all of the claims arise from the same series of events" and "the arbitration might help resolve, or at least shed some light on, the issues remaining in federal court") (internal quotation marks omitted); *see also Cole v. Am. Bldg. Maint. Co. of N.Y.*, 2005 WL 8167404, at *3 (D.D.C. Aug. 10, 2005) (Kollar-Kotelly, J.) (staying proceeding, including against third parties, pursuant to 9 U.S.C. § 3 until the "conclusion of arbitration").

## III. Reinhardt's Public Policy Arguments Are Frivolous.

Finally, Reinhardt falls back on generic public policy arguments and the recently enacted Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act in a last-ditch effort to avoid arbitrating all of his claims against Guidehouse—even those entirely unrelated to sexual assault and sexual harassment. His arguments are frivolous.

Reinhardt concedes (as he must) that the Act expressly provides that it "shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act," which is March 3, 2022.  (*See* PL 117-90, March 3, 2022, 136 Stat. 26 at § 3, "Applicability.")  But none of the claims asserted by Reinhardt arise after that date of enactment.  And, although Reinhardt contends that his claims against his former employer Guidehouse somehow "continue to accrue" (Opp'n at 17), he provides no legal support whatsoever for that unsupportable proposition.  Indeed, Reinhardt's employment with Guidehouse ended in September 2021, more than five months before the enactment of the Act.

Accordingly, Reinhardt's attempts to coax this Court into refusing to compel arbitration based on a statute that has no application to this case should be rejected.

## <u>CONCLUSION</u>

For the reasons set forth above and in Guidehouse's opening memorandum of law, the Court should enter an order staying this judicial proceeding and directing Reinhardt to bring his claims against Guidehouse in accordance with the Arbitration Agreement.

Dated: May 11, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L St. NW
Washington, D.C. 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.

## CERTIFICATE OF SERVICE

I certify that, on the 11th day of May, 2022, I caused this document to be filed electronically through the Court's electronic-filing system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: May 11, 2022

Respectfully submitted,

/s/ John W.H. Harding
John W.H. Harding #1028734
WINSTON & STRAWN LLP
1901 L St NW
Washington, D.C. 20036
(202) 282-5774 (telephone)
(202) 282-5100 (fax)
Jwharding@winston.com

Attorney for Defendant Guidehouse Inc.