**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KYLE REINHARDT,

      Plaintiff,

      v.

GUIDEHOUSE INC., *et al.*,

      Defendants.

Civil Action No. 22-1237 (CKK)

**MEMORANDUM OPINION**
(Sept. 9, 2025)

Pending before this Court is Defendant Guidehouse Inc.'s [30] Refiled Motion to Stay and to Compel Arbitration ("Guidehouse Mot."); Defendant Kim Cirka's [31] Refiled Motion to Stay and Compel Arbitration ("Cirka Mot."); and Plaintiff Kyle Reinhardt's [32] Refiled Consolidated Statement of Points and Authorities in Opposition to Defendants' Motions ("Pl.'s Opp'n").[1] Defendants move to stay this judicial proceeding and to compel arbitration of Plaintiff's claims, pursuant to the terms of Plaintiff's Employment Agreement and the Arbitration Agreement attached thereto. For the reasons explained herein,

---

[1] Because this case was initially filed in the Superior Court of the District of Columbia, and removed to this Court, the Defendants' motions to stay and compel arbitration and Plaintiff's opposition were attached to Defendants' [1] Notice of Removal. For ease of reference, this Court requested that the motions and opposition be refiled on this Court's docket, as separate documents.

In connection with this Opinion, the Court also considered: (1) Guidehouse Inc.'s [7] Reply Memorandum in support of its Motion ("Guidehouse Reply"); (2) Kim Cirka's [11] Reply in support of her Motion ("Cirka Reply"); (3) Plaintiff's [35] Response to Minute Order on Choice of Law ("Pl.'s Resp."); (4) Defendant Guidehouse's [36] Supplemental Briefing in support of its Motion ("Guidehouse Supp."); (5) Defendant Cirka's [37] Supplemental Briefing in support of her Motion ("Cirka Supp."), which is accepted by this Court for late filing; (6) Plaintiff's [18] Motion for Leave to File Amended Complaint (Pl.'s Mot. to Amend"); (7) Defendants' [19] Response in Opposition to Plaintiff's Motion for Leave to File an Amended Complaint ("Defs.' Resp. to Mot. to Amend"); (8) Plaintiff's [20] Reply in Support of Motion for Leave to File Amended Complaint ("Pl.'s Reply in support of Am. Compl."); and (9) the entire record in this case.

Defendants' Motions are GRANTED.  A separate Order accompanies this Memorandum Opinion.

I. BACKGROUND

Plaintiff Kyle Reinhardt ("Plaintiff" or "Mr. Reinhardt") began his employment with PriceWaterhouseCoopers, LLP ("PwC") on or about September 10, 2012 in PwC's consulting line of client services.  *See* sworn Declaration of Jennifer Moltzan[2] ("Moltzan Decl.") [attached to Guidehouse Mot., ECF No. 30, as Ex. A] ¶2.  From January 1, 2015 to May 1, 2018, Public Sector operated as the public sector consulting business and a subsidiary of PwC. Moltzan Decl.¶ 3.  On July 5, 2017, in consideration of Mr. Reinhardt's promotion to the position of Director of Public Sector and his continued employment, Plaintiff entered into an Employment Agreement, Guidehouse Mot., Ex. 1, which incorporates an Arbitration Agreement [attached to the Employ. Agrmt. as Ex. A].

On May 1, 2018, Public Sector's ownership interests were acquired; business continued under the new ownership, and employees of Public Sector continued their employment, Moltzan Decl. ¶6, and on June 13, 2018, Public Sector changed its name to Guidehouse LLP.  *Id.* ¶7.   On January 1, 2020, Guidehouse LLP transferred and assigned all its assets and business, as well as the employment agreements of all its employees – including Mr. Reinhardt – to Guidehouse Inc., its subsidiary.  *Id.* ¶8.   Mr. Reinhardt remained continuously employed in the position of Director after the acquisition, after

---

[2] Jennifer Moltzan is employed by Guidehouse, Inc. as Director, Human Capital, and was previously employed at PwC from December 12, 2011 through December 31, 2014, and at PwC Public Sector LLP ("Public Sector") from January 1, 2016 through December 31, 2019, including after Public Sector changed its name to Guidehouse LLP on June 13, 2018.  Moltzan Declaration ¶1.

Public Sector's name was changed to Guidehouse LLP, and after Guidehouse LLP transferred and assigned its assets and employment agreements to Guidehouse Inc. *Id.* ¶10.

Mr. Reinhardt's employment was terminated by Guidehouse Inc. on September 23, 2021, based on alleged performance issues. *Id.* ¶11. Mr. Reinhardt filed a complaint with the District of Columbia Office of Human Rights ("DCOHR") on October 14, 2021, but he withdrew that complaint on February 2, 2022. On that same day, Mr. Reinhardt filed a judicial proceeding in the Superior Court for the District of Columbia, which was later removed to this Court. The operative complaint is Plaintiff's [24] First Amended Complaint, and the Defendants are Guidehouse, Inc. and Kim Cirka ("Ms. Cirka"), a "partner and equity holder of Guidehouse," who led "Guidehouse's public sector healthcare practice." First Am. Compl., ECF No. 24 ¶18.

Plaintiff asserts claims for discrimination on the basis of sex (Count I), discrimination on the basis of his status as a victim of sexual abuse (Count II), retaliation (Count III), whistleblower retaliation (Count IV), intentional infliction of emotional distress (Count V), breach of contract (Count VI) (indicating that "Reinhardt and Guidehouse are parties to Reinhardt's employment contract"), and violation of the Wage Payment and Collection Law (Count VII). First Am. Compl., ECF No. 24. The Court turns now to the terms of the Employment Agreement and the Arbitration Agreement, which are at the heart of Defendants' motions to stay and to compel arbitration.

A. Employment Agreement

Pertinent provisions in Mr. Reinhardt's Employment Agreement are as follows:

The PricewaterhouseCoopers Public Sector LLP ("the Firm") Employment Agreement indicates that it "shall be binding upon and inure to the benefit of the Firm's

3

successors and assigns." Furthermore, "[w]ithout limiting the foregoing, the Firm may assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Firm or to any transferee of all or a portion of the assets or business to which this Employment Agreement relates." Employment Agrmt., Ex. 1 ¶14.

The Employment Agreement dispute resolution provision states that the parties "agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which requires [both parties] to submit to final and binding arbitration of all claims covered under the arbitration agreement." Employment Agrmt., Ex. 1, ¶16. As far as the applicable law, the "Employment Agreement is governed by the laws of the State of New York, without regard to its conflict of laws principles and provisions, and irrespective of [plaintiff's] practice location, unless otherwise required by the law of the state in which [plaintiff] primarily reside[s] and work[s]." Employment Agrmt., Ex. 1 ¶18.

B. Arbitration Agreement

The Arbitration Agreement, which is referenced in and attached to the Employment Agreement as Exhibit A, is prefaced with language indicating that there is a "possibility that legal disputes may arise between you and PricewaterhouseCoopers LLP and/or any of its subsidiaries or affiliates based in the United States (collectively the "Firm) and accordingly, the Agreement "requires that legal disputes be resolved through arbitration in accordance with the terms of this Agreement." Arbitration Agreement, Ex. A [to Ex. 1].

Pursuant to the Arbitration Agreement, "Covered Claims" are defined as follows:

> Except as expressly set forth below, this Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your

separation from such employment (collectively, "Employment-Related Claims"), that the Firm may have against you, or that you may have against the Firm (and/or against any of the Firm's partners, principals, officers, managers, directors, employees, or agents) including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered Claims"). Covered Claims include, without limitation, claims under . . . state and local wage and hour laws, state and local laws concerning discrimination and retaliation, and any other federal, state and local laws regarding employment, and all amendments thereto, [as well as] claims for breach of contract, . . .

Arbitration Agrmt, Ex. A ¶1. c.

The Arbitrator does not have the "authority to decide jurisdictional or arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the Arbitration," as "such questions shall be reserved for a court of competent jurisdiction." *Id.* at ¶ 3(f).[3]

The Arbitration Agreement is "governed by the FAA [Federal Arbitration Act], codified at 9 U.S.C. §§ 1-16, Pub. L. 68-401 (Feb. 12, 1925), and to the extent, if any, that the FAA is held not to apply, by the law of the State of New York, without regard to its conflict of law principles (including for purposes of determining contract formation), unless otherwise required by the law of the state in which you primarily reside and work." *Id.* at ¶5.

---

[3] It is the court, not the arbitrator, that must decide whether a dispute is subject to arbitration: "a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

C.  Summary of the Parties' Arguments

Defendants Guidehouse Inc. and Kim Cirka (collectively "Defendants")[4] move for this Court to compel arbitration and stay the judicial proceeding, with the stay to remain in effect during the pendency of the arbitration.  D.C. Code § 16-4407(f).  Defendants' arguments may be summarized as follows. First, Defendants contend that the FAA and the D.C. Code both require Mr. Reinhardt to arbitrate.  Guidehouse Mot., ECF No. 30, at 13-14; Cirka Mot., ECF No. 31-2, at 9-10.   Second, Defendants argue that the Arbitration Agreement is an enforceable agreement to arbitrate.  Guidehouse Mot., ECF No. 30, at 14-15; Cirka Mot., ECF No. 31-2, at 11.  Third, Defendants assert that all claims alleged by Mr. Reinhardt are "Covered Claims" under the Arbitration Agreement. Guidehouse Mot., ECF No. 30, at 15-19; Cirka Mot., ECF No. 31-2, at 11-14.[5]

Plaintiff opposes the motion to stay and compel arbitration by alleging that neither Guidehouse Inc. nor Cirka may enforce the Arbitration Agreement, and furthermore, that certain of his claims are not "Covered Claims" under the Agreement.  Mr. Reinhardt argues also that public policy favors denial of Defendants' motions.

---

[4] Throughout this Memorandum Opinion, the Court will refer primarily to Guidehouse's arguments as representative of Defendants' arguments, as Guidehouse filed its motion and reply prior to Ms. Cirka filing hers, and Ms. Cirka's briefing often mirrors Guidehouse's briefing, or she adopts Guidehouse's briefing and incorporates it by reference.  To the extent that Ms. Cirka makes additional or different arguments, the Court will reference those.

[5] Defendants proffer, preemptively, that the Arbitration Agreement is not unconscionable, Guidehouse Mot., ECF No. 30, at 19-22; Cirka Mot., ECF No. 31-2, at 14-17, but this argument was not propounded (or addressed) by Plaintiff, and therefore, it is not addressed herein.

II. Legal Standard

The Federal Arbitration Act ("FAA") provides that all arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for revocation of any contract." 9 U.S.C. §2; D.C. Code §4406(a). The FAA creates a strong presumption in favor of arbitration by codifying the "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "[C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *Id.* (citations omitted); *see Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . .") Like the FAA, the District of Columbia Revised Arbitration Act ("RUAA") also "broadly protect[s] the right of a party to contract for the use of arbitration as an alternative dispute-resolution mechanism." *TRG Customer Solutions, Inc. v. Smith*, 226 A.3d 751, 755 (D.C. 2020). Accordingly, "Federal and District of Columbia statutes are in agreement on the issue of favoring arbitration when the parties have entered into a contract containing an arbitration clause." *Friend v. Friend*, 609 A.2d 1137, 1139 (D.C. 1992) (internal quotation marks omitted).

Since parties can only be forced to submit to arbitration by their own agreement, it is however "for the courts to decide whether the parties are bound by a given arbitration clause." *Stromberg Sheet Metal Works, Inc. v. Wash. Gas Energy Sys., Inc.*, 448 F. Supp. 2d 64, 67 (D.D.C. 2006) (citing *Howsam*, 537 U.S. at 84). A motion to compel arbitration is treated as a "request for summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008). As such, "[t]he party seeking to

compel arbitration must 'present evidence sufficient to demonstrate an enforceable agreement to arbitrate.'" *Haire v. Smith, Currie & Hancock LLP*, 925 F. Supp. 2d 126, 129 (D.D.C. 2013) (quoting *Hill v. Wackenhut Servs., Int'l*, 865 F. Supp. 2d 84, 89 (D.D.C. 2012)). "The burden then shifts to plaintiffs to show that there is a genuine issue of material fact as to the making of the agreement." *Id.* The Court "will compel arbitration if the pleadings and the evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 96 (D.D.C. 2013) (internal quotations omitted).

In considering a motion to compel arbitration, the district court undertakes a "two-part inquiry." *Stromberg*, 448 F. Supp. 2d at 68. "First, the court must decide whether the parties entered into a valid and enforceable arbitration agreement." *Id.* (citing *Nur v. K.F.C. USA, Inc.*, 142 F. Supp. 2d 48, 50-51 (D.D.C. 2001)). Second, is for the court to "determine whether the arbitration agreement encompasses the claims raised in the complaint." *Stromberg*, 448 F. Supp. 2d at 68 (citing *Nur*, 142 F. Supp. 2d at 51). Under either the FAA or the RUAA, the Court's analysis is the same and requires arbitration where a court finds that "the parties have an enforceable agreement to arbitrate and that the underlying dispute between the parties falls within the scope of the agreement." *Jahanbein v. Ndidi Condominium Unit Owners Ass'n, Inc.*, 85 A.3d 824, 827 (D.C. 2014) (citation and internal quotation marks omitted).

III. Analysis of the Parties' Claims

As noted above, first, Plaintiff challenges the validity of the Arbitration Agreement generally on grounds that Defendants may not <u>enforce</u> the agreement based on his allegations that: (1) Guidehouse Inc. is not a subsidiary or affiliate of PwC and therefore is

not covered by the Arbitration Agreement; and (2) Cirka is no longer a PwC partner, with the effect that she is no longer covered by the Agreement.  Guidehouse Inc. highlights that "Reinhardt's dispute is not over the existence of a written agreement to arbitrate" as he "repeatedly admits that he entered into a valid, enforceable arbitration agreement." Guidehouse Supp., ECF No. 36, at 1-2 (emphasis added) (citing Reinhardt's opposition and his declaration, which both acknowledge that he entered into an Employment Agreement and Arbitration Agreement).  Rather, Plaintiff's "challenge goes to the bounds of contract enforcement by a non-signatory (*i.e.*, Guidehouse Inc.)." *Id.* at 2; *see Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 254-55 (2017) (distinguishing the concept of contract formation, bearing on "initial validity" from the concept of enforcement); *see also Stromberg*, 448 F. Supp. 2d at 68-69 (noting that the validity and enforceability as to a signatory were undisputed, but addressing a challenge to enforcement by a non-signatory).  As a threshold issue, this Court must address a disagreement between the parties as to which state's law applies in determining whether there is an enforceable agreement to arbitrate.

A. Choice of Law

To determine the validity and enforceability of an arbitration agreement, courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944 (1995).  When an agreement is governed by the FAA, such as this one, "federal courts use the conflict of law principles applied by the state in which they sit." *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 87 (D.D.C. 2016) (citing *Aneke v. Am. Express Travel Related Servs., Inc.,* 841 F. Supp. 3d 368, 375 (D.D.C. 2012)).  Accordingly, this Court applies District of Columbia ("D.C.") law in the first

instance to determine which state law should apply in adjudicating Plaintiff's challenges to the Arbitration Agreement. In general, D.C. law holds "'that parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state specified.'" *Ekstrom v. Value Health, Inc.* 68 F. 3d 1391, 1394 (D.C. Cir. 1995) (quoting *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)).

Defendants contend that under this standard, New York law should apply to "govern[ ] the question of whether there is a valid agreement to arbitrate." Guidehouse Mot., ECF No. 7, at 12 n.4. Defendants rely on the choice of law provision in the Arbitration Agreement which "calls for application of New York law, including for purposes of determining contract formation . . . unless otherwise required by the law of the state in which [he] primarily reside[d] and work[ed]." Guidehouse Supp., ECF No. 36, at 3; *see* Arbitration Agreement ¶5. Defendants argue that D.C. law does not require "otherwise," and in fact, "applicable conflict of law principles *support* honoring the agreement's New York choice-of-law provision in assessing Guidehouse Inc.'s capacity for enforcement." Guidehouse Supp., ECF No. 36, at 3 (emphasis in original).

Defendants contend that the "reasonable relationship" requirement from *Aneke, supra.*, is satisfied in this case because –as noted in Plaintiff's Complaint – PwC is headquartered in New York. Guidehouse Supp., ECF No. 36, at 3-4. Guidehouse Inc. explains that "District of Columbia courts routinely find that a state is reasonably connected to the contract where . . . one of the parties to the contract is headquartered in, does business in, or is a resident of that state." *Org. of Chinese Ams., Inc v. Damron*, Civil Action No. 22-178 (BAH), 2023 WL 2301977, at *9 (D.D.C. Mar. 1, 2023) (citations and internal

quotation marks omitted); *see also B&S Glass, Inc. v. Del Metro*, Civil Action No. 20-2769, 2021 WL 3268360, at *5 (D.D.C. July 30, 2021) (Kollar-Kotelly, J.) ("When one party to a contract is based in or has considerable operations in the state specified in a choice-of-law provision, then a 'reasonable relationship' exists.") Plaintiff notes however that "*none* of the Parties maintain either a current primary residence or are headquartered in the State of New York." Pl.'s Supp., ECF No. 35, at 7.[6] Furthermore, "under precedent in New York, the Defendants' favored forum, 'applying the choice of law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.'" *Id.* (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) (internal citation omitted)).

In contrast, Plaintiff argues that D.C. law applies to "the question of whether the parties formed an agreement to arbitrate," Pl.'s Opp'n, ECF No. 32, at 1.[7] More specifically, Plaintiff argues that where there is a conflict between two statutory schemes, the District of Columbia applies a "modified governmental interests" approach that "balance[s] the competing interests of the two jurisdictions and appl[ies] the law of the jurisdiction with the more substantial interest in the resolution of the issue." Pl.'s Supp., ECF No. 35, at 5 (citing *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 366 (D.D.C. 2020) (internal citations omitted)). These interests include: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the parties' domicile, place of incorporation, or

---

[6] The Court notes that PwC was terminated as a defendant in fall of 2024.

[7] Plaintiff agrees that New York law applies to the contracts themselves. Reinhardt Opp'n, ECF No. 32, at 13.

principal place of business. *See Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 864 (D.C. Cir. 2015) (citing Restatement (Second) of Conflicts of Laws § 188(2)(a)-(e) (1988)); *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.,* 129 F.3d 143, 148 (D.C. Cir. 1997); *see Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981) (finding that under the "substantial interest" test, Maryland law applied because both parties were Maryland residents and the agreement concerned property in Maryland).

Plaintiff concludes that in applying the substantial interest test, D.C. law should apply because "the purported agreement is clearly related to Reinhardt's employment in Washington, D.C., Reinhardt is a resident of Washington, D.C., Guidehouse previously maintained a place of business in Washington, D.C., and Cirka was previously employed at a Washington, D.C. location of Guidehouse." Pl.'s Supp., ECF No. 35, at 6 (noting that the "entire employment relationship was centered in Washington, D.C., where Reinhardt entered into the employment contract and where a substantial number of the events occurred"). Defendants argue however that "the factors cited by Reinhardt for application of District of Columbia law . . . are those that typically inform conflict of laws analysis where there is *not* an express choice-of-law provision." Guidehouse Supp., ECF No. 36, at 4 (emphasis in original); *see PCH Mut. Ins. Co. v. Casualty & Surety, Inc.*, 569 F. Supp. 2d 67, 72-73 (D.D.C. 2008) (Kollar-Kotelly, J.) (explaining that the "constructive blending" test applies "where the parties to a contract have not agreed on a choice of law"). "[T]hese are considerations where there is no enforceable choice-of-law provision and more than one jurisdiction has a potential interest in having its law applied." *Org. of Chinese Ams.*, 2023 WL 2301977, at *10.

This Court therefore looks to cases involving motions to compel arbitration where there is a choice-of-law provision in the contested agreement.  In *Samenow v. Citicorp Credit Services*, 253 F. Supp 3d 197, 202 (D.D.C. 2017) (Kollar-Kotelly, J.), the plaintiff brought an action against a credit card company, asserting claims stemming from termination of five credit card accounts, and the defendant company moved to compel arbitration.  The defendant argued that South Dakota law should apply as the arbitration provisions in the credit card agreements called for application of South Dakota law and Defendant's corporate residence was in South Dakota.  This Court noted however that "this line of analysis is flawed in that it presumes the validity of the choice-of-law provision in the Arbitration Agreements, which Plaintiff expressly challenges" as unconscionable, and "the Court would first need to determine whether a valid and enforceable agreement exists, by application of District of Columbia law, before it could enforce the choice-of-law provisions and apply South Dakota law." *Id.; see generally Amirmotazedi v. Viacom, Inc.*, 768 F. Supp. 2d 256, 261 n.2 (D.D.C. 2011) ("in cases such as this where one party is alleging that no contract was formed, it would be premature to enforce the choice of law provision before deciding whether an agreement exists").

Similarly, in a case involving a motion to compel arbitration of an agreement containing a Utah choice-of-law provision, where the plaintiff contested that she consented to the agreement, the Honorable James Boasberg, Chief Judge, noted that "if an agreement did exist, it would have been formed in the District [and] [t]his city is also where Plaintiff resides, where the contract negotiation (if any) would have occurred, and where the contract's performance would take place." *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 87 (D.D.C. 2016). Although the defendant bank was headquartered in Utah, Judge

Boasberg opined that "[g]iven the significant relationship of the parties to the District of Columbia and Defendant's failure to identify any countervailing interests of the state of Utah, the Court concludes that the question whether any agreement — and specifically any agreement to arbitrate — was formed between the parties is governed by D.C. law." *Id.* at 87-88 (noting that under the circumstances therein, there was no presumption that Agreement's choice-of-law provision governed).

Similarly, in the instant case, there is no real argument by Defendants that the parties (currently involved in this lawsuit) or the Arbitration Agreement are connected to New York, and Mr. Reinhardt contests the applicability of the Agreement. Defendants note however that *McMullen* involved a dispute regarding the *existence* of a valid contract as opposed to a dispute [here] regarding whether defendants may enforce the contract. Guidehouse Supp., ECF No. 36, at 4. Accordingly, Defendants attempt to distinguish between whether a choice-of-law clause may be applied before determining that a contract is valid versus before determining that a contract is enforceable.

Given the circumstances of this case, however, this Court need not address whether that distinction is meritorious because "[u]nder District of Columbia choice-of-law principles, the absence of a true conflict compels the application of District of Columbia law by default." *Signature Tech. Solutions. v. Incapsulate, LLC*, 58 F. Supp. 3d 72, 80 (D.D.C. 2014) (internal quotation marks and alterations omitted); *see Fowler v. A&A Co.*, 262 A.2d 344, 348 (D.C. 1970) (defining a "true conflict" as circumstances where "more than one jurisdiction has a potential interest in having its law applied and, if so, whether the <u>law of the competing jurisdictions is different</u>") (emphasis added); *see also Geico v.*

*Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) ("[T]he first step is to determine whether a 'true conflict' exists. . .'")

In the instant case, Defendants acknowledge that "[e]ven if the Court were to apply the District of Columbia's substantive law to resolve Guidehouse Inc.'s ability to enforce the arbitration agreement, the outcome remains the same – Guidehouse Inc. is entitled to enforce the agreement, either as an assignee, or via application of the doctrine of equitable estoppel." Guidehouse Supp., ECF No. 36, at 4-5; *see also* Cirka Reply, ECF No. 11, at 3-4 (arguing that she is a third-party beneficiary under the Arbitration Agreement and incorporating by reference Guidehouse's equitable estoppel argument). A false conflict is one where the laws of the two states are "1) the same; 2) different but would produce the same outcome under the facts of the case; or 3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws." *Greaves v. State Farm Ins. Co.*, 984 F. Supp. 12, 14 (D.D.C. 1997) (Kollar-Kotelly, J.), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998). In the case at bar, Guidehouse Inc. – which "preemptively addressed both New York and District of Columbia law throughout its reply memorandum" (and in its Supplement) – argues that, in applying the law of either jurisdiction, the outcome would be the same. Guidehouse Supp., ECF No. 36, at 5; *see also* Cirka Reply, ECF No. 11, at 3-4 (citing D.C. law in support of its argument about contract enforceability). Upon this Court's review of the law cited, the Court finds no relevant substantive difference in the law. Accordingly, in the absence of a true conflict, this Court proceeds by applying D.C. law, as the Agreement relates to Plaintiff's employment in D.C., and the District of Columbia is where Plaintiff resides,

Guidehouse maintained a place of business, and Ms. Cirka was employed. The Court turns now to the enforceability of the Arbitration Agreement.

B. Is there an enforceable arbitration agreement?

Plaintiff contends that "[a]rbitration is predicated upon the consent of the parties to a dispute, and the determination of whether the parties have consented to arbitrate is a matter to be determined by the court on the basis of contracts between the parties." Pl.'s Opp'n, ECF No. 32, at 18, citing *Bailey v. Fed. Nat'l Mortg. Ass'n*, 209 F.3d 740, 746 (D.C. Cir. 2000) (citation omitted). Defendants argue that, in this case, there is an enforceable agreement to arbitrate insofar as a condition of Mr. Reinhardt's promotion to Director at Guidehouse was that he agreed to be bound by the terms of the Arbitration Agreement, when he signed the Employment Agreement, which attaches the Arbitration Agreement and incorporates by reference. Moltzan Decl. at ¶¶ 4, 12. Defendants contend that "[i]n exchange for entering into the Arbitration Agreement, Reinhardt received valuable consideration – specifically, a promotion to Director, continued employment, and Guidehouse's mutual promise to arbitrate." Guidehouse Mot., ECF No. 30, at 15. The "District of Columbia adheres to the majority position that continued employment may serve as consideration for a new agreement if the employment is at-will." *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 343 (D.D.C. 2011) (Kollar-Kotelly, J.) (citing *Kauffman v. Int'l Bhd. of Teamsters*, 950 A.2d 44, 48 (D.C. 2008)).

Plaintiff argues for a restricted reading of the Arbitration Agreement, relying on the preface to the Agreement, which defines the "Firm" as PwC and its "subsidiaries and affiliates," [including Public Sector], and asserting that only those parties may enforce the

Agreement.  Mr. Reinhardt contends that because [PwC's] Public Sector LLP was sold to

a new owner (who renamed the company Guidehouse LLP), Guidehouse is not a subsidiary

or affiliate of PwC and therefore, it is not covered by the Arbitration Agreement.  In support

of his argument, Plaintiff references the language of the Arbitration Agreement, which

discusses legal disputes that arise between Plaintiff and "PricewaterhouseCoopers LLP

and/or any of its subsidiaries or affiliates." Pl.'s Opp'n, ECF No. 32, at 16.[8]

Mr. Reinhardt proffers that courts look to the plain meaning of the terms. *Id.* "Once

the court has determined that a contractual provision is unambiguous, a court must

"examine the document on its face, giving the language used its plain meaning." *Debnam*

*v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009).   Under traditional rules of contract

interpretation, "the plain and unambiguous meaning of a written agreement is controlling,

in the absence of some clear evidence indicating a contrary intention." *Vogel v. Tenneco*

*Oil Co.*, 465 F.2d 563, 565 (D.C. Cir. 1972).  "Extrinsic evidence of the parties' subjective

intent may be resorted to only if the document is ambiguous." *Interstate Fire & Cas. Co.*

*v. Wash. Hosp. Ctr. Corp.*, 758 F.3d 378, 383 (D.C. Cir. 2014) (quoting *Sears v. Catholic*

*Archdiocese of Washington*, 5 A.3d 653, 661 n.15 (D.C. 2010)). "In determining whether a

contract is ambiguous, we examine the document on its face, giving the language used its

plain meaning, unless, in context, it is evident that the terms used have a . . . specialized

meaning." *Interstate Fire*, 758 F.3d at 383, quoting *Beck v. Cont'l Cas. Co.*, 936 A. 2d

747, 751 (D.C. 2007).   Here, Mr. Reinhardt proffers that the "language of the PwC

---

[8] Mr. Reinhardt contends that "[o]nce Public Sector became an independent company,
this incorporation [of the Arbitration Agreement] became superfluous." Reinhardt Opp'n,
ECF No. 32, at 18.

Arbitration Agreement is unambiguous and does not extend to cover non-subsidiaries (such as Guidehouse Inc.) or former Partners (such as Cirka)." Pl.'s Opp'n, ECF No. 32, at 20.

Plaintiff argues additionally that in the event there is ambiguity, that "ambiguity as to the contract's meaning will be construed strongly against the drafter," which was Public Sector. *Id.* at 21, citing *Dyer v. Bilaal*, 983 A.2d 349, 355; *id.* at 22 (noting that "when the Employment Agreement was drafted, Cirka was a Public Sector Partner and should be deemed to be a drafter of that contract as well . . . [and] [t]hus, any ambiguity present there should be construed against her as well").

Mr. Reinhardt's narrow reading of the coverage of the Arbitration Agreement is premised on his general (and somewhat confusing) assertions that: (1) the dispute resolution provision in the Employment Agreement "merely restates that, at the time of executing the agreement, Public Sector was a subsidiary and/or affiliate of PwC based in the United States"; (2) the Arbitration Agreement is a "stand-alone agreement"; and (3) the Arbitration Agreement's integration clause "prohibits modification by parole evidence." Pl.'s Opp'n, ECF No. 32, at 18 (case citation omitted). The Court finds these assertions unpersuasive. First, the Employment Agreement clearly indicates that dispute resolution is in the form of arbitration, according to the terms and conditions set out in Arbitration Agreement, which is attached to the Employment Agreement and specifically incorporated by reference. Second, in this case, the two agreements are to be read together, as explained below. Third, while the Arbitration Agreement's integration clause [¶ 6] indicates that this is the "parties' entire agreement on the subject matter hereof," this integration clause does not change the fact that the Arbitration Agreement is part and parcel of the Employment Agreement, incorporated by reference and attached thereto. There is nothing in the

"Dispute Resolution" section of the Employment Agreement that is inconsistent with or rebuts the fact that arbitration [as governed by the terms set forth in the Arbitration Agreement] is the means of dispute resolution mentioned in the Employment Agreement. Below, the Court explains why the Arbitration Agreement should not be treated as a stand-alone agreement.

1. The Employment and Arbitration Agreements are to be Read Together

In this case, Guidehouse Inc. argues, and this Court agrees, that under basic rules of contract construction, the Employment Agreement and the Arbitration Agreement must be read together. The parties to the Employment Agreement are Mr. Reinhardt and Public Sector (defined therein as the "Firm"), and in the section dealing with Dispute Resolution, the parties "agree to be bound by the terms of the arbitration agreement attached hereto as Exhibit A, which is incorporated by reference, and which requires [Reinhardt] and the Firm to submit to final and binding arbitration all claims covered under the arbitration agreement." Employment Agreement, Ex. 1 ¶¶16; *see also* Arbitration Agreement, Ex. A ¶1(a) ("**By signing the employment agreement, you have accepted this Agreement, and you and the Firm are bound by its terms.**") (emphasis in original). In its Reply, ECF No. 7, at 12, Guidehouse Inc. asserts that, under District of Columbia law, where, as here, "a contract incorporates another writing, the two must be read together as the contract between the parties." *Tower Ins. Co. of N.Y. v. Davis/Gilford*, 967 F. Supp. 2d 72, 79 (D.D.C. 2013) (quotation omitted) (finding "no ambiguity in the incorporation clause" that expressly incorporated the arbitration provisions into an agreement by reference). Similarly, in this case, the Court finds no ambiguity in the incorporation clause in the

Employment Agreement, and the two Agreements must be read together. The Court turns now to the assignment provision in the Employment Agreement.

2. Assignment of the Right to Arbitrate is Permissible

Guidehouse Inc. notes that Reinhardt does not dispute "that his employment under the Employment Agreement continued uninterrupted and remained valid from the date he signed it (July 5, 2017) through the date of his separation from Guidehouse Inc. (September 23, 2021)" nor does he "challenge [or even mention] the validity of Guidehouse LLP's assignment of the Employment Agreement and Arbitration Agreement to Guidehouse Inc." Guidehouse Reply, ECF No. 7, at 10. It is "well-settled that an assignee of a contract stands in the shoes of the assignor and acquires the same rights and liabilities as if he had been an original party to the contract." *Manganaro Corp. v. Jefferson at Penn Quarter, L.P.,* No. Civ. A. 04-2133 (GK), 2005 WL 3273979, at *3 (D.D.C. Aug. 9, 2005); *see Stromberg,* 448 F. Supp. 2d at 69 ("Because the language of the contract between WGL [the contractor] and TEG [a subcontractor to design the project] contemplates that they may assign their rights under the contract, TEG's argument that the contract does not allow WGL to assign its right to arbitrate is without merit" even where the agreement between WGL and TEG "contains language limiting the obligation of parties to the agreement to arbitrate with non-parties to the agreement[.]")

In *Stromberg,* 448 F. Supp. 2d at 69, the court found that Stromberg – an assignee of WGL – had the same rights as WGL had in its contract with TEG, because an assignee "has the same rights as the assignor, and, as a result, the assignee can enforce those rights by the same remedies available to the assignor." *Id.,* citing *Woodland Ltd. P'ship v. Wulff,*

868 A.2d 860, 863 (D.C. 2005). Accordingly, the "plain language of the contract" did not relieve TEG from an obligation to submit to arbitration. *Stromberg*, 448 F. Supp. 2d at 69.

In this case, Mr. Reinhardt's continued his employment – without executing a new employment agreement with Guidehouse – and his operative Employment Agreement provided that the Agreement "shall be binding upon and inure to the benefit of the Firm's [Public Sector LLP] successors and assigns [such as Guidehouse LLP/Guidehouse Inc.]. Specifically, the Employment Agreement, Ex. A ¶14, specifies that the Firm "may assign its rights and delegate its duties hereunder in whole or in part to any . . . transferee of all or a portion of the assets or business to which the Employment Agreement relates." For non-signatories like Guidehouse Inc., "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quotation omitted). This applies also to "a written arbitration provision [ ] made enforceable against (or for the benefit of) a third party under state contract law." *Id., see also Oehme, van Sweden & Assocs. Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 97 (D.D.C. 2012) ("A nonsignatory to an arbitration agreement may be bound by that agreement under traditional principles of contract and agency law.") (citations omitted).

This Court finds that there is authority under District of Columbia law for Guidehouse Inc. to enforce the Arbitration Agreement as an assignee. "District of Columbia law establishes the general rule that all claims are freely assignable and permits the assignee to stand in the same position as the assignor." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Riggs Nat'l Bank of Wash., D.C.*, 5 F.3d 554, 556 (D.C. Cir. 1993).

Furthermore, in *Stromberg, supra.*, the court applied District of Columbia law in granting the assignee's motion to compel arbitration, finding that "it is 'well-settled that an assignee of a contract stands in the shoes of the assignor and acquires the same rights and liabilities as if he had been an original party to the contract.'" 448 F. Supp. 2d at 68-70 & n.2 (quotation omitted). Accordingly, this Court finds that, as an assignee of the Employment Agreement, Guidehouse Inc. is entitled to enforce the Arbitration Agreement, which is incorporated by reference in the Employment Agreement and made a part thereto.

      3. Equitable Estoppel Also Supports Enforcement of the Arbitration Agreement

      Guidehouse argues that in addition to its right to enforce the Arbitration Agreement in its capacity as an assignee, "the Arbitration Agreement remains enforceable by Guidehouse against Reinhardt under the doctrine of equitable estoppel." Guidehouse Reply, ECF No. 7, at 14; Cirka Reply, ECF No. 11, at 4 (adopting and incorporating by reference Guidehouse's argument on equitable estoppel). "The purpose of the doctrine of equitable estoppel is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from rely[ing] on the contract when it works to [his] advantage [by establishing the claim] and repudiate[ing] it when it works to [his] disadvantage [by requiring arbitration]." *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (internal quotation marks omitted). In this case, Mr. Reinhardt received his salary and benefits pursuant to the Employment Agreement, and he is suing under that Agreement, for breach of contract, but he repudiates the arbitration requirement referenced therein.

      The Supreme Court has explained that "in the arbitration context, equitable estoppel allows a nonsignatory to a written agreement containing an arbitration clause to compel arbitration where a signatory to the written agreement must rely on the terms of that

agreement in asserting its claims against the nonsignatory." *GE Energy Power Conversion Finance SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020). Applying District of Columbia law, "[u]nder the doctrine of estoppel, a non-signatory can compel arbitration with a signatory when the non-signatory is seeking to resolve issues that are intertwined with an agreement that the signatory has signed." *Riley v. BMO Harris Bank, N.A.,* 61 F. Supp. 3d 92, 98-99 (D.D.C. 2014) (Kollar-Kotelly, J.) (internal quotation marks omitted). Furthermore, "the propriety of applying the equitable estoppel doctrine . . . is reinforced" where "there was a relationship among the parties which either supports the conclusion that the signatory had consented to extend the agreement to the non-signatory, or otherwise put, made it inequitable for the signatory to refuse to arbitrate on the ground that it had made no agreement with the non-signatory." *Riley*, 61 F. Supp. 3d at 101 (internal quotation marks and alterations omitted); *id.* at 102 (distinguishing cases in which the non-signatory has no role in performing the underlying agreement).

Guidehouse summarizes the application of equitable estoppel as follows: (1) Mr. Reinhardt admits that throughout his employment with Guidehouse Inc., he was working pursuant to the terms of the Employment Agreement he entered with "Public Sector" (now known as Guidehouse LLP, parent to Guidehouse Inc.), and therefore, he derived benefit from the Agreement; (2) he alleges a breach-of-contract claim against Guidehouse Inc. under that same Employment Agreement; and while he disputes the applicability of the Arbitration Agreement [*i.e.*, attempts to avoid arbitration] (3) D.C. law permits the "express incorporation of the [A]rbitration [A]greement into the [E]mployment [A]greement that Reinhardt now invokes," *Tower Ins. Co. of N.Y.*, 967 F. Supp. 2d at 79. Guidehouse Supp., ECF No. 36, at 7. Accordingly, Guidehouse concludes, and this Court agrees, that it is

entitled also to enforce the Arbitration Agreement under a theory of equitable estoppel. It would be inequitable for Mr. Reinhardt [the signatory] to refuse to arbitrate on grounds that he had made no agreement with Guidehouse Inc. [the non-signatory], when the two had a relationship of employee-employer and the Employment Agreement contains a provision regarding dispute resolution that hinges on arbitration.

      4. Ms. Cirka is a Third-Party Beneficiary under the Arbitration Agreement.

      In addition to the arguments propounded by Guidehouse, which are adopted and incorporated by referent in her Reply, ECF No. 11, at 3, Ms. Cirka asserts that she is entitled to enforce the Arbitration Agreement in her own right "because it expressly covers claims by Reinhardt against Guidehouse employees and she is clearly a third-party beneficiary." *Id..* In *Western Union Telegraph Co. v. Massman Const. Co.*, the court found that:

> One who is not a party to a contract nonetheless may sue to enforce its provisions if the contracting parties intend the third party to benefit directly thereunder . . . We will read the contract as a whole to determine whether the third party's benefit under the contract is intended or incidental. . . Consequently, the absence of the third party's name from the contract is not fatal to his claim, especially when the surrounding circumstances tend to identify the third-party beneficiary.

402 A.2d 1275, 1277 (D.C. 1979) (internal citations omitted); *see also Monument Realty v. Washington Metro. Auth.*, 535 F. Supp. 2d 60, 70 (D.D.C. 2008) (same).

      In this case, the Arbitration Agreement specifically refers to Covered Claims against "any of the Firm's partners . . . employees, or agents," and this supports Ms. Cirka's claim that she is a third-party beneficiary thereunder. Ex. A at ¶ 1.c. Mr. Reinhardt argues that Ms. Cirka is not entitled to enforce the Arbitration Agreement because she is no longer an employee of Guidehouse. Cirka Reply, ECF No. 11, at 3; Pl's Opp'n, ECF No. 32, at 19. Ms. Cirka contests this argument on grounds that "Reinhardt provides no support for this position" and further, that "all of [his] claims against Ms. Cirka directly relate to her

employment, as evidenced by the fact that Reinhardt brings, among other claims, claims of workplace discrimination, harassment, and retaliation against Ms. Cirka." Cirka Reply, ECF No. 11, at 3-4. Moreover, all the claims supposedly occurred while she was a Guidehouse employee, and any "[d]oubts regarding an arbitration provision must be resolved in favor of coverage." *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 97 (D.D.C. 2012) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 103 S. Ct. 927, 951 (1983)). This Court agrees that Ms. Cirka is a third-party beneficiary under the Arbitration Agreement, which covers claims against Guidehouse employees. In this case, there is no dispute that Mr. Reinhardt's claims pertain to events that are alleged to have occurred when Ms. Cirka was a Guidehouse employee. Furthermore, the Court notes that all claims in Plaintiff's [24] First Amended Complaint are alleged against either Guidehouse, individually, or against Guidehouse and Ms. Cirka, jointly, and accordingly, the Court having concluded that the arbitration requirement applies to claims involving Guidehouse, it would be nonsensical to conclude that it does not encompass Ms. Cirka regarding claims involving both Defendants. The Court turns now to whether such claims are "Covered Claims" under the Arbitration Agreement.

C. All Claims are "Covered Claims" under the Arbitration Agreement

As a preliminary matter, The Court notes that – <u>after</u> the parties had already completed briefing on the motions to stay and compel arbitration – Plaintiff was granted leave to amend his Complaint to remove an assault claim and to add a claim for relief under the False Claims Act's anti-retaliation provision (Count IV). Accordingly, the motions to stay and compel arbitration – which preceded the filing of the First Amended Complaint – do not specifically mention the Count IV whistleblower retaliation claim. However, this

claim is addressed in connection with the briefing on Plaintiff's [18] Motion for Leave to Amend, and the Court looks to the parties' arguments there.

The claims at issue in Plaintiff's First Amended Complaint are as follows: (1) gender discrimination, in violation of the D.C. Human Rights Act ("DCHRA") [Count I, both Defendants]; (2) discrimination as a victim of sexual abuse, in violation of the DCHRA [Count II, both]; (3) retaliation, in violation of the DCHRA [Count III, both]; (4) retaliation under the False Claims Act ("FCA") [Count IV, both]; (5) intentional infliction of emotional distress [Count V, both]; (6) breach of contract [Count VI, Guidehouse]; and (7) violation of the D.C. Wage Payment and Collection Law [Count VII, Guidehouse]. As previously noted, the assault claim against Ms. Cirka was dropped by Plaintiff, and accordingly, it need not be addressed herein.

In determining whether the claims asserted by Mr. Reinhardt fall within the scope of the Arbitration Agreement, the Court must decide "whether the arbitration clause is susceptible of an interpretation that covers the dispute." *Parker v. K & L Gates, LLP*, 76 A.3d 859, 867 (D.C. 2013). "If the clause is susceptible to such an interpretation, then the trial court must order arbitration." *Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1996) (citation omitted). "Upon a finding of the existence of an enforceable arbitration clause, a presumption in favor of arbitration attaches," *2200 M. St. LLC v. Mackell*, 940 A.2d 143, 151 (D.C. 2007) (quoting *Lopata v. Coyne*, 735 A.2d 931, 936 (D.C. 1999)). If there is any ambiguity or doubt over whether a claim is covered by the Arbitration Agreement, "any doubts are to be resolved in favor of arbitration." *Jahanbein*, 85 A.3d at 827.

In this case, Mr. Reinhardt does not attempt to rebut Defendants' argument that the DCHRA claims (Counts I-III), the breach of contract claim (Count VI), and the D.C. Wage

Payment claim (Count VII) are covered by the Arbitration Agreement. *See* Arbitration Agreement Arbitration Agrmt, Ex. A ¶1. c. (defining "Covered Claims" as including, "without limitation, claims under . . . state and local wage and hour laws, state and local laws concerning discrimination and retaliation, and any other federal, state and local laws regarding employment, and all amendments thereto, [as well as] claims for breach of contract, . . .") Furthermore, nor does Plaintiff dispute that the retaliation claims [Counts II and IV] are arbitrable "if an enforceable arbitration agreement exists." Pl's Reply in Support of Am. Compl., ECF No. 20, at 3, which this Court has determined to be the case.[9] Accordingly, Plaintiff does not dispute that five of his six claims are employment-related "Covered Claims." Plaintiff does argue however that "[e]ven if certain claims are subject to arbitration, this Court should retain jurisdiction over the others." Pl.'s Opp'n, ECF No. 32, at 22 (citation omitted).

The Court turns now to Plaintiff's claim for intentional infliction of emotional distress ("IIED"), which is the only claim that Plaintiff argues is not a "Covered Claim."

1. Intentional Infliction of Emotion Distress (Count V)

The Arbitration Agreement provides that it "shall apply to all disputes, controversies and claims relating to or arising out of [Mr. Reinhardt's] employment agreement or termination of that agreement, or [his] application for employment, offer of employment, prospective employment or employment . . ., or [his] separation from such employment[.]" Arbitration Agreement, Ex. A ¶1. c. Defendants argue that Plaintiff's IIED

---

[9] Defendants indicate that it is "well-settled that FCA retaliation claims are arbitrable"; *see U.S. ex rel. McBride v. Haliburton Co.*, Civil Action No. 05-828 (HHK), 2007 WL 1954441, at *5 (D.D.C. July 5, 2007) (finding that "employment-related "FCA retaliation claim "must be arbitrated"). Defs.' Resp. to Mot. to Amend, ECF No. 19, at 2 & n.2 (string citing cases from other courts that also support this principle).

claim is covered by the Arbitration Agreement because "[a]ccording to [the] complaint, Guidehouse —as a consulting firm—'built [business] relationship through dinners and drinks,' and it was during these 'dinner[s] and drinks' with Cirka that the alleged instances of purported workplace harassment occurred." Guidehouse Mot., ECF No. 30, at 17; *see* Am. Compl, ECF No. 24 ¶¶ 28-97 (describing the workplace culture and alleged instances of harassment); ¶ 29 (Mr. Reinhardt describing these dinner and drinks with Ms. Cirka as a "regular part of [his] job at Guidehouse").

Defendants proffer that Mr. Reinhardt "tethers his claim for intentional infliction of emotional distress to alleged conduct that occurred during work 'dinner and drinks' with Cirka, [and accordingly,] this too is a "Covered Claim' under the Arbitration Agreement." Guidehouse Mot., ECF No. 30, at 18. Plaintiff notes that Defendants "both concede, as they must, that many of the facts supporting the claims of intentional infliction of emotions distress came from his boss (Cirka), at work events (such as the mandatory dinners and drinks), or the treatment he suffered from his boss and his employer as a result of his status as a victim of sexual abuse." Pl.'s Opp'n, ECF No. 32, at 24. Plaintiff contends, however, that this tort of IIED "necessarily involves conduct that is so outrageous it falls outside any foreseeable employment duties, or actions 'arising out of' Reinhardt's employment." *Id.* Plaintiff argues that because he had no reasonable expectation that he would be subject to IIED as part of his employment, therefore, his "status as a contracted employee did not give rise to this claim," and the IIED claim is not a "Covered Claim." *Id.; see Choharis v. State Farm Fire and Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008) (a breach of contract case

where the court noted that a "cause of action that could be considered a tort independent of contract performance [was] a viable claim.")[10]

The Court does not find Plaintiff's argument to be persuasive. In this case, Plaintiff's IIED claim arises out of his employment relationship with Guidehouse (and Ms. Cirka), insofar as he alleges in his First Amended Complaint, at ¶¶ 2-13, that Guidehouse and Ms. Cirka created a hostile workplace environment in which Plaintiff was sexually harassed, retaliated against for not "playing the game' wrongfully denied a promotion, placed on a performance improvement plan, and eventually terminated. "As a result of Defendants conduct, [Plaintiff] has suffered and continues to suffer harm, including but not limited to financial loss, impairment to his name and reputation, humiliation, psychological harm, emotional distress, pain, and suffering. *Id.* ¶ 164. Accordingly, the Court finds that Plaintiff's IIED claim is predicated on his harassment, discrimination, and retaliation claims, where such claims rely on a common core of facts, and furthermore, Plaintiff's IIED is inseparable from those harassment, discrimination, and retaliation claims, which are all subject to the Arbitration Agreement. *See generally* Guidehouse Reply, ECF No. 7, at 17-18 (pointing to allegations from the Complaint, to illustrate the interrelationship of Plaintiff's claims). Accordingly, this Court finds that Plaintiff's IIED claim may be characterized as a "dispute[s] controvers[y] and claim[] relating to or arising out of" his employment, Arbitration Agreement, Ex. A ¶ 1.c., and it is therefore a "Covered Claim." *See Booker v. Robert Half Int'l*, 315 F. Supp. 2d 94, 98 (D.D.C. 2004) (noting a broad interpretation of the phrase "relating to or arising out of"). Having determined that all

---

[10] Plaintiff cited three cases to support his argument, but the Court notes that they are factually inapposite.

claims asserted by Plaintiff are "Covered Claims" subject to arbitration, the Court turns now to Plaintiff's public policy argument.

D. Public Policy Considerations

Plaintiff argues generally that public policy supports a denial of arbitration that applies broadly to his claims in Counts I, II, III, IV, and V. More specifically, Mr. Reinhardt relies on the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, Pub. L No. 117-90, 136 Stat. 26 (March 3, 2022). Pl.'s Opp'n, ECF No. 32, at 25. Mr. Reinhard acknowledges however that "[t]he Act applies to . . . any and all claims that arose after the Act was signed into law" and further that "most of [his] claims arose before the Act was enacted." *Id.* He asserts however that his "claims continue to accrue." *Id.* Guidehouse contests application of the Act on grounds that, "[Reinhardt] provides no legal support whatsoever for that unsupportable proposition" as his "employment with Guidehouse ended in September 2021, more than five months before enactment of the Act." Guidehouse Reply, ECF No. 7, at 16. The Court finds that the Act is inapplicable to Mr. Reinhardt's claims, and as such, Plaintiff's public policy argument is without merit.

E. Stay of Case during Arbitration

The Court has concluded that Defendants' motions to enforce the Arbitration Agreement shall be granted and the case shall proceed to arbitration, which will encompass all claims asserted by Mr. Reinhardt. "If the court orders arbitration, the court, on just terms, shall stay any judicial proceeding that involves a claim subject to arbitration." D.C. Code § 16-4407(f); *see* 9 U.S.C. § 3 ("[T]he court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until

such arbitration has been had in accordance with the terms of the agreement[.]")

Accordingly, this case will be stayed pending completion of arbitration. A separate Order

accompanies this Memorandum Opinion.

Dated: September 9, 2025

COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE